# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# SCHEDULE 13D

**(Rule 13d-101)**

## INFORMATION TO BE INCLUDED IN STATEMENTS FILED PURSUANT
## TO § 240.13d-1(a) AND AMENDMENTS THERETO FILED PURSUANT TO § 240.13d-2(a)

**Under the Securities Exchange Act of 1934**
**(Amendment No.      )\***

---

# Allergan, Inc.

**(Name of Issuer)**

**COMMON STOCK, $0.01 PAR VALUE**
**(Title of Class of Securities)**

**018490102**
**(CUSIP Number)**

**Valeant Pharmaceuticals International, Inc.**
**Robert R. Chai-Onn**
**2150 St. Elzéar Blvd. West**
**Laval, Quebec**
**Canada, H7L 4A8B**
**(514) 744-6792**

**With a copy to:**

**Alison S. Ressler**
**Sullivan & Cromwell LLP**
**1888 Century Park East**
**Los Angeles, California 90067-1725**
**(310) 712-6600**
**(Name, Address and Telephone Number of Person Authorized to Receive Notices and Communications)**

**April 11, 2014**
**(Date of Event Which Requires Filing of This Statement)**

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§ 240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box.  ☐

**Note.** Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See § 240.13d-7 for other parties to whom copies are to be sent.

\*    The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, *see* the Notes).

CUSIP No. 018490102

| 1. | Name of reporting person<br><br>Valeant Pharmaceuticals International, Inc. | | |
|---|---|---|---|
| 2. | Check the appropriate box if a member of a group (see instructions):<br>(a) ☒    (b) ☐ | | |
| 3. | SEC use only | | |
| 4. | Source of funds (see instructions)<br><br>AF | | |
| 5. | Check if disclosure of legal proceedings is required pursuant to Item 2(d) or 2(e)    ☐ | | |
| 6. | Citizenship or place of organization<br><br>British Columbia, Canada | | |
| Number of shares beneficially owned by each reporting person with | 7. | Sole voting power<br><br>-0- | |
| | 8. | Shared voting power<br><br>28,878,538 | |
| | 9. | Sole dispositive power<br><br>-0- | |
| | 10. | Shared dispositive power<br><br>597,431 | |
| 11. | Aggregate amount beneficially owned by each reporting person<br><br>28,878,538 | | |
| 12. | Check box if the aggregate amount in Row (11) excludes certain shares (see instructions)    ☐ | | |
| 13. | Percent of class represented by amount in Row (11)<br><br>9.7% [1] | | |
| 14. | Type of reporting person (see instructions)<br><br>HC | | |

(1)    This calculation is based on 299,108,984 shares of Common Stock, par value $0.01 per share (the "Common Stock"), of Allergan, Inc. (the "Issuer") outstanding as of March 11, 2014 as reported in the Issuer's definitive proxy statement filed on March 26, 2014.

CUSIP No. 018490102

| | | |
|---|---|---|
| 1. | Name of reporting person<br><br>Valeant Pharmaceuticals International | |
| 2. | Check the appropriate box if a member of a group (see instructions):<br>(a) ☒      (b) ☐ | |
| 3. | SEC use only | |
| 4. | Source of funds (see instructions)<br><br>WC | |
| 5. | Check box if disclosure of legal proceedings is required pursuant to Item 2(d) or 2(e)   ☐ | |
| 6. | Citizenship or place of organization<br><br>Delaware | |

| Number of shares beneficially owned by each reporting person with | 7. | Sole voting power<br><br>-0- |
|---|---|---|
| | 8. | Shared voting power<br><br>28,878,538 |
| | 9. | Sole dispositive power<br><br>-0- |
| | 10. | Shared dispositive power<br><br>597,431 |

| | | |
|---|---|---|
| 11. | Aggregate amount beneficially owned by each reporting person<br><br>28,878,538 | |
| 12. | Check box if the aggregate amount in Row (11) excludes certain shares (see instructions)   ☐ | |
| 13. | Percent of class represented by amount in Row (11)<br><br>9.7% [1] | |
| 14. | Type of reporting person (see instructions)<br><br>CO | |

(1)   This calculation is based on 299,108,984 shares of Common Stock outstanding as of March 11, 2014 as reported in the Issuer's definitive proxy statement filed on March 26, 2014.

**ITEM 1.**        **Security and Issuer.**

This statement on Schedule 13D (this "Schedule 13D") relates to the common stock, par value $0.01 per share (the "Common Stock"), of Allergan, Inc., a Delaware corporation (the "Issuer"). The principal executive offices of the Issuer are located at 2525 Dupont Drive, Irvine, CA 92612.

**ITEM 2.**        **Identity and Background.**

(a) – (c); (f) This Schedule 13D is being filed by Valeant Pharmaceuticals International, Inc., a corporation continued under the laws of British Columbia, Canada ("Valeant"), and Valeant Pharmaceuticals International, a Delaware corporation and a wholly owned subsidiary of Valeant ("Valeant USA" and together with Valeant, the "Reporting Persons"). The Reporting Persons have entered into a joint filing agreement, a copy of which is filed as Exhibit 99.1 hereto.

The Reporting Persons are multinational, specialty pharmaceutical and medical device companies that develop, manufacture, and market a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter products, and medical devices (contact lenses, intraocular lenses, ophthalmic surgical equipment, and aesthetics devices). The address of Valeant's principal business and principal office is 2150 St. Elzéar Blvd. West, Laval, Quebec, Canada, H7L 4A8B, and the address of Valeant USA's principal business and principal office is 700 Route 202/206 North Bridgewater, New Jersey 08807.

The name, business address, present principal occupation or employment and the name, principal business and address of any corporation or other organization in which such employment is conducted and citizenship of each of the directors and executive officers of Valeant and Valeant USA is set forth in Schedule I hereto incorporated herein by reference.

(d) – (e) None of the Reporting Persons or, to the knowledge of the Reporting Persons, any of the other persons identified in this Item 2 has, during the last five years, been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

**ITEM 3.**        **Source and Amount of Funds or Other Consideration.**

Pursuant to the agreements described in Item 6 below, Valeant USA contributed $75.9 million of its working capital to PS Fund 1, LLC ("PS Fund 1"), a company formed by Pershing Square. Pershing Square has informed the Reporting Persons that PS Fund 1 used those funds, together with funds contributed by Pershing Square, to purchase the securities that are the subject of this Schedule 13D. As used herein, "Pershing Square" means Pershing Square Capital Management, L.P. and its affiliates.

**ITEM 4.**        **Purpose of Transaction.**

Valeant currently intends to propose a merger in which the Issuer's shareholders will receive a combination of cash and Valeant common shares. Valeant has not yet determined the amount of cash and number of Valeant common shares it will offer, but it currently expects the cash component will total around $15 billion. Barclays and Royal Bank of Canada have indicated they are prepared to deliver financing commitments covering the cash portion of the transaction at the time Valeant makes an offer.

Although Valeant currently expects to make an offer, it is under no obligation and provides no assurance it will do so. If Valeant fails to make an offer before May 2, 2014, Pershing Square will have the right to terminate the letter agreement described in Item 6 below and wind up PS Fund 1.

In the course of pursuing a combination with the Issuer or otherwise, the Reporting Persons may consider, propose or take one or more of the actions described in subsections (a) through (j) of Item 4 of Schedule 13D.

**ITEM 5.**     **Interest in Securities of the Issuer.**

Percentage interests in shares of Common Stock reported in this Schedule 13D are based on 299,108,984 shares of Common Stock outstanding as of March 11, 2014 as reported in the Issuer's definitive proxy statement filed on March 26, 2014. As a result of the agreements described in Item 6 below, the Reporting Persons may be deemed members of a "group" (within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended) with Pershing Square. The Reporting Persons are responsible for the completeness and accuracy of the information concerning the Reporting Persons contained herein, but are not responsible for the completeness and accuracy of the information concerning Pershing Square.

(a) Neither Reporting Person directly owns any securities of the Issuer. However, as a result of the agreements described in Item 6 below, the Reporting Persons may be deemed to beneficially own securities of the Issuer beneficially owned by Pershing Square. Each Reporting Person disclaims beneficial ownership in the shares of Common Stock reported herein except to the extent it exercises voting or dispositive power with respect to those shares.

Pershing Square has informed the Reporting Persons that it beneficially owns 28,878,538 shares of Common Stock, or 9.7% of the outstanding shares of Common Stock. These shares include 597,431 shares that PS Fund 1 owns directly, 3,450,000 shares of Common Stock underlying forward purchase contracts and an additional 24,831,107 shares that PS Fund 1 has the right to acquire under American-style call options.

(b) As a result of the agreements described in Item 6 below, the Reporting Persons may be deemed to share the power to vote or direct the vote of all shares owned by PS Fund 1, and may be deemed to share the power to dispose or direct the disposition of 597,431 shares of Common Stock owned by PS Fund 1. Each Reporting Person disclaims shared power to vote or direct the vote of any shares of Common Stock except to the extent it exercises voting power with respect to those shares, and each Reporting Person disclaims shared power to dispose or direct the disposition of any shares of Common Stock except to the extent it exercises dispositive power with respect to those shares.

(c) No transactions in shares of Common Stock or options or other derivatives relating to shares of Common Stock were effected by the Reporting Persons or, to the knowledge of the Reporting Persons, any of the other persons named in Item 2 above during the sixty days prior to the date of this Schedule 13D. Pershing Square has informed the Reporting Persons that Exhibit 99.2 (supplied by Pershing Square) describes all transactions in shares of Common Stock and options or other derivatives relating to shares of Common Stock effected by Pershing Square in the past 60 days.

(d) To the knowledge of the Reporting Persons and except for the respective rights and interests of Valeant USA and Pershing Square in PS Fund 1, no person other than PS Fund 1 is known to have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the securities reported in this Item 5.

(e) Not applicable.

**ITEM 6.      Contracts, Arrangements, Understandings or Relationships With Respect to Securities of the Issuer.**

On February 25, 2014, Valeant and Pershing Square entered into a letter agreement pursuant to which, among other things, the parties agreed that:

- Valeant and Pershing Square will become members in a newly formed jointly owned entity (which thereafter became known as PS Fund 1) and that entity will be the exclusive entity through which Pershing Square will acquire Issuer equity,

- Valeant will contribute $75.9 million to the entity, Pershing Square will contribute in its discretion additional amounts to the entity and the entity will purchase equity in the Issuer,

- Valeant will not, while Valeant, Pershing Square and/or the entity may be a group, acquire beneficial ownership of Issuer equity, except in a business combination transaction with the Issuer or as a result of transactions by Pershing Square, the entity or any of their respective affiliates,

- the entity will dissolve following the earliest to occur of several events, including the consummation of a business combination transaction with the Issuer or at such time that Valeant informs Pershing Square or the Issuer that is no longer interested in pursuing a business combination transaction with the Issuer,

- income, gain and loss on $75.9 million in value of shares of Common Stock purchased by the entity will be allocated to Valeant and the remaining net profit realized by the entity will be allocated to Pershing Square, except that Valeant will have a right to 15% of the net profits otherwise allocable to Pershing Square if, before dissolution and at a time when a Valeant business combination proposal for the Issuer is outstanding, a proposal for a third party business combination with the Issuer is outstanding or made,

- Valeant will consult with Pershing Square before making any material decisions relating to a business combination with the Issuer,

- Pershing Square will direct the management of the entity (including the manner and timing of purchases and sales of Issuer equity) and will generally decide how the entity votes any securities it owns, except that until the Termination Time (as defined in the letter agreement) the entity will vote all of its shares of Common Stock in favor of a proposal by Valeant to acquire the Issuer and other proposals supported by Valeant and

against proposals reasonably likely to impair the ability of Valeant to consummate a business combination with the Issuer, and, subject to limited exceptions, will not sell or otherwise reduce its economic ownership in Issuer equity,

- at the election of Valeant, immediately prior to consummation of a Valeant business combination with the Issuer, Pershing Square will purchase for $400 million Valeant common shares at a per share price reflecting a 15% discount to the then current market price,

- if Valeant and the Issuer consummate a business combination transaction that permits stockholders of the Issuer to elect to receive Valeant common shares, Pershing Square will cause the entity to elect to receive Valeant common shares for all shares of Common Stock over which it controls that election, and

- if Valeant and the Issuer consummate a business combination transaction, Pershing Square will, on the date of consummation, hold Valeant common shares with a then current value of at least $1.5 billion and, for a period of at least one year after that consummation, it will not sell Valeant common shares unless, after giving effect to the sale, it continues to own at least $1.5 billion in value of Valeant common shares (and during that one year period it will not hedge its investment in that minimum number of shares).

Pershing Square formed PS Fund 1 and, pursuant to and in accordance with the letter agreement, Valeant USA and Pershing Square entered into an amended and restated limited liability company agreement of PS Fund 1 that generally reflected the understandings set forth in the letter agreement. The foregoing summary of the letter agreement and the amended and restated limited liability company agreement is qualified in its entirety by reference to the actual language of those agreements, which are filed as Exhibits 99.3 and 99.4 and incorporated herein by reference.

Except as described herein, none of the Reporting Persons or, to the knowledge of the Reporting Persons, any of the other persons identified in Item 2 above has any contracts, arrangements, understandings or relationships (legal or otherwise) with respect to any securities of the Issuer.

**ITEM 7.**      **Material to be Filed as Exhibits.**

Exhibit 99.1 – Joint filing agreement, dated April 21, 2014.

Exhibit 99.2 – Trading data for PS Fund 1 (supplied by Pershing Square).

Exhibit 99.3 – Letter Agreement, dated as of February 25, 2014, between Pershing Square Capital Management, L.P. and Valeant Pharmaceuticals International, Inc.

Exhibit 99.4 – Amended and Restated Limited Liability Company Agreement of PS Fund 1, dated as of April 3, 2014.



**SIGNATURE**

After reasonable inquiry and to the best of our knowledge and belief, we certify that the information set forth in this Schedule 13D is true, complete and correct.

Dated: April 21, 2014

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**

By: _____ /s/ Robert R. Chai-Onn
     Name:             Robert R. Chai-Onn
     Title:  Executive Vice President, General Counsel and Chief Legal Officer, Head of Corporate and Business Development

**VALEANT PHARMACEUTICALS INTERNATIONAL**

By: _____ /s/ Robert R. Chai-Onn
     Name:             Robert R. Chai-Onn
     Title:  Executive Vice President, General Counsel and Corporate Secretary

Exhibit E, Page 410

**SCHEDULE I**[1]

**Board of Directors of Valeant**

| Name | Citizenship | Principal Occupation or Employment and Name, Principal Business and Address of Employer |
| --- | --- | --- |
| J. Michael Pearson | Canada | Chairman of the Board and Chief Executive Officer of Valeant |
| G. Mason Morfit | U.S.A. | President, ValueAct Capital |
| Katharine B. Stevenson | Canada | Corporate Director |
| Lloyd Segal | Canada | Equity Partner, Persistence Capital Partners |
| Norma A. Provencio | U.S.A. | President and Owner, Provencio Advisory Services Inc. |
| Robert A. Ingram | U.S.A. | General Partner, Hatteras Venture Partners |
| Robert N. Power | U.S.A. | Corporate Director |
| Theo Melas-Kyriazi | Greece | Chief Financial Officer, Levitronix LLC |
| Ronald H. Farmer | Canada | Managing Director of Mosaic Capital Partners |
| Howard B. Schiller | U.S.A. | Executive Vice President and Chief Financial Officer of Valeant |
| Fred Hassan | U.S.A. | Partner and Managing Director, Warburg Pincus |

**Board of Directors of Valeant USA not already listed above**

| Name | Citizenship | Principal Occupation or Employment and Name, Principal Business and Address of Employer |
| --- | --- | --- |
| Robert R. Chai-Onn | U.S.A. | Executive Vice President, General Counsel and Chief Legal Officer, Head of Corporate and Business Development of Valeant |

---

[1] The business address of each individual listed in this Schedule I is c/o Valeant Pharmaceuticals International, Inc., 2150 St. Elzéar Blvd. West, Laval, Quebec, Canada, H7L 4A8B.

**Executive Officers of Valeant not already listed above**

| Name | Citizenship | Principal Occupation or Employment |
|---|---|---|
| Brian M. Stolz | U.S.A. | Executive Vice President of Administration and Chief Human Capital Officer |
| Dr. Ari S. Kellen | U.S.A. | Executive Vice President/Company Group Chairman |
| Ryan H. Weldon | U.S.A. | Executive Vice President/Company Group Chairman |
| Laizer D. Kornwasser | U.S.A. | Executive Vice President/Company Group Chairman |
| Dr. Pavel Mirovsky | Czech Republic | President and General Manager, Europe |

**Executive Officers of Valeant USA not already listed above**

| Name | Citizenship | Principal Occupation or Employment |
|---|---|---|
| Jeremy M. Lipshy | U.S.A. | Senior Vice President, Tax |
| Linda LaGorga | U.S.A. | Senior Vice President & Treasurer |

**EXHIBIT INDEX**

<u>Exhibit</u>                                                        <u>Document Description</u>

99.1          Joint filing agreement, dated April 21, 2014.

99.2          Trading data for PS Fund 1 (supplied by Pershing Square).

99.3          Letter agreement, dated February 25, 2014, between Valeant Pharmaceuticals International, Inc. and Pershing Square Capital
              Management, L.P.

99.4          Amended and Restated Limited Liability Company Agreement of PS Fund 1, dated as of April 3, 2014.

**EXHIBIT 99.1**

In accordance with Rule 13d–1(k)(1) under the Securities Exchange Act of 1934, as amended, the undersigned agree that the statement to which this Exhibit is attached is (and any amendments thereto will be) filed on behalf of each of them.

Dated: April 21, 2014

**VALEANT PHARMACEUTICALS INTERNATIONAL, INC.**

By: _____ /s/ Robert R. Chai-Onn
    Name:           Robert R. Chai-Onn
    Title:  Executive Vice President, General Counsel and Chief Legal Officer, Head of Corporate and Business Development

**VALEANT PHARMACEUTICALS INTERNATIONAL**

By: _____ /s/ Robert R. Chai-Onn
    Name:           Robert R. Chai-Onn
    Title:  Executive Vice President, General Counsel and Corporate Secretary

CUSIP No. 018490102                                  13D                                  Page 14

**Exhibit 99.2**

**TRADING DATA**

| Name | Trade Date | Buy/Sell | No. of Shares / Quantity | Unit Cost | Strike Price | Trade Amount | Security | Expiration Date |
|------|-----------|----------|--------------------------|-----------|--------------|--------------|----------|-----------------|
| PS Fund 1, LLC | February 25, 2014 | Buy | 174,636 | $ 125.16 | N/A | $ 21,858,175 | Common Stock | N/A |
| PS Fund 1, LLC | February 26, 2014 | Buy | 422,795 | $ 127.83 | N/A | $ 54,047,745 | Common Stock | N/A |
| PS Fund 1, LLC | March 3, 2014 | Buy | 1,239,000 | $ 127.68 | $ 1.27 | $ 158,199,424 | OTC Call Option | March 4, 2015 |
| PS Fund 1, LLC | March 6, 2014 | Buy | 863,000 | $ 129.06 | $ 1.29 | $ 111,382,405 | OTC Call Option | March 9, 2015 |
| PS Fund 1, LLC | March 11, 2014 | Buy | 779,000 | $ 128.58 | $ 1.28 | $ 100,165,612 | OTC Call Option | March 12, 2015 |
| PS Fund 1, LLC | March 14, 2014 | Buy | 1,416,000 | $ 128.90 | $ 1.28 | $ 182,527,498 | OTC Call Option | March 16, 2015 |
| PS Fund 1, LLC | March 19, 2014 | Buy | 1,353,000 | $ 131.42 | $ 1.31 | $ 177,816,131 | OTC Call Option | March 20, 2015 |
| PS Fund 1, LLC | March 24, 2014 | Buy | 2,130,000 | $ 128.61 | $ 1.28 | $ 273,944,412 | OTC Call Option | March 25, 2015 |
| PS Fund 1, LLC | March 27, 2014 | Buy | 2,578,000 | $ 123.60 | $ 1.23 | $ 318,646,987 | OTC Call Option | March 30, 2015 |
| PS Fund 1, LLC | April 1, 2014 | Buy | 1,733,000 | $ 123.55 | $ 1.23 | $ 214,115,963 | OTC Call Option | April 2, 2015 |
| PS Fund 1, LLC | April 4, 2014 | Buy | 1,046,000 | $ 125.56 | $ 1.25 | $ 131,335,969 | OTC Call Option | April 6, 2015 |
| PS Fund 1, LLC | April 8, 2014 | Buy | 1,191,107 | $ 121.94 | $ 1.21 | $ 145,238,585 | OTC Call Option | April 9, 2015 |
| PS Fund 1, LLC | April 11, 2014 | Buy | 2,523,000 | $ 120.66 | $ 1.20 | $ 304,426,946 | OTC Call Option | April 13, 2015 |
| PS Fund 1, LLC | April 14, 2014 | Buy | 2,184,000 | $ 123.65 | $ 1.23 | $ 270,057,278 | OTC Call Option | April 15, 2015 |
| PS Fund 1, LLC | April 15, 2014 | Buy | 1,843,000 | $ 126.02 | $ 1.26 | $ 232,258,730 | OTC Call Option | April 16, 2015 |
| PS Fund 1, LLC | April 16, 2014 | Buy | 2,233,000 | $ 130.45 | $ 1.30 | $ 291,294,180 | OTC Call Option | April 17, 2015 |
| PS Fund 1, LLC | April 17, 2014 | Buy | 1,720,000 | $ 134.01 | $ 1.33 | $ 230,503,908 | OTC Call Option | April 20, 2015 |
| PS Fund 1, LLC | April 21, 2014 | Buy | 3,450,000 | $ 140.37 | N/A | N/A | OTC Equity Forward | April 22, 2015 |

Exhibit 99.3

EXECUTION VERSION

CONFIDENTIAL

February 25, 2014

Pershing Square Capital Management, L.P.
888 Seventh Avenue, 42nd Floor
New York, New York 10019
Attention: William A. Ackman

Mr. Ackman:

      Reference is made to that certain letter agreement, dated as of February 9, 2014 (the "Confidentiality Agreement"), between Pershing Square Capital Management, L.P. (together with its controlled affiliates, and including any successor thereto, "you" or "Pershing Square") and Valeant Pharmaceuticals International, Inc. (together with its controlled affiliates, and including any successor thereto, the "Company") executed in connection with a potential transaction related to Allergan, Inc. ("Allergan"). Capitalized terms used herein but not defined herein shall have the meanings given to such terms in the Confidentiality Agreement.

      1.    Formation of Co-Bidder Entity; Acquisition of Allergan Equity.

      (a) Pershing Square and the Company will, promptly following the date of this letter agreement, become members in a newly formed jointly owned entity (the "Co-Bidder Entity") that will be governed in accordance with the terms of this letter agreement and other customary provisions, which shall purchase Allergan Equity, including the purchase of $75.9 million in value of shares of Allergan Common Stock whose gain or loss will be allocated to the Company (the "Company Allocated Shares") and additional shares of Allergan Common Stock subject to the next sentence and the last sentence of this paragraph. The Co-Bidder Entity shall not purchase any Allergan Equity in a manner that triggers a requirement to file a Notification and Report Form (the "HSR Form") under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or a Statement on Schedule 13D with respect to Allergan Common Stock (the "Schedule 13D") without the Company's prior consent. If the Company shall not have provided such consent within 30 days after receipt of a written request from Pershing Square, Pershing Square may terminate this letter agreement and dissolve the Co-Bidder Entity.

The Company will contribute the $75.9 million to the Co-Bidder Entity in immediately available funds on the second Business Day following the earlier of (x) the 60th day after the date hereof and (y) the date upon which Pershing Square provides notice that the Co-Bidder Entity owns Allergan Equity (including derivatives convertible into Allergan Common Stock) representing beneficial or economic ownership of 4% of the outstanding Allergan Common Stock. The number of Company Allocated Shares shall be equal to (i) $75.9 million divided by (ii) the weighted average price per share of Allergan Common Stock paid by the Co-Bidder Entity for Allergan Common Stock between the date of formation of the Co-Bidder Entity through and including the earlier of (x) and (y) above. Pershing Square shall make such other contributions to the Co-Bidder Entity from time to time in its discretion as may be required to purchase the Allergan Equity it decides that the Co-Bidder Entity should acquire.

(b) On the date the Schedule 13D is filed by the Co-Bidder Entity or Pershing Square, as applicable, related to Allergan (the "Disclosure Date") or as promptly as possible thereafter, Pershing Square shall cause the Co-Bidder Entity to file an HSR Form and to use its commercially reasonable efforts to promptly cause the expiration or termination of any waiting period thereunder.

(c) Pershing Square agrees that the Co-Bidder Entity will be the exclusive person or entity through which Pershing Square, or any of its affiliates, shall become the beneficial owner of Allergan Equity and that, at the Company's request, it will update the Company with respect to any purchases or other transactions of Allergan Equity by the Co-Bidder Entity.

(d) Prior to making any material decision relating to a Company Transaction (including, for the avoidance of doubt, any proxy contest, proxy solicitation, written consent solicitation or other action relating to or potentially affecting the composition of the board of directors of Allergan), the Company will consult with Pershing Square and will consider in good faith Pershing Square's comments on such prospective actions; provided that the parties acknowledge that no steps have been taken towards a tender or exchange offer for securities of Allergan and the parties agree that the consent of both Pershing Square and the Company shall be required for launching such a tender offer or an exchange offer. If a Company Transaction is being pursued by the Company through a tender or exchange offer or a merger or any related proxy or other solicitation prior to the Termination Time, each of the Company, Pershing Square and the Co-Bidder Entity will be identified as co-bidders or soliciting persons, respectively.

(e) Pershing Square will direct the management of the Co-Bidder Entity, including, subject to this Section 1 and Section 4(b), the manner and timing of purchases and sales of Allergan Equity, and any vote with respect to the Allergan Equity, it being understood that, until the Termination Time, the Co-Bidder Entity will vote all of its shares of Allergan Common Stock (i) in favor of a Qualifying Transaction Proposal and other proposals supported by the Company and (ii) against any proposal which would be reasonably likely to impair the ability to consummate the Company Transaction.

2

2.   <u>Acquisition Financing and Post-Acquisition Matters</u>.

(a) Immediately prior to the consummation of a Company Transaction, at the Company's election, Pershing Square shall contribute to the funding of the consideration payable under the Company Transaction through the payment to the Company's designated wholly owned merger subsidiary of $400,000,000 in immediately available funds, and the Company shall cause to be delivered to Pershing Square, the number of common shares, no par value, of the Company ("<u>Company Common Shares</u>") equal to (i) $400,000,000 <u>divided</u> by (ii) a price per Company Common Share equal to the market price for purposes of the Toronto Stock Exchange requirements on the date of exercise of the Company's election, less a discount of 15 percent, provided that the Company shall have received all necessary governmental, regulatory and stockholder approvals in connection with such contribution.

(b) If a Company Transaction is consummated that permits the shareholders of Allergan to elect to receive consideration in the form of either cash or Company Common Shares in respect of their Allergan Common Stock, Pershing Square will cause the Co-Bidder Entity to elect to receive Company Common Shares for all the Allergan Common Stock over which it controls such election.

(c) If a Company Transaction is consummated, as of the date of consummation of the Company Transaction, Pershing Square will, directly or indirectly, hold a number of Company Common Shares equal to at least $1.5 billion divided by the Market Price of the Company Common Shares on the date of such consummation. Thereafter, for a period of one year following the consummation of the Company Transaction, Pershing Square will not, directly or indirectly, sell or transfer or otherwise dispose of any Company Common Shares which it beneficially owns or any economic interest therein unless, after giving effect to such disposition, and calculated at the time of such disposition, its investment in the Company Common Shares is no less than the number of Company Common Shares equal to $1.5 billion divided by the Market Price of the Company Common Shares on the date of such disposition, and, during such one-year period, Pershing Square will not, directly or indirectly, hedge its investment in such minimum number of Company Common Shares. As used herein, "<u>Market Price</u>" of Company Common Shares on any day means the average of the volume weighted average prices of the Company Common Shares on the New York Stock Exchange on each of the five trading days preceding such day. The Company and Pershing Square shall enter into a mutually acceptable registration rights agreement that provides reasonable and customary demand registration rights, at the Company's expense, with respect to all of Pershing Square's share holdings in the Company.

(d) The Company agrees that, except as expressly provided by this letter agreement, at any time during which the Company and Pershing Square and/or the Co-Bidder Entity may be deemed a group (within the meaning of Section 13(d)(3) of the Exchange Act), it shall not, and shall cause its Representatives and affiliates not to, acquire beneficial ownership (within the meaning of Section 13(d)(1) of the Exchange

3

Act) of Allergan Equity, except as a result of the consummation of a Company Transaction or as a result of transactions by Pershing Square, the Co-Bidder Entity or any of their respective affiliates.

(e) Except as otherwise expressly set forth in this letter agreement, all costs and expenses incurred in connection with this letter agreement and the transactions contemplated hereby shall be borne by the party incurring such cost or expense.

3.    <u>Dissolution and Profit Sharing</u>.

(a) The Co-Bidder Entity shall dissolve at the earliest of (i) the parties' mutual agreement to dissolve the Co-Bidder Entity, (ii) the consummation of a Company Transaction, (iii) the Company's election, by written notice to Pershing Square, following the closing of a Third Party Transaction, (iv) the sale by the Co-Bidder Entity of all of the Allergan Equity owned by it following the Disclosure Date, (v) the termination of this letter agreement pursuant to Section 1, and (vi) the termination of this letter agreement as a result of the Termination Time occurring pursuant to Section 5(a), 5(b) or 5(c) (the "<u>Dissolution Date</u>"), at which time (A) the Co-Bidder Entity's assets shall be valued (with publicly traded securities valued based on the closing price of the securities on the first business day prior to the Dissolution Date), (B) there shall be allocated to the Company's capital account, all of the income, gains and losses on the Company Allocated Shares and, if prior to the Dissolution Date a Company Transaction shall not have been consummated and a Third Party Transaction Proposal is made or outstanding at a time when a Qualifying Transaction Proposal or any other acquisition proposal by the Company is outstanding, an amount equal to 15% of the Net Transaction Profits in respect of Allergan Equity other than the Company Allocated Shares, and (C) the Co-Bidder Entity shall thereupon liquidate and distribute its remaining assets pro rata in accordance with its capital accounts within ten (10) calendar days after the Dissolution Date (it being understood that the Co-Bidder Entity will distribute 15% of the Net Transaction Profits to the Company in cash and/or securities in the same form and in the same proportion that it owns and that there will be no distributions from the Co-Bidder Entity prior to the Dissolution Date).

(b) For the avoidance of doubt, if there is a business combination that is consummated involving Allergan and the Company, the Company shall not be entitled to an allocation of any Net Transaction Profits other than those arising from the Company Allocated Shares.

(c) The Co-Bidder Entity shall not enter into a transaction involving any person or entity affiliated with Pershing Square with a view to avoiding or minimizing the making of any payment required to be made under this Section 3.

4.    <u>Securities Matters</u>.

(a) Notwithstanding anything in Section 2 of the Confidentiality Agreement to the contrary and subject to the provisions of this letter agreement, the Company hereby consents to the purchase of, and other transactions in or relating to, the Allergan Equity by the Co-Bidder Entity, whether directly or indirectly.

(b) Subject to Section 5 below, other than (i) converting derivative positions into Allergan Common Stock, (ii) in a Company Transaction, (iii) with the written consent of the Company, (iv) subject to Section 2(c), after a vote by the shareholders of Allergan on a Company Transaction, or (v) prior to the earlier of (A) the making of a Qualified Transaction Proposal and (B) ten (10) calendar days before the Disclosure Date, the Co-Bidder Entity may not sell or otherwise reduce its economic ownership in Allergan Equity.

4

5.    <u>Termination of Certain Rights and Obligations</u>.

The rights and obligations under Sections 1(b), 1(c), 1(d), 2(a), 2(b), 2(c) and 4(b) shall terminate upon the earliest of (such time being the "<u>Termination Time</u>"):

(a) such time as the Company shall have informed Pershing Square or the Target that it is not interested in consummating a Company Transaction (and the Company shall promptly notify Pershing Square of such determination);

(b) at election of either party, following the expiration of ten (10) calendar days after the Disclosure Date, if a Qualifying Transaction Proposal shall not have been made by such time or, if made, the time at which such acquisition proposal shall have been withdrawn or abandoned by the Company;

(c) at election of either party, following the expiration of twelve (12) months from the date hereof, if a definitive agreement providing for a Company Transaction shall not have been entered into by the Company and Allergan by such time or, if entered into, the time at which such definitive agreement shall have been terminated or abandoned by the Company;

(d) forty-five (45) calendar days after a merger or other business combination agreement is entered into that is a Third Party Transaction Proposal if a Company Superior Proposal with respect to such Third Party Transaction Proposal has not been made before such time or, if made, the time at which such Company Superior Proposal shall have been withdrawn or abandoned;

(e) five (5) Business Days prior to the stated expiration date (including any extension thereof) of a tender offer or exchange offer that is a Third Party Transaction Proposal if a Company Superior Proposal with respect to such Third Party Transaction Proposal has not been made before such time or, if made, the time at which such Company Superior Proposal shall have been withdrawn or abandoned; provided that it is reasonably expected that such tender offer or exchange offer will be closed and shares accepted for payment on such expiration date; and

(f) forty-five (45) calendar days after a Third Party Transaction Proposal is made if a Company Superior Proposal with respect to such Third Party Transaction Proposal has not been made before such time or, if made, the time at which such Company Superior Proposal shall have been withdrawn or abandoned.

6.    <u>Definitions</u>.

(a) "<u>Allergan Common Stock</u>" means shares of common stock, par value $0.01 per share, of Allergan.

(b) "Allergan <u>Equity</u>" means Allergan Common Stock and/or derivative instruments which derive their value from Allergan Common Stock.

(c) The terms "<u>beneficial owner</u>", "<u>beneficial ownership</u>", and "<u>beneficially own</u>" with respect to securities will be deemed to have the meaning that such terms would have under Section 13 of the Exchange Act and the rules or regulations thereunder.

(d) The term "<u>business day</u>" means Monday through Friday of each week, except a legal holiday recognized as such by the United States federal government or the Canadian federal government or any day on which banking institutions in the State of New York are authorized or obligated to close.

(e) "<u>Company Superior Proposal</u>" means a publicly announced offer by the Company to consummate a Company Transaction at a price and on terms that are equal to or more favorable to the shareholders of Allergan from a financial point of view than any Third Party Transaction Proposal then outstanding.

(f) "<u>Company Transaction</u>" means an acquisition of all or substantially all of the Allergan Common Stock or all or substantially all of the assets of Allergan or a similar business combination with Allergan by the Company or an affiliate of the Company.

(g) "<u>Net Transaction Profits</u>" means an amount (not less than zero) equal to the net profits (after deducting any third party expenses for commissions and fees and expenses in respect of financing and derivatives, but, for the avoidance of doubt, without deducting for legal, investment banking or other advisory fees incurred by Pershing Square, which will be paid by Pershing Square) (if any) that would be realized by the Co-Bidder Entity with respect to its Allergan Equity (other than the Company Allocated Shares) if it sold all of its assets for amounts based on the valuation specified in Section 3 together with any income paid with respect to such Allergan Equity after the date of acquisition by the Co-Bidder Entity and prior to the Dissolution Date; provided that Net Transaction Profits shall be adjusted as required to give effect to dividends, spin-offs, stock splits and other similar events between the Dissolution Date and the date of distribution of the Net Transaction Profits.

6

(h) "<u>Qualifying Transaction Proposal</u>" means a publicly announced offer by the Company for a Company Transaction.

(i) "<u>Third Party Transaction</u>" means an acquisition of at least a majority of the Allergan Common Stock or all or substantially all of the assets of Allergan or a similar business combination with Allergan by a person other than the Company or an affiliate of the Company.

(j) "<u>Third Party Transaction Proposal</u>" means a publicly announced offer by a person other than the Company or an affiliate of the Company to consummate a Third Party Transaction at a price and on terms that are more favorable to the shareholders of Allergan from a financial point of view than any Qualifying Transaction Proposal or Company Superior Proposal then outstanding, if any.

   7.   <u>Miscellaneous</u>.

   (a) It is understood and agreed that, unless and until the Company has entered into a definitive agreement with Allergan with respect to a Company Transaction, if any, the Company does not intend to be, nor shall it be, under any legal obligation of any kind whatsoever with respect to a Company Transaction.

   (b) This letter agreement shall become effective as of the date hereof.

   (c) This letter agreement shall not constitute an amendment, modification or waiver of any provision of the Confidentiality Agreement not expressly referred to herein. Except as expressly provided in this letter agreement, the provisions of the Confidentiality Agreement are and shall remain in full force and effect.

   (d) It is agreed that no failure or delay by Pershing Square or the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

   (e) All references to "dollars" or "$" herein refer to United States dollars.

   (f) Sections 5(a), (c), (d), (e), (f), (g), (h) and (i) of the Confidentiality Agreement shall apply to this letter agreement, *mutatis mutandis*.

   (g) This letter agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same letter agreement.

[The next page is the signature page]

7

If you are in agreement with the foregoing, please so indicate by signing and returning one copy of this letter agreement, whereupon this letter agreement will constitute our agreement with respect to the subject matter hereof.

Very truly yours,

VALEANT PHARMACEUTICALS INTERNATIONAL, INC.

By            /s/ J. Michael Pearson
     Name:       J. Michael Pearson
     Title:       Chairman and Chief Executive Officer

CONFIRMED AND AGREED TO:

PERSHING SQUARE CAPITAL MANAGEMENT, L.P.
By: PS Management GP, LLC, its General Partner

By /s/ William A. Ackman
     Name:   William A. Ackman
     Title:    Managing Member

Dated:  2/25/2014

**Exhibit 99.4**

EXECUTION VERSION
CONFIDENTIAL

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## PS FUND 1, LLC
Dated as of April 3, 2014

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of PS Fund 1, LLC (the "Company") is made and entered into as of the date set forth above by and among Pershing Square Capital Management, L.P., a Delaware limited partnership, as non-member manager (the "Manager"), Valeant Pharmaceuticals International, a Delaware corporation (the "Valeant Member"), Pershing Square, L.P., a Delaware limited partnership, Pershing Square II, L.P., a Delaware limited partnership, Pershing Square International, Ltd., a Cayman Islands exempted company, Pershing Square Holdings, Ltd., a Guernsey limited liability company, and each such natural person, partnership, limited liability company, corporation, unincorporated association, joint venture, trust, state or any other entity or any governmental agency or political subdivision thereof ("Person") as may be admitted to the Company as a non-managing member (each (excluding the Manager), a "Member") and shall hereafter govern the Company.

R E C I T A L S

WHEREAS, the Company was formed as a Limited Liability Company under the Delaware Limited Liability Company Act, 6 Del. C. §§ 18.101, *et seq.*, as amended from time to time (the "Act"), by the filing of the Certificate of Formation of the Company with the Office of the Secretary of State of the State of Delaware on February 11, 2014, and has operated pursuant to the terms of the Limited Liability Company Agreement of PS Fund 1, LLC, dated as of February 11, 2014 (the "Original Agreement"); and

WHEREAS, the Manager and Valeant Pharmaceuticals International, Inc. ("Valeant Parent") entered into a letter agreement, dated February 25, 2014, attached hereto as Annex A (the "Relationship Agreement").

NOW, THEREFORE, in consideration of the mutual promises herein made, the parties hereto agree to amend and restate the Original Agreement in its entirety as follows:

Section 1. Company Name and Address. The name of the Company is "PS Fund 1, LLC". The principal office of the Company is located at 888 Seventh Avenue, 42nd Floor, New York, New York 10019, or at such other location as the Manager in the future may designate. The Manager shall promptly notify the Members of any change in the Company's address.

Section 2. Registered Agent and Registered Office. The registered agent for the Company is Corporation Service Company. The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

Section 3. <u>Purpose</u>.

(a) The Company is organized for the purposes of (i) serving as the Co-Bidder Entity under the Relationship Agreement, (ii) on the terms set forth in the Relationship Agreement, acquiring and disposing of Allergan Equity, (iii) taking actions related to causing Allergan, Inc. ("<u>Allergan</u>") to enter into and consummate a business combination transaction and (iv) activities reasonably related thereto. Capitalized terms used herein and not defined are used herein as defined in the Relationship Agreement, and where the terms hereof and the terms of the Relationship Agreement conflict the terms hereof shall govern.

(b) The Company shall have the power to engage in all actions, proceedings, activities and transactions that the Manager may deem necessary or advisable in connection with the foregoing purpose, including, without limitation, the opening of accounts in the name of the Company at one or more banks or financial institutions and the borrowing of monies.

Section 4. <u>Appointment of the Manager; Management</u>.

(a) The Manager is hereby appointed as a non-member manager of the Company and shall be deemed a "manager" as described in Section 18-401 of the Act. The Manager shall not be deemed a Member, and shall have no interest in the Company's assets or in any distributions made by the Company. Subject to the terms and conditions of the Relationship Agreement and this Agreement, the Manager shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Company, shall make all decisions regarding the business of the Company, and shall have all of the rights, powers and obligations of a manager of a limited liability company under the laws of the State of Delaware. Except as otherwise expressly provided in the Relationship Agreement and this Agreement, the Manager is hereby granted the right, power and authority to do on behalf of the Company all things which, in the Manager's sole discretion, are necessary or appropriate to manage the Company's affairs and fulfill the purposes of the Company.

(b) Except as authorized by the Manager and except as authorized by Section 5, the Members, in their capacities as such, shall not take part in the management or control of the Company, transact any business in the Company's name or have the power to sign documents for or otherwise bind the Company. The Members hereby consent to the exercise by the Manager of the powers conferred on it by this Agreement, but subject to the Relationship Agreement.

Section 5. <u>Termination of the Manager</u>. A majority-in-interest of the Members may remove the Manager as manager of the Company upon not less than 90 days' prior written notice to the Manager. The Manager may resign as manager of the Company upon not less than 90 days' prior written notice to the Company. Upon any such resignation, the Company shall be governed by a majority-in-interest of the Members with the powers of the Manager, unless such other Person (including any Member) is appointed by a majority-in-interest of the Members as a manager of the Company. A "majority-in-interest" of the Members shall mean Members that have in excess of 50% of the Company Percentages (as defined below) of the Members together with the Valeant Member.

-2-

Section 6. <u>Term</u>. The term of the Company began on the date the Certificate of Formation of the Company was filed, and shall continue until cancellation of the Certificate of Formation of the Company in accordance with this Agreement.

Section 7. <u>Dissolution</u>. There shall be a dissolution of the Company and its affairs shall be wound up when (and only when) required by Section 3 of the Relationship Agreement.

Section 8. <u>Winding Up</u>. Upon the dissolution of the Company, the Manager shall proceed with the liquidation and distribution of the assets of the Company consistent with the valuation method described in Section 3 of the Relationship Agreement, and upon completion of the winding up of the Company shall have the authority to, and shall execute and file a certificate of cancellation of the Certificate of Formation of the Company and such other documents required to effect and evidence the dissolution and termination of the Company. Before the distribution of all the assets of the Company, the business of the Company and the affairs of the Members, as such, shall continue to be governed by this Agreement and the Relationship Agreement. Dissolution and payment of creditors shall be effected in accordance with the Act.

Section 9. <u>Capital Contributions; Company Percentages; Valeant Allocated Shares; Sales of Allergan Equity</u>.

(a) The Company will keep track of the capital contributions each Member makes to the Company. The "<u>Company Percentages</u>" shall be determined for each Member other than the Valeant Member for each accounting period of the Company by dividing the balance of each such Member's capital account by the aggregate capital accounts of all such Members as of the beginning of such accounting period after taking into account capital contributions, and withdrawals and distributions. The sum of the Company Percentages shall equal 100 percent. The Company may accept and allocate capital contributions from the Valeant Member based on the commitments found in the Relationship Agreement.

(b) The Company shall, on or prior to the date on which the Valeant Member is required to make a $75.9 million capital contribution pursuant to Section 1(a) of the Relationship Agreement, purchase the first $75.9 million in cumulative purchase price of shares of Allergan Common Stock, and those shares, along with all direct or indirect proceeds therefrom, shall be separately tracked. Such shares (and proceeds) are herein referred to as "<u>Valeant Allocated Shares</u>".

(c) The Company shall not sell or otherwise reduce its economic ownership in Allergan Equity in contravention of the Relationship Agreement. The Company shall not sell or otherwise dispose of any Valeant Allocated Shares except in a dissolution of the Company or as contemplated by Section 11 of this Agreement.

(d) Except as otherwise required under the Relationship Agreement, no Member shall have any obligation to make a capital contribution.

-3-

Section 10. <u>Capital Accounts, Allocations and Certain Tax Matters</u>.

(a) <u>General</u>. The Company shall maintain a capital account for each Member pursuant to the principles of Section 704(b) and 704(c) of the Internal Revenue Code of 1986, as amended (the "<u>Internal Revenue Code</u>"), and the Treasury Regulations promulgated thereunder. All items of Company income, gain, loss or expense relating to the Valeant Allocated Shares shall be allocated to the Valeant Member. All other items of Company income, gain, loss or expense shall be allocated to the capital accounts of the Members other than the Valeant Member *pro rata* based on the Company Percentages, subject to the first sentence of this Section 10(a) and except that 15% of the Net Transaction Profits shall be allocated to the Valeant Member at the time and in the circumstances required by Section 3 of the Relationship Agreement; for the avoidance of doubt, if there are insufficient items of income or gain to allocate 15% of the Net Transaction Profits to the Valeant Member, an amount equal to the shortfall shall be transferred from the capital accounts of the Members other than the Valeant Member (pro rata based on the Company Percentages) to the capital account of the Valeant Member so that the capital account of the Valeant Member is increased by the full amount intended by the Relationship Agreement. Allocations for Federal income tax purposes shall be made to the Members in a similar manner. A Member has no rights to income, gain, loss or expense of the Company other than those rights provided in this Agreement or in a separate written instrument executed by the Company and such Member.

(b) <u>Determination by the Manager of Certain Matters</u>. All matters concerning valuations and the allocation of taxable income, deductions, credits, net income and net losses of the Members, including taxes thereon and accounting procedures, not expressly provided for by the terms of this Agreement, shall be reasonably determined by the Manager in a manner consistent with the principles provided herein.

(c) <u>Filing of Tax Returns</u>. The Manager or its designated agent, at the Company's expense, shall prepare and file, or cause the accountants of the Company to prepare and file, a Federal information tax return in compliance with Section 6031 of the Internal Revenue Code, and any required state and local income tax and information returns for each tax year of the Company.

(d) <u>Reports to Members and Former Members</u>. Within 90 days after the end of each tax year of the Company or as soon as reasonably practicable thereafter, the Company shall prepare and mail, or cause its accountants to prepare and mail, to each Member and, to the extent necessary, to each former Member (or its legal representatives), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representatives) to prepare its Federal income tax return in accordance with the laws, rules and regulations then prevailing.

(e) <u>Tax Matters Partner</u>. A Member other than the Valeant Member shall be designated on the Company's annual federal information tax return as the Tax Matters Partner of the Company for purposes of Section 6231(a)(7) of the Internal Revenue Code.

-4-

(f) Member Tax Basis. Upon request of the Manager, each Member agrees to provide to the Manager information regarding its adjusted tax basis in its interest in the Company along with documentation substantiating such amount.

(g) Treatment. The Members agree that, absent a final determination by a relevant tax authority to the contrary, they will treat the partnership and its operations in accordance with their form for U.S. tax purposes.

Section 11. Distributions. Except with the consent of the Valeant Member, distributions shall not be made prior to the Dissolution Date. On or after the Dissolution Date, the Manager shall make distributions as required by Section 3(a) of the Relationship Agreement. Subject to compliance with regulatory and other laws applicable to the Company, at the written request of the Valeant Member delivered to the Manager at any time after a vote by the stockholders of Allergan on a Company Transaction, the Company shall make an in kind distribution to the Valeant Member of all Valeant Allocated Shares. The Company agrees to use its reasonable best efforts to comply with regulatory or other laws applicable to the Company in order to permit the distributions contemplated by this Section 11 to be made on the Dissolution Date or as promptly as possible thereafter.

Section 12. Assignability of Interest. A Member may not, directly or indirectly, (i) pledge, assign, hypothecate, sell, exchange, reference under a derivatives contract or any other arrangement, transfer directly, indirectly or synthetically to a beneficial owner or other Persons different from such Member or otherwise dispose of its interest in the Company, in whole or in part, to any Person, or (ii) substitute for itself as a Member any other Person; provided, however, that a Member may assign all or a portion of its rights and obligations hereunder to one or more of its wholly owned subsidiaries, upon written notice thereof to the Manager attaching the fully executed instrument of assignment, which shall be in form and substance reasonably satisfactory to the Manager. Any attempted pledge, transfer, assignment or substitution not made in accordance with this Agreement shall be void.

Section 13. New Members. No new Members shall be admitted without the prior written consent of the Valeant Member, which may be withheld in its sole discretion.

Section 14. Withdrawal. No Member may withdraw as a Member or make withdrawals from such Member's capital account; provided that, in accordance with Section 10, Company income, gain, loss or expense allocated to the Members' (other than the Valeant Member's) capital accounts may be re-allocated to the capital accounts of the Members (other than the Valeant Member's).

Section 15. Limited Liability. Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager; provided, however, that a Member shall be required to contribute to the Company any amounts required under the Act.

-5-

Section 16. Expenses. The Manager shall be authorized to incur and pay all expenses on behalf of the Company in connection with the Company's business which it deems necessary or desirable, and to charge or be reimbursed by the Company therefor, including, without limitation, accounting, auditing, entity-level taxes and tax preparation expenses, legal fees and expenses (including expenses relating to regulatory filings made in connection with the Company's business, indemnification expenses and expenses relating to regulatory or similar investigations, inquiries and "sweeps"), professional fees and expenses (including fees and expenses of investment bankers, appraisers, public and government relations firms and other consultants and experts), investment-related expenses (including research and expenses (including travel and lodging expenses) associated with activist campaigns, such as expenses related to event hosting and production, public presentations, public relations, public affairs and government relations, forensic and other analyses and investigations, proxy contests, solicitations and tender offers, and compensation, indemnification and other expenses of any nominees proposed by the Manager as directors or executives of portfolio companies), printing and postage expenses, brokerage fees and commissions, expenses relating to short sales (including dividend and stock borrowing expenses), clearing and settlement charges, custodial fees, bank service fees, margin and other interest expense and transaction fees, blue sky and corporate filing fees and expenses, insurance expenses, organizational expenses, and payments for custody of the Company's assets and for the performance of administrative services, and other Company expenses as approved by the Manager; provided that the foregoing shall not be deemed to amend or modify the definition of Net Transaction Profits and provided further that legal, investment banking and other advisory fees shall not be charged to, or deducted from, the Valeant Allocated Shares or deducted in calculating the Net Transaction Profits.

Section 17. Exculpation.

(a) The Manager, affiliates of the Manager and any of their respective members, managers, equity holders, partners, directors, officers, employees, advisers, representatives or agents (each, an "Indemnified Person"), to the fullest extent permissible under applicable law, shall have no liability to any Member or the Company for (a) any actions or inactions arising out of or in connection with the Company, this Agreement or any investment made or held by the Company unless such action or inaction was taken or not taken in bad faith or constituted gross negligence or willful misconduct or violated the terms hereof or of the Relationship Agreement, or (b) losses, judgments, liabilities, expenses (including reasonable attorneys' fees and costs) and amounts paid in settlement of any actual or threatened claim, proceeding or action, whether judicial, administrative, investigative or otherwise (each, a "Loss" or, collectively, "Losses") due to the action or inaction or to the negligence, dishonesty or bad faith of any broker or agent of the Company, provided that such broker or agent was selected, engaged and retained by the Company with reasonable care. Each of the Indemnified Persons may consult with counsel and accountants in respect of Company's affairs and shall be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of counsel and/or accountants, provided that such counsel and/or accountants were selected with reasonable care. For purposes of clarification, the Company (and not any Indemnified Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct or gross negligence.

-6-

(b) Notwithstanding any of the foregoing to the contrary, the provisions of this Section 17 shall not be construed (i) so as to provide for the exculpation of any Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on Persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section 17 to the fullest extent permitted by law or (ii) to waive or release the Manager from any liabilities arising out of or in connection with a breach of this Agreement or the Relationship Agreement.

Section 18. Indemnification.

(a) Each Indemnified Person, to the fullest extent permissible under applicable law, shall be indemnified by the Company from and against any Losses sustained by reason of (a) any action or inaction or alleged action or inaction arising out of or in connection with the Company, this Agreement or any investment made or held by the Company, provided that such action or inaction or alleged action or inaction was not performed or omitted in bad faith and did not constitute gross negligence or willful misconduct by such Indemnified Person and did not constitute a violation of the terms hereof or of the Relationship Agreement by such Indemnified Person, or (b) the negligence, dishonesty or bad faith of any broker or agent of the Company, provided that such broker or agent was selected, engaged and retained with reasonable care. For purposes of clarification, the Company (and not any Indemnified Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct or gross negligence.

(b) The Valeant Member, affiliates of the Valeant Member and any of their respective members, managers, equity holders, partners, directors, officers, employees, advisers, representatives or agents (for purposes of Section 18(c) only, such Persons shall be included as "Indemnified Persons"), to the fullest extent permissible under applicable law, shall be indemnified by the Company from and against any Losses sustained by reason of any breach of, or inaccuracy of, Section 19 of this Agreement. The indemnification provided by the Company pursuant to this Section 18 (b) shall not relate to any matter other than Section 19 and shall not affect the calculation of Net Transaction Profits.

(c) The provision of advances from the Company's capital to an Indemnified Person for reasonable legal expenses and other costs incurred in connection with the defense of any action or proceeding that is entitled to indemnification under this Section 18 is permissible, in the sole discretion of the Manager, provided that such Indemnified Person undertakes to repay the advanced funds to the Manager if it is ultimately determined by a final order of a court of competent jurisdiction that the Indemnified Person is not entitled to such indemnification under Section 18.

(d) Notwithstanding any of the foregoing to the contrary, the provisions of this Section 18 shall not be construed so as to provide for the indemnification of an Indemnified Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on Persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 18 to the fullest extent permitted by law.

-7-

(e) If United States withholding tax is imposed on the Company or any other Member by reason of income allocated or cash distributed to a Member (the "Indemnifying Member"), the Indemnifying Member agrees to indemnify the Company or such other Members, respectively.

(f) None of the information provided by any Member (in the case of the Valeant Member, including by Valeant Parent) to any other Member for inclusion in any filing with the Securities and Exchange Commission, the securities commission of any province of Canada or any other regulatory filing made by any Member (in the case of the Valeant Member, including by Valeant Parent) in connection with the pursuit of transactions contemplated by this Agreement and the Relationship Agreement, will, at the respective times of the filing of such documents, at any time such documents are amended or supplemented or at the time of any distribution or dissemination of such documents, as applicable, contain any statement that, in light of the circumstances under which it is made, is false or misleading with respect to any material fact required to be stated therein or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading. Each Member (in the case of the Valeant Member, including Valeant Parent) shall indemnify the other Members and each of such Members' respective members, managers, equity holders, partners, directors, officers, employees, advisers, representatives or agents from and against any Losses sustained by reason of its breach of the first sentence of this Section 18(f).

Section 19. Representation. Each of the Manager and the Company represents to the Valeant Member that the Company was formed solely for the purpose described in Section 3(a) and, since the date of its formation, has not engaged in any activities, acquired any assets or incurred any liabilities, except for activities conducted, assets acquired and liabilities incurred which would be permissible for it to conduct, acquire or incur under Section 3(a).

Section 20. Affiliate Transactions. The Company shall not enter into a transaction involving any person or entity affiliated with the Manager that would reduce any payment required to be made under Section 3 of the Relationship Agreement.

Section 21. Notice. Each notice relating to this Agreement shall be in writing and delivered in person, by registered or certified mail, by Federal Express or similar overnight courier service, by electronic mail (e-mail) or by facsimile. All notices to the Company shall be addressed to its principal office and place of business (if delivered personally or by post). All notices addressed to the Manager shall be addressed to 888 Seventh Avenue, 42nd Floor, New York, New York 10019. All notices addressed to the Valeant Member shall be addressed to 700 Route 202/206 North Bridgewater, New Jersey 08807. All notices addressed to other Members shall be addressed to such Member at c/o Pershing Square Capital Management, L.P., 888 Seventh Avenue, 42nd Floor, New York, New York 10019. The Manager or any Member may designate a new address by notice to that effect given to the Company and the other Members. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when delivered personally, if delivered on a Business Day; the next

-8-

Business Day after personal delivery if delivered personally on a day that is not a Business Day; four Business Days after being deposited in the United States mail, postage prepaid, return receipt requested, if mailed; on the next Business Day after being deposited for next day delivery with Federal Express or similar overnight courier; when sent, if e-mailed on a Business Day; the next Business Day following the day on which the e-mail is sent if e-mailed on a day that is not a Business Day; when receipt is acknowledged, if facsimiled on a Business Day; and the next Business Day following the day on which receipt is acknowledged if facsimiled on a day that is not a Business Day. A "Business Day" shall be any day on which banks in New York City are open for normal business.

Section 22. Third Party Rights. Except for the provisions of Sections 17 and 18, the provisions of this Agreement are not intended to be for the benefit of any creditor or other Person (other than the Members in their capacities as such) to which any debts, liabilities or obligations are owed by (or who otherwise have a claim against or dealings with) the Company or any Member, and, to the fullest extent permitted by law, no such creditor or other Person shall obtain any rights under any of such provisions (whether as a third party beneficiary or otherwise) or shall by reason of any such provisions have a right to make any claim in respect to any debt, liability or obligation (or otherwise) including any debt, liability or obligation against the Company or any Member.

Section 23. No Fiduciary Duty. This Agreement is not intended to, and does not, create or impose any fiduciary duty on the Manager or any Member, or any of their respective affiliates, or any of the Manager's or any Member's or their respective affiliate's members, managers, equity holders, partners, directors, officers, employees, advisers, representatives or agents (collectively, the "Released Persons"). Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties with respect to the Company that, absent such waiver, may be implied by applicable law, including the Act, and in doing so, acknowledges and agrees that the duties and obligation of each Released Person to each other and to the Company in respect of the matters contemplated by this Agreement and the Relationship Agreement are only as expressly set forth in this Agreement and the Relationship Agreement. The provisions of this Agreement and the Relationship Agreement, to the extent that they restrict the duties and liabilities of a Released Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Released Person. Whenever in this Agreement or the Relationship Agreement a Released Person is permitted or required to make a decision (including a decision that is in such Released Person's discretion or under a grant of similar authority or latitude), the Released Person shall be entitled to consider only such interests and factors as such Released Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other person (other than in all cases as expressly provided by this Agreement or the Relationship Agreement). Whenever in this Agreement a Released Person is permitted or required to make a decision in such Released Person's good faith, the Released Person shall act under such express standard as interpreted for contract law purposes and shall not be subject to any other or different standard imposed by this Agreement or any other applicable law.

Section 24. Integration. This Agreement, the Relationship Agreement and the letter agreement, dated February 9, 2014, between the Manager and Valeant Parent constitute the

-9-

entire agreement among the parties hereto pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements and understandings of the parties in connection therewith.

Section 25. <u>Headings</u>. The headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement. References to "Section" in this Agreement shall be deemed to refer to the indicated Section of this Agreement, unless the context clearly indicates otherwise.

Section 26. <u>Counterparts</u>. Counterparts may be executed through the use of separate signature pages or in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart. Each party understands and agrees that any portable document format (PDF) file, facsimile or other reproduction of its signature on any counterpart shall be equal to and enforceable as its original signature and that any such reproduction shall be a counterpart hereof that is fully enforceable in any court or arbitral panel of competent jurisdiction.

Section 27. <u>Choice of Law</u>. Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be governed by and construed under the laws of the State of Delaware applicable to contracts made and to be entirely performed in such state and, without limitation thereof, that the Act as now adopted or as may be hereafter amended shall govern all limited liability company aspects of this Agreement.

Section 28. <u>Amendments</u>. This Agreement may be amended only by written instrument executed by the Manager and all the Members.

Section 29. <u>Remedies and Waiver</u>. No failure or delay in exercising any right hereunder shall operate as a waiver of or impair any such right. No single or partial exercise of any such right shall preclude any other or further exercise thereof or the exercise of any other right. Any waiver must be given in writing to be effective, and no waiver shall be deemed a waiver of any other right.

Section 30. <u>Survival</u>. Section 17, Section 18, Section 21, Section 22, Section 23, Section 27, Section 29 and this Section 30 shall survive any termination of this Agreement.

[*The rest of this page is intentionally left blank.*]

-10-

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of the date first set forth above.

MANAGER:

PERSHING SQUARE CAPITAL MANAGEMENT, L.P. By:
PS Management GP, LLC, its general partner

/s/ William A. Ackman

Name:        William A. Ackman
Title:        Managing Member

MEMBERS:

PERSHING SQUARE, L.P.
By: Pershing Square GP, LLC, its general partner

/s/ William A. Ackman

Name:        William A. Ackman
Title:        Managing Member

PERSHING SQUARE II, L.P.
By: Pershing Square GP, LLC, its general partner

/s/ William A. Ackman

Name:        William A. Ackman
Title:        Managing Member

PERSHING SQUARE INTERNATIONAL, LTD.
By: Pershing Square Capital Management, L.P., its
investment manager
By: PS Management GP, LLC, its general partner

/s/ William A. Ackman

Name:        William A. Ackman
Title:        Managing Member

PERSHING SQUARE HOLDINGS, LTD.
By: Pershing Square Capital Management, L.P., its
investment manager
By: PS Management GP, LLC, its general partner


_____ /s/ William A. Ackman
Name:                                                    William A. Ackman
Title:                                                    Managing Member

VALEANT MEMBER:

VALEANT PHARMACEUTICALS INTERNATIONAL

By: _____ /s/ J. Michael Pearson
Name: J. Michael Pearson
Title:   President