1  Mark Holscher (SBN 139582)
2  mark.holscher@kirkland.com
   Michael Shipley (SBN 233674)
3  michael.shipley@kirkland.com
   KIRKLAND & ELLIS LLP
4  333 South Hope Street
5  Los Angeles, California 90071
   Telephone:  (213) 680-8400
6  Facsimile:   (213) 680-8500

7  *Attorneys for Defendants Pershing*
8  *Square Capital Management, L.P.; PS*
   *Management GP, LLC; PS Fund 1,*
9  *LLC; and William Ackman*

10 [Additional counsel on signature page]

11

12

13

14              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
15             SOUTHERN DIVISION – SANTA ANA

16

17 ALLERGAN, INC., *et al.*,              )  Case No.:  8:14-cv-01214-DOC-(ANx)
                                          )
18              Plaintiffs,               )  Honorable David O. Carter
                                          )
19      v.                                )
                                          )  **DEFENDANTS' OPPOSITION TO**
20                                        )  **PLAINTIFFS' MOTION FOR**
   VALEANT PHARMACEUTICALS,              )  **PRELIMINARY INJUNCTION**
21 INTERNATIONAL, INC., *et al.*,         )
                                          )
22              Defendants.               )  Hearing Date:    October 28, 2014
                                          )  Time:            8:30 a.m.
23                                        )  Courtroom:       9D
                                          )
24 _____)

25

26

27

28

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

2

# TABLE OF CONTENTS

**Page**

3      PROCEDURAL HISTORY ........................................................................... 6

4      THE PRELIMINARY INJUNCTION RECORD ........................................ 7

5      ARGUMENT ............................................................................................... 11

6

7         I.    Plaintiffs Have Not Demonstrated any Likelihood of Irreparable Injury. ... 12

8               A.    Allergan Faces No Imminent and Irreparable Harm. ................... 12

9               B.    Any Supposed Harm from PS Fund 1 Voting Its Shares Is Not
                       Harm Cognizable Under the Federal Securities Laws. ................ 16

10        II.   The Actual and Permanent Harm that Granting an Injunction Would Cause

11              Outweighs the Imagined Harm It Would Prevent. ...................................... 18

12        III.  The Public Interest Does Not Favor Granting an Injunction. ...................... 20

13        IV.   Plaintiffs Have No Likelihood of Success on the Merits of Their Claims. . 21

14              A.    Allergan Cannot Prevail on the Merits of Its Claim Under SEC
                       Rule 14e–3. ................................................................................... 21
15

16                    1.    Allergan Has No Standing Under Rule 14e–3. ................. 22

17                    2.    No Substantial Steps Toward a Tender Offer Had Been
                             Taken when PS Fund 1 Acquired Its Shares. ..................... 24
18

19                          a.    The Factual Record Demonstrates that No Steps
                                    Were Taken Toward a Tender Offer Before Late
20                                  May ....................................................................... 25

21
                            b.    Allergan Misleadingly Equates Steps Toward a
22                                 Merger With the Commencement of a Tender
                                   Offer. .................................................................... 28
23

24                    3.    PS Fund 1 Is an "Offering Person" Outside the Trading
                             Proscription in Rule 14e–3. .............................................. 31
25

26              B.    Allergan's Disclosure Claims Are Meritless. ............................... 37

27        V.    ALLERGAN'S INEQUITABLE CONDUCT ............................................. 38

28      CONCLUSION ............................................................................................ 40

i

1

2

# TABLE OF AUTHORITIES

**Page(s)**

3

**Cases**

4

5

*AHI Metnall L.P. by AHI Kan., Inc. v. J.C. Nichols Co.*,
    891 F. Supp. 1352 (W.D. Mo. 1995)................................................................. 19

6

7

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ................................................................. 11, 20

8

*Anderson v. United State*s,
    612 F.2d 1112 (9th Cir. 1979) ................................................................. 12

9

10

*Barnett v. U.S. Air, Inc.*,
    228 F.3d 1105 (9th Cir. 2000) ................................................................. 18

11

*Brody v. Transitional Hosp. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................. 2

12

13

*Burlington Indus., Inc. v. Edelman*,
    666 F. Supp. 799 (M.D.N.C. 1987) ................................................................. 16, 23

14

15

*City Capital Assocs. LP v. Interco, Inc.*,
    696 F. Supp. 1551 (D. Del. 1988) ................................................................. 38

16

17

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................. 15

18

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
    654 F.3d 276 (2d Cir. 2011) ................................................................. 17

19

20

*Dahl* v. *HEM Pharm. Corp.*,
    7 F.3d 1399 (9th Cir. 1993) ................................................................. 12

21

*Dan River, Inc. v. Icahn*,
    701 F.2d 278 (4th Cir. 1983) ................................................................. 15, 17

22

23

*Dirks v. SEC.*,
    463 U.S. 646 (1983) ................................................................. 23

24

25

*Dollar Rent a Car of Wash., Inc. v. Travelers Indem. Co.*,
    774 F.2d 1371 (9th Cir. 1985) ................................................................. 12

26

*Dotster, Inc. v. ICANN*,
    296 F. Supp. 2d 1159 (C.D. Cal. 2003) ................................................................. 12

27

28

ii

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Edgar v. Mite Corp.*,
   457 U.S. 624 (1982) .................................................................................. 21

*Energy Ventures, Inc. v. Appalachian Co.*,
   587 F. Supp. 734 (D. Del. 1984) ............................................................ 20

*Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*,
   2014 WL 1259959 (E.D.N.Y. Mar. 25, 2014) ...................................... 37

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) .................................................................................. 29

*Essex Chem. Corp. v. Gurit-Heberlein AG*,
   1988 U.S. Dist. LEXIS 19515 (D.N.J. June 24, 1988) ....................... 23

*Finnegan* v. *Campeau Corp.*,
   915 F.2d 824 (2d Cir. 1990) ................................................................... 35

*Fuddruckers, Inc. v. Doc's B.R. Others*, Inc.,
   826 F.2d 837 (9th Cir. 1987) .................................................................. 39

*Gearhart Indus., Inc. v. Smith Int'l, Inc.*,
   741 F.2d 707 (5th Cir. 1984) ............................................................ 16, 17

*Gen. Aircraft Corp. v. Lampert*,
   556 F.2d 90 (1st Cir. 1977) .................................................................... 17

*Hollywood Casino Corp. v. Simmons*,
   No. 3:02-0325-M, 2002 WL 1610598 (N.D. Tex. July 18, 2002) ..................... 33

*In re Digital Island Secs. Litig.*,
   357 F.3d 322 (3d Cir. 2004) ................................................................... 29

*In re The MONY Grp., Inc. S'holder Litig.*,
   853 A.2d 661 (Del. Ch. 2004) ................................................................ 16

*Jana Master Fund, Ltd. v. CNET Networks, Inc.*,
   954 A.2d 335 (Del. Ch. 2008) ................................................................ 19

*Keystone Driller Co. v. Gen. Excavator Co.*,
   290 U.S. 240 (1933) .................................................................................. 39

*Koppers Co. v. Am. Express Co.*,
   689 F. Supp. 1371 (W.D. Penn. 1988) ................................................... 34

*La. Muni. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*,
   886 F. Supp. 2d 1255 (W.D. Okla. 2012) .............................................. 19

*Mai Basic Four, Inc. v. Prime Computer, Inc.*,
   871 F.2d 212 (1st Cir. 1989) .................................................................. 34

iii

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Marlyn Nutraceuticals, Inc.* v. *Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ................................................................. 12

*Martin-Marietta Corp. v. Bendix Corp.*,
    690 F.2d 558 (6th Cir. 1982) ................................................................ 21

*Masters v. Avanir Pharms., Inc.*,
    996 F. Supp. 2d 872 (C.D. Cal. 2014) ........................................... 20, 21

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ..................................................................... 23

*Pa. Ave. Funds v. Borey*,
    No. 06-1737RAJ, 2008 WL 426509 (W.D. Wash. Feb. 13, 2008) ..................... 31

*Pac. Realty Trust v. APC Inv., Inc.*,
    685 F.2d 1083 (9th Cir. 1982) ............................................................... 17

*Piper v. Chris-Craft Indus., Inc.*,
    430 U.S. 1 (1977) .................................................................................. 24

*Princess Cruises, Inc. v. United States*,
    397 F.3d 1358 (Fed. Cir. 2005) ............................................................ 39

*Rabbani v. Enzo Biochem, Inc.*,
    682 F. Supp. 2d 400 (S.D.N.Y 2010) ..................................................... 37

*Ranger Oil Ltd. v. Petrobank Energy & Res. Ltd.*,
    2000 WL 33115906 (S.D.N.Y. May 23, 2000) ............................... 15, 16, 23

*Rondeau v. Mosinee Paper Corp.*,
    422 U.S. 49 (1975) ........................................................................ 17, 18, 23

*S.E.C. v. Ginsburg*,
    362 F.3d 1292 (11th Cir. 2004) ............................................................ 29

*S.E.C. v. Maio*,
    51 F.3d 623 (7th Cir. 1995) ........................................................ 24, 29, 30

*S.E.C. v. Mayhew*,
    121 F.3d 44 (2d Cir. 1997) .................................................................... 29

*S.E.C. v. Musella*,
    748 F. Supp. 1028 (S.D.N.Y. 1989) ...................................................... 36

*S.E.C. v. Warde*,
    151 F.3d 42 (2d Cir. 1998) .............................................................. 24, 29

*Shepard v. Meridian Ins. Grp., Inc.*,
    137 F. Supp. 2d 1096 (S.D. Ind. 2001) ................................................. 16

iv

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

*Smallwood v. Pearl Brewing Co.*,
    489 F.2d 579 (5th Cir. 1974) ................................................................. 35

*Steginsky* v. *Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014) .................................................................. 35

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
    646 F. Supp. 2d 510 (S.D.N.Y. 2009) .................................................. 40

*Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus., Ltd.*,
    2010 WL 2835548 (S.D.N.Y. July 13, 2010) ..................................... 38

*Telex Corp. v. Edelman*,
    No. 87-C-873-E, 1987 WL 43390 (N.D. Okla. Nov. 5, 1987) ............... 16, 28

*United States v. Chestman*,
    947 F.2d 551 (2d Cir. 1991) .................................................................. 24

*United States v. O'Hagan*,
    139 F.3d 641 (8th Cir. 1998) ........................................................ 29, 30, 36

*Walton v. U.S. Marshals Serv.*,
    No. 03-1460 SI, 2003 WL 23875599 (N.D. Cal. Aug. 12, 2003) .......... 37

*William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
    526 F.2d 86 (9th Cir. 1975) .................................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................ passim

**Statutes and Regulations**

15 U.S.C. § 78n(d) ................................................................................ 37

15 U.S.C. § 78n(e) ........................................................................ passim

17 C.F.R. § 229.1000(d) ....................................................................... 37

17 C.F.R. § 240.140–11 ........................................................................ 41

17 C.F.R. § 240.14d–1 ..................................................................... 37, 41

17 C.F.R. § 240.14d–10 ........................................................................ 41

17 C.F.R. § 240.14d–100(K) ................................................................. 41

17 C.F.R. § 240.14d–3 .......................................................................... 41

17 C.F.R. § 240.14d–4 .......................................................................... 41

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

17 C.F.R. § 240.14d–5 ............................................................................ 41

17 C.F.R. § 240.14e–1 ....................................................................... 36, 41

17 C.F.R. § 240.14e–2 ............................................................................ 41

17 C.F.R. § 240.14e–3 ...................................................................... passim

Del. Code Ann. tit. 8, § 212(a) ............................................................... 21

**Other Authorities**

18 D. Langevoort, *Insider Trading Regulation, Enforcement & Prevention* § 7:1
    (2014 online ed.)................................................................... 36

A. Jacobs, *The Williams Act—Tender Offers & Stock Accumulations* § 5:40
    (2014 online ed.)......................................................... 17, 20, 21

Charles. A. Wright, *et al.*, *Federal Practice and Procedure* § 2948.1
    (2014 online ed.)................................................................... 12

*Corporate Acquisitions*, *Mergers & Divestitures* § 8:23 (2014 online ed.) ................. 36

H. Bloomenthal & S. Wolff, *Securities Law Handbook* § 33:28 (2014 online ed.)...... 36

SEC Excerpt from Current Issues and Rulemaking Projects Outline
    (November 14, 2000), Section II.D.2. Mergers & Acquisitions—Identifying
    the Bidder in a Tender Offer ....................................................... 32, 33

SEC, Div. of Corp. Fin., *Current Issues & Rulemaking Projects* at 13
    (Nov. 14, 2000)..................................................................... 36

Tender Offers, Exchange Act Release No. 17,120, 20 SEC Docket 1350,
    1980 WL 20869 (Sept. 4, 1980) ................................................ 24, 25

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

## INTRODUCTION

2      Plaintiffs move to enjoin PS Fund 1 from voting on eight proposals at a

3  December 18 special meeting of Allergan's shareholders.  The motion asks this Court

4  to intrude on a process that is playing out in the market—both Allergan and

5  Defendants are actively soliciting shareholder support for the meeting.  An injunction

6  would substantially tilt the playing field: because a majority of outstanding (as opposed

7  to voting) shares must vote in favor of removing directors for this proposal to pass, if

8  PS Fund 1 cannot vote its shares, they will effectively become "no" votes.  Therefore,

9  it would take a supermajority of the other shareholders to remove the six directors at

10  issue.  That would further entrench Allergan's board and management and frustrate the

11  voting rights of shareholders, including shareholders other than PS Fund 1.  This

12  drastic and unprecedented relief should be rejected for seven independent reasons.

13      *First*, Allergan bears the heavy burden of convincing this Court that Allergan

14  would suffer irreparable harm if PS Fund 1 votes on December 18.  Allergan's brief,

15  however, barely even addresses irreparable harm.  This is not surprising given that both

16  ██████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ███████████████████████████████████████  Not a single independent

19  shareholder has indicated that it would suffer any harm if PS Fund 1 votes on the eight

20  proposals along with Allergan's other shareholders.

21      The absence of harm here is obvious from the actual proposals at issue, which

22  Allergan ignores entirely.  They include: amending bylaws that contain extraordinarily

23  onerous restrictions on shareholder voting that the Delaware Court of Chancery

24  described as "quite a horse-choker," removing six directors who will be replaced by

25  directors of *Allergan*'s choosing, and a non-binding request that Allergan talk to

26  Valeant.  If the Court denies Allergan's motion, Allergan remains free to argue to its

27  shareholders between now and December 18 why they should vote against these

28  proposals and indeed, Allergan has been doing so.  But the owners of Allergan should

1

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   make that decision.  Allergan's motion thus fails from the start—because of the nature

2   of the proposals, Allergan cannot possibly suffer irreparable injury if PS Fund 1 and

3   Allergan's other shareholders have their votes counted.

4       *Second*, Allergan seeks unprecedented relief that would cause serious and

5   irreparable harm to Defendants and to Allergan's other shareholders that vastly

6   outweighs any harm alleged by Allergan.  Allergan seeks to prevent the full universe of

7   Allergan stockholders from voting their shares on matters validly presented to them in

8   accordance with Delaware law and Allergan's charter.  There is no precedent for

9   invoking federal insider trading laws to strip state law voting rights incident to the

10   ownership of the shares of a Delaware corporation.  Allergan cites none.  Granting

11   Allergan the injunctive relief it seeks would bestow it with greater relief than it could

12   ever obtain after a jury trial on the merits.

13       *Third*, Allergan has come nowhere close to stating a cognizable claim under

14   Rule 14e–3.  Indeed, it lacks standing to assert insider trading because it was not a

15   purchaser or seller of its own stock at the time of PS Fund 1's trading.  In *Brody v.*

16   *Transitional Hospitals Corp.,* 280 F.3d 997, 1001 (9th Cir. 2002), the Ninth Circuit

17   flatly rejected standing under Rule 14e–3 for any plaintiff who did not trade

18   contemporaneously with the defendant.  Despite this unequivocal and binding

19   precedent—which Defendants pointed out repeatedly in the record here—Allergan did

20   not spend a single line of its brief to try to establish standing.  This silence is

21   deafening.  Instead, it buried a futile standing argument in a footnote on the last page

22   of its brief.

23       *Fourth*, Allergan has not proven any of the essential elements of "insider

24   trading" claims under Rule 14e–3 or under more traditional theories of insider trading.

25   Allergan's complaint alluded to a traditional insider trading theory that Defendants

26   purchased Allergan stock after obtaining confidential Allergan information from an

27   overlapping director of Allergan who left its board two years ago.  This notion was

28   proven false during discovery.  Allergan has abandoned this theory.

2

1        Allergan instead claims that Pershing Square and Valeant engaged in traditional

2  insider trading because PS Fund 1, an entity majority-owned by Pershing Square,

3  purchased stock in Allergan when they knew that their partner Valeant was going to

4  make an offer to acquire Allergan.  This too is incorrect.  PS Fund 1 and Pershing

5  Square were explicitly permitted to purchase stock in Allergan on the basis of

6  information shared by Valeant because they had formed a joint venture with Valeant to

7  acquire Allergan.  The purchase of stock based on material non-public information that

8  is received from a party without any breach of a fiduciary duty or other relationship of

9  trust and confidence does not constitute insider trading that violates Rule 10b–5.

10        That leaves Allergan with a purported claim under SEC Rule 14e–3.  But unless

11  a tender offer—the essential jurisdictional predicate of Section 14(e)—was in the

12  works at the time PS Fund 1 traded in advance of Valeant's April 22 proposal to merge

13  with Allergan, there can be no violation of Rule 14e–3. ███████████████

14  ████████████████████████████████████████

15  █████████████████████████████████ That

16  Valeant and Pershing Square made a tender offer months later cannot render historical

17  acts that were lawful at the time they were performed retroactively unlawful in

18  hindsight.

19        Here, the evidence is undisputed that, rather than contemplate a tender offer,

20  Valeant and Pershing Square ruled out a potential tender offer at the time of PS

21  Fund 1's trades.  This ends the Rule 14e–3 inquiry.  There can be no steps, substantial

22  or otherwise, in furtherance of a tender offer where, as here, there was no expectation

23  of a tender offer in the first instance.  The preliminary injunction record on this issue—

24  █████████████████████████—makes this absolutely clear.

25  Allergan pretends that the evidence refuting its theory is missing, and that the facts

26  "are straightforward and largely uncontroverted."  Mot. at 2:9–10.  Allergan failed,

27  however, to mention the dispositive evidence that Pershing Square and Valeant could

28  not possibly have taken steps toward a tender offer before April 22, 2014.

3

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1       In fact, the agreement between Pershing Square and Valeant *precluded* either

2 from taking steps toward a tender offer.  Moreover, ███████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████ Valeant and Pershing

5 Square did not consider making a tender offer until the end of May 2014.  Indeed,

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████

9 ████████████████████████████████

10       Ignoring this contrary proof, Allergan speculates that Pershing Square and

11 Valeant always intended to use a tender offer to "take over" Allergan.  That is plainly

12 false.  Defendants knew that any uninvited offer would be met with the adoption of a

13 poison pill, which makes it impossible for Defendants to complete a tender offer.

14 Thus, as Allergan and its well-versed corporate law specialists understand, a strategy to

15 take over Allergan from the outset with a tender offer makes no sense.  With its April

16 22nd proposal, Defendants chose to pursue a path to pressure Allergan to engage in

17 negotiations, rather than pursue a path that it knew could not be completed.

18       *Fifth*, because Valeant, Pershing Square and PS Fund 1 are co-offerors in the

19 tender offer, Allergan has no possible claim.  These parties must be co-offerors

20 because they are listed as the co-offerors in the offering documents ████████████

21 ████████████████████ They are jointly and severally liable for the entire

22 $50 billion tender offer if for any reason Valeant cannot provide all of the funding.

23 Even worse, before Allergan brought this lawsuit based upon its new theory that PS

24 Fund 1, Pershing Square and Valeant were not co-offerors, ██████████████████

25 ████████████████████████████████████████████ Under settled SEC rules and practices, as well as

26 ████████████████████████ Under settled SEC rules and practices, as well as

27 the plain language of Rule 14e–3, a co-bidder is the same thing as a co-offeror, which

28 sinks Allergan's new claims here.

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    *Sixth*, Allergan's brief likewise ignores another key factor this Court must
2    consider on this motion—the public interest.  The public interest is strongly served by
3    a denial of Allergan's proposed injunction, so all of its shareholders can vote on these
4    proposals.  The two leading shareholder advisory services, Institutional Shareholder
5    Services, Inc. (ISS) and Glass-Lewis, have noted that Allergan's conduct has been
6    extraordinarily shareholder-hostile and that the bylaws up for vote on December 18 are
7    the most shareholder-unfriendly procedures for calling a special meeting of any public
8    company in the country.  Not one shareholder has asked that PS Fund 1 be blocked
9    from voting.  The owners of Allergan should decide the fate of these issues without a
10   judicial hand on the scales.

11       The circumstances surrounding Allergan's Preliminary Injunction filing
12   illuminate what is going on here.  Allergan stipulated to hold the December 18 meeting
13   shortly after Chancellor Bouchard criticized its efforts to block any such meeting
14   through its "horse-choker" bylaws.  But Allergan still needs to convince its
15   shareholders to give Allergan their proxies to vote against the eight proposals.  The
16   SEC's rules permitted Allergan to file its intended proxy materials any time after the
17   September 16th Order setting the meeting for December 18.  It was not a coincidence,
18   however, that Allergan filed its proxy materials at 3:35 a.m. on October 7th, less than
19   three hours after filing the public version of its inflammatory preliminary injunction
20   brief.  Allergan's public proxy urging shareholders to vote against the eight proposals
21   explicitly referenced its preliminary injunction motion so that shareholders would read
22   its inflammatory brief.  Allergan timed the filings to maximize the likelihood that its
23   shareholders would read its inflammatory and meritless motion.

24       Finally, Allergan's unclean hands bar it from obtaining the extraordinary
25   equitable relief it seeks.  The evidence produced belatedly in this case by Allergan
26   reveals Allergan's inequitable conduct.  Rather than considering in good faith the
27   merits of the merger proposal and seeking to maximize the value of that proposal for
28   the benefit of its shareholders, Allergan almost immediately implemented a

5

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  diametrically opposed strategy to defeat any offer from Valeant. ███████

2  ████████████████████████████████████████████

3  ███████████████████████████████████████

4  ████████████████████████████████████████

5  ███████████████████████████████████████

6  ████████████████████████████████████████

7  ████████████████████████████████████████████

8  ████████████████████████████████████████████

9  ██████████████████████████████████████

10 █████████████

11     This litigation is the latest weapon deployed by Allergan management to

12 disenfranchise their shareholders and preserve their positions.  There is nothing

13 remotely equitable or in the public interest in Allergan management's attempt to strip

14 its largest shareholders of the basic rights inherent to shareholder ownership.  The

15 motion should be denied.

16                          **PROCEDURAL HISTORY**

17     On August 1, 2014, Allergan and its in-house lawyer, Karah Parschauer, filed

18 the pending "Complaint for Violations of Securities Laws."  ECF No. 1.  The

19 Complaint asserts various claims contending that PS Fund 1's solicitation of proxies in

20 support of a special meeting of shareholders to consider eight proposals should be

21 enjoined.  As a result of a lawsuit filed by Defendants in Delaware Chancery Court, an

22 order was entered directing that a special meeting of shareholders take place on

23 December 18, 2014 to consider the eight proposals. Ex. 35 ¶ 2.  The Order set October

24 30 as the Record Date—shareholders of record on that date are entitled to vote in

---

[1]   After baselessly trashing Valeant's accounting for months, and continuing to do so
in its recently filed preliminary proxy statement, Allergan chose not to expose its
alleged accounting expert to cross-examination in this litigation.  Instead, on the eve of
his scheduled deposition, Allergan quietly withdrew him, effectively saying "never
mind."

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  person or by proxy at the meeting. *Id.* ¶ 3.  The Order also provides that Allergan take

2  no action to change or cancel the meeting or prevent the vote from going forward. *Id.*

3  ¶ 4.  The Delaware Court retained continuing jurisdiction with respect to its Order,

4  cancelling an expedited trial on the merits of the claims made against Allergan and its

5  directors that was set to commence by October 6. *Id.* ¶ 7.

6          Having failed in its effort to stop the meeting, Allergan now seeks to fix the

7  outcome by enjoining PS Fund 1 from voting at the meeting.  It also appears that

8  Allergan seeks to enjoin PS Fund 1 from voting proxies received from other

9  shareholders.  Proposal 1 seeks the removal of six of the current Allergan Board

10 members, and a majority of outstanding shares must vote in favor for the proposal to

11 pass. Ex. 51 at 14.  Proposal 2 requests that the Board elect or appoint six highly

12 qualified and independent individuals to the Board. *Id.* at 14–15.  This

13 recommendation does not require appointment even if passed by a majority. *Id.* at 15.

14 Proposals 3 through 7 deal with amendments to the bylaws addressing concerns with

15 the overly restrictive provisions affecting shareholder rights, which require a majority

16 vote to pass. *Id.* at 15–19.  The last proposal is a non-binding request that the Board

17 engage in good faith negotiations with Valeant. *Id.* at 19.  Because the vote is non-

18 binding in nature, "the Board will be under no legal obligation to take any action with

19 respect to the shareholders' request to engage with Valeant, no matter how many votes

20 are cast in favor" of this proposal. *Id.* at 20.

21                        **THE PRELIMINARY INJUNCTION RECORD**

22          Defendants provided Allergan with approximately 170,000 pages of documents,

23 including board minutes, internal emails, financing documents and other records

24 detailing the events that occurred during the relevant time frame.  Allergan also

25 deposed the CEO and CFO of Valeant, the CEO of Pershing Square, and a senior

26 member of Pershing Square's investment team.  All of this material was provided to

27 Allergan prior to the agreed date for it to file its preliminary injunction motion.  As

28

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

discussed below, discovery revealed that there is no factual support for the accusations Allergan has made in this case.

By contrast, Allergan's response to discovery was, to be charitable, inadequate, requiring Court intervention and hearings to pry documents from the Plaintiffs. Ultimately, the filing deadline for Defendants' response had to be extended as a result of the delayed production. Through it all, the following facts are beyond dispute:

In January 2014, Valeant and Pershing Square began discussing ways they might work together. Pearson Decl. ¶¶ 4–5; Ackman Decl. ¶¶ 5–7. They signed a confidentiality agreement on February 9, and Valeant disclosed it was interested in acquiring Allergan. Pearson Decl. ¶ 10; Ackman Decl. ¶ 9. Valeant and Pershing Square then spent two weeks working to determine how best to accomplish an acquisition of Allergan and how to structure their relationship. Pearson Decl. ¶¶ 11–15; Ackman Decl. ¶¶ 10–12. There were no discussions at this time of a tender offer, because everyone involved knew it would be pointless: Allergan could adopt a poison pill, making it impossible to close the tender offer. Ex. 12 at 97:20–98:12, 125:6–23; Ex. 1 at 139:9–142:8; Ex. 4 at 204:13–205:15; Daines Decl. ¶¶ 12–14.[2]

The discussions culminated in a Relationship Agreement signed on February 25. Ex. 54. The Relationship Agreement set forth the terms of a joint venture in which, among other things: the parties would form a new entity, PS Fund 1, to acquire Allergan stock (id. ¶ 1(a)); Valeant would contribute approximately $75 million to PS Fund 1, and Pershing Square would contribute the rest (id.); Valeant would consult with Pershing Square before making any material decision relating to the merger proposal (id. ¶ 1(d)); and, if a transaction is completed, Pershing Square will hold beneficially at least $1.5 billion of Valeant stock for at least a year (id. ¶ 2(c)), while Valeant is entitled to a share of PS Fund 1's profits if Allergan agrees to a competing

[2]   All references to "Ex." are to the Appendix of Exhibits in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, submitted concurrently herewith.

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

transaction (¶ 3(a)).  The express purpose of the agreement was to pursue a merger with Allergan—it prohibited launching a tender or exchange offer without the consent of both parties.  *Id*. ¶ 1(d).

Between February 25 and April 21, 2014, PS Fund 1 acquired 9.7 percent of Allergan's outstanding equity.  During that time, Valeant made numerous preparations for a merger proposal, and none for a tender offer.  Valeant prepared a draft merger proposal to be presented to Allergan; it did not prepare documentation for a tender offer. *See* Ex. 23 at 39–52; Pearson Decl. ¶¶ 29, 30(a).  It arranged for financing for a merger; it did not seek or obtain financing for a tender offer.  Wolfe Decl. ¶ 4; Mehta Decl. ¶ 4; Ex. 3 at 61:6–63:12, 72:16–73:17, 96:20–97:13; Ex. 69. ████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

On April 21, Defendants publicly announced PS Fund 1's ownership of Allergan equity.  Exs. 55, 71.  On April 22, they sent a public letter to Allergan's board proposing a merger and attaching a draft merger agreement. Ex. 72.  There was no mention of a tender offer.  *Id*.  As expected, the Allergan board adopted a poison pill the following day. Ex. 86.  Pershing Square began preparing to hold a shareholder referendum, to give shareholders an opportunity to voice their opinion as to whether the Allergan board should sit down and negotiate a merger with Valeant.  Ackman Decl. ¶ 26.  Defendants also attempted repeatedly to initiate discussions with Allergan.  Pearson Decl. ¶ 21; Ackman Decl. ¶¶ 22–25.  Allergan formally rejected Valeant's proposal on May 12. Ex. 86.  On May 28, Valeant substantially increased its offer.  Ex. 87.

In late May, officers of Pershing Square and Valeant attended the Sanford Bernstein investor conference in New York and spoke with many large Allergan shareholders. Ex. 15 at 233:15–234:3; Ex. 12 at 125:6–23; Ex. 1 at 164:19–165:4.  The

9

shareholders conveyed that: (i) Valeant should raise its offer; (ii) the bidders should solicit support for a special meeting to remove Allergan's directors; and (iii) they should accompany the meeting request with a tender offer to show their commitment to a deal.  Ex. 1 at 164:19–165:4, 253:17–255:11, 270:13–273:1; Ex. 12 at 125:6–23; Ex. 15 at 233:15–234:3, 248:4–249:11.  Valeant and Pershing Square responded to this feedback.  On May 30, they announced a new, higher offer.  Pearson Decl. ¶ 27.  On June 2, Valeant and Pershing Square announced that they would forego the referendum, and instead begin soliciting shareholder requests for a special meeting. Ackman Decl. ¶ 44.  And after meeting with Allergan shareholders on May 28, Valeant began, for the first time, taking any steps toward a tender offer.  Pearson Decl. ¶¶ 25–28; Ex. 1 at 272:5–273:1.

The steps taken toward a tender offer on and *after* May 28 contrast sharply with the steps toward a merger prior to that. ███████████████████████ ██████████████████████████████████████ Valeant sought financing for a tender offer, and on June 12, its lenders provided a financing commitment that, unlike prior commitments, stated that the financing could be used for a tender offer.  Ex. 85; Wolfe Decl. ¶ 5; Mehta Decl. ¶ 5.  Valeant for the first time authorized its counsel to begin preparing the substantial legal documentation necessary for a tender offer on May 28.  Pearson Decl. ¶ 30.  And Valeant for the first time contacted an exchange agent and a dealer manager—both of which are necessary for a tender offer but not a merger—on or around June 6 and 7.  *Id*.

The record is undisputed that the actions of Valeant and Pershing Square prior to April 22—such as hiring counsel, holding meetings, and preparing public filings— were not in support of a tender offer. ████████████████████████ ████████████████████████████████████████ ███████████████████████████████████████████

10

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████   There is not one shred of evidentiary support

6 for the proposition that steps taken toward a merger necessarily are in furtherance of a

7 tender offer.

8 **ARGUMENT**

9 "A preliminary injunction is an extraordinary remedy never awarded as of right.

10 In each case, courts must balance the competing claims of injury and must consider the

11 effect on each party of the granting or withholding of the requested relief." *Winter v.*

12 *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotations and citation omitted).

13 The moving party must establish four elements to obtain a preliminary injunction: (1)

14 that it will suffer irreparable harm if the injunction is not granted, (2) that its threatened

15 injury outweighs the harm caused to the opposing party as a result of the injunction, (3)

16 that the injunction is not adverse to the public interest, and (4) that it has a substantial

17 likelihood of success on the merits of the case. *Alliance for the Wild Rockies v.*

18 *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Although the four factors can be

19 balanced against one another on a sliding scale, a movant must make at least a

20 threshold "showing on all four prongs." *Id.*

21 Allergan asserts that injunctive relief here would be to "preserve the status quo."

22 Mot. 1, 5. That is an inaccurate characterization of the extraordinary nature of the

23 relief Plaintiffs seek. Where, as here, the movant seeks a mandatory rather than a

24 prohibitory injunction, the "preliminary relief is subject to heightened scrutiny and

25 [3] ████████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ██████████████████████████████████████████████████

28 ██████████████████████████████████████

11

should not be issued unless the facts and law clearly favor the moving party." *Dahl* v.
*HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Marlyn Nutraceuticals, Inc.* v. *Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases").

The status quo is that PS Fund 1 is a 9.7 percent stockholder of Allergan. Pursuant to both title 8, section 212 of the Delaware code and Allergan's bylaws, PS Fund 1 is entitled to vote at the upcoming special meeting.  Plaintiffs ask this Court to strip PS Fund 1 of those voting rights, and also invalidate the votes of other Allergan stockholders whose proxies were solicited by Defendants.  Such relief would dramatically alter the status quo and therefore is "particularly disfavored." *Anderson v. United State*s, 612 F.2d 1112, 1114 (9th Cir. 1979) (quotation omitted).

# I.  Plaintiffs Have Not Demonstrated any Likelihood of Irreparable Injury.

"An essential prerequisite to the granting of a preliminary injunction is a showing of irreparable injury to the moving party in its absence." *Dollar Rent a Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985).  "Irreparable injury is an injury that is not remote or speculative, but actual and imminent and for which monetary damages cannot adequately compensate." *Dotster, Inc. v. ICANN*, 296 F. Supp. 2d 1159, 1162 (C.D. Cal. 2003).  The preliminary injunction "standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.  Indeed, the "most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  Charles. A. Wright, *et al.*, *Federal Practice and Procedure* § 2948.1 (2014 online ed.).

## A.  Allergan Faces No Imminent and Irreparable Harm.

Allergan has not argued that voting on proposals 3, 4, 5, 6, 7, or 8 would result in any irreparable harm, Mot. 33–36, thereby conceding that no injunction should

apply to those proposals.  Proposals 3 through 7 make it less difficult for shareholders to call a special meeting.  Allergan chose not to defend them in related Delaware litigation after the Delaware Court called them "quite a horse-choker of a bylaw." Ex. 89 at 35:10-11.  Moreover, Institutional Shareholder Services, the leading shareholder advisory service, harshly criticized them as improperly hostile to legitimate shareholders' rights. Ex. 24 at 8–10; Ex. 25 at 6, 7.  They are, in fact, the worst special meeting bylaws among Delaware companies, where Allergan is incorporated. Subramanian Decl. ¶¶ 34–37.  There is no credible argument that voting on, or even making the proposed governance changes would cause any harm, much less irreparable harm.

Proposal 8 is a non-binding shareholder recommendation that the Allergan board engage in "good faith discussions" with Valeant regarding Valeant's merger proposal. Ex. 51 at 19–20.  This proposal states that it does not "in any way preclud[e] discussions the Board may choose to engage in with other parties potentially offering higher value." *Id*. at 19.  A non-binding request that the board engage in discussions cannot cause irreparable harm.

The only proposals that Allergan argues could result in irreparable harm are proposals 1 and 2.  This argument is supported by literally nothing.  Proposal 1 is a vote to remove six of Allergan's nine directors.  *Id*. at 14.  Allergan has provided no authority for the notion that the removal of directors by an affirmative vote of shareholders in accordance with governing corporate law presents a threat of irreparable harm that justifies an injunction.  Nor does Allergan provide any evidence supporting its theory of irreparable harm. ███████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████

---

4   It won't.  *Compare* Ex. 35 Art. II § 3(B)(1) (Allergan bylaw providing that the secretary may not accept special meeting requests from persons who have violated the (Continued…)

1    Proposal 2 is for a non-binding shareholder recommendation on the nomination

2  of six new directors, in the event Proposal 1 passes. Ex. 51 at 14–15.  Allergan cannot

3  and has not provided any evidence that it will be harmed if its remaining Board

4  members receive a recommendation on new directors.  ████████████████████

5  ███████████████████████  Notably, this proposal does not actually put any new

6  member on the Board.  "Proposal 2 is nonbinding in nature and thus the Board will be

7  under no legal obligation to take any action with respect to the shareholders' request to

8  appoint new directors."  Ex. 51 at 15; ████████████████████████████

9  █████████████████████  ████████████████████  Under

10  Allergan's Charter, open board seats are filled by the remaining directors.  Ex. 38.

11    Unable to argue that voting on these proposals would cause it harm, Allergan

12  spins out theories of harm based on speculation that Allergan's directors and

13  shareholders will repeatedly act against their own interests and "destroy" the company

14  by selling it to Valeant, and that only Allergan's current directors and management

15  know what is best for shareholders.  These theories defy common sense.  They assume

16  that: (1) Proposals 1 and 2 pass; (2) the three remaining members of the Allergan board

17  follow the recommendation on Proposal 2 and nominate Defendants' proposed slate;

18  (3) at least a majority of Allergan's directors *breach their fiduciary duties* by

19  approving a transaction with Valeant that is not value maximizing to Allergan's

20  shareholders; and (4) the majority of these shareholders then vote in favor of the

21  supposedly "destructive" merger.  *See* Partnoy Decl. ¶ 11.

22    As a threshold matter, nobody knows whether the proposals will pass or fail,

23  regardless of whether the Court enjoins PS Fund 1 from voting its shares.  ████

24  ████████████████  if the Court enjoined PS Fund 1 from voting all of its

25  shares—9.7 percent of those outstanding—a proposal could still pass if it receives

26

27  securities laws); *with id.* Art. II § 6 (bylaw on shareholder voting containing no similar

28  limitation).

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1    strong support from remaining shareholders. ███████████████  Conversely, if

2    the Court does not enjoin PS Fund 1 from voting, a proposal could still fail if it

3    receives little support from remaining shareholders.  *Id.*  Allergan has provided no

4    factual basis to guess how shareholders will vote.

5            The courts, however, have expressly rejected corporate management's assertions

6    of potential irreparable harm if directors are replaced or a merger is successful.  This

7    unbridled speculation that unidentified future directors and shareholders will act

8    irrationally and against their own interests does not come remotely close to satisfying

9    the standard required to obtain an injunction.[5]  *Winter*, 555 U.S. at 21 ("must

10   demonstrate a *likelihood* of irreparable injury—not just a possibility—in order to

11   obtain preliminary relief"); *see also Dan River, Inc. v. Icahn*, 701 F.2d 278, 283 (4th

12   Cir. 1983) (no irreparable harm despite assertions that acquirer would "embark upon a

13   course of extraordinary transactions which will dismantle the company as it now

14   exists"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The speculative

15   nature of [a] claim of future injury requires a finding that this prerequisite of equitable

16   relief [irreparable injury] has not been fulfilled.").

17           *Ranger Oil Ltd. v. Petrobank Energy & Res. Ltd.*, 2000 WL 33115906

18   (S.D.N.Y. May 23, 2000) illustrates the lack of irreparable harm arising from claims

19   such as those Allergan makes here.  Ranger Oil was the subject of an unwelcome

20   tender offer made by a consortium consisting of a competitor (Petrobank) and an

21   investment fund (Caribou).  *Id.* at *1.  Before the offer, Caribou purchased a

22   substantial block of Ranger shares.  *Id.*  Ranger sued and moved to preliminarily enjoin

23   the tender offer because the Caribou parties' "purchases of Ranger shares . . . on the

24   basis of [their] inside knowledge of the impending tender offer, constituted illegal

25   insider trading in violation of § 14(e) of the Act and SEC Rule 14e–3."  *Id.* at *3.

26   ───────────────
     [5] ████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ██████████████████████████████

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The court denied the motion for lack of injury, irreparable or otherwise.  As here, "any alleged injury is a harm solely to those Ranger shareholders who sold to [Caribou] and not a harm to Ranger itself."  *Id.* at *9.[6]  The court further rejected the premise that Ranger could rely upon any injuries to its shareholders as the basis for injunctive relief.  These "allegedly aggrieved Ranger shareholders may bring an action for monetary damages to recover the difference in value between the price they received on the sale of the shares to [Caribou]—if indeed there were any insider trading—and the value of the shares if the alleged insider information had been publicly known."  *Id.*  In a holding that is squarely on point here, *Ranger Oil* held that an injunction would be inappropriate.  *Id.*[7]

**B.**  **Any Supposed Harm from PS Fund 1 Voting Its Shares Is Not Harm Cognizable Under the Federal Securities Laws.**

The voting rights of shareholders are creatures of state law.  The law of Delaware—the state in which Allergan chose to incorporate—entitles PS Fund 1 to vote its shares at any Allergan shareholder meeting.  Del. Code Ann. tit. 8, § 212(a) ("[E]ach stockholder ***shall be entitled*** to 1 vote for each share of capital stock held by such stockholder.") (emphasis added); *see also In re The MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 666 n.1 (Del. Ch. 2004) ("the court is unaware of any precedent

---

[6]   In so holding, *Ranger Oil* distinguished *Burlington Indus., Inc. v. Edelman*, 666 F. Supp. 799, 813 (M.D.N.C. 1987), noting that in that case the target/issuer was the source of the information. *Ranger Oil*, 2000 WL 33115906 at *9 ("Ranger alleges not that the Caribou defendants traded on inside information illicitly obtained from Ranger, but rather that [Caribou] traded on inside information from [the offeror's] plans for a tender offer.").

[7]   *See also Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 717–18 (5th Cir. 1984) (holding that regardless of whether management of a company might view change as "catastrophic," the target company "was not injured in any manner by its sale"); *Telex Corp. v. Shepard v. Meridian Ins. Grp., Inc.*, 137 F. Supp. 2d 1096, 1113 (S.D. Ind. 2001) ("The corporation itself would not be harmed directly by the sale or exchange of its shares for a low price."); *Telex Corp. v. Edelman*, No. 87-C-873-E, 1987 WL 43390, at *3 (N.D. Okla. Nov. 5, 1987) (concerns that the "company itself could be harmed by being divided and parceled out following a successful takeover" is not "a basis for irreparable harm").

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

that would support the plaintiffs' suggestion that this court should consider sterilizing the voting power of shares in situations of this kind").  Allergan's Bylaws likewise provide that "[e]ach stockholder shall, at each meeting of stockholders, be entitled to vote in person or by proxy each share of stock of the Corporation that has voting rights." Ex. 34, Art. II, § 6.

Allergan cites no authority for the proposition that, even if it prevailed at a full jury trial on the merits, shares acquired in violation of Rule 14e–3 may be selectively stripped of the incidents of share ownership, including voting rights.  There is none.  Indeed, the remedy, if any, for a violation of the Rule is a cause of action for damages by a shareholder with proper standing.  *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60 (1975) ("[T]hose persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages, thus negating the basis for equitable relief.").

Tellingly, the key paragraph in which Allergan argues that it is entitled to "an injunction to prevent Defendants from exercising ownership rights flowing from their illegal stock purchases,"—*i.e.*, taking away PS Fund 1's right to vote—cites *no legal authority whatsoever*. Mot. at 38.  The paragraph only cites an expert report.  *See id.*  The reason Allergan cites no such authority is simple:  Courts have uniformly rejected claims for injunctive relief seeking disenfranchisement—sometimes called "sterilization"—of shareholders.  *See CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 287 (2d Cir. 2011) (sterilization "inappropriate"); *Gearhart Indus.*, 741 F.2d at 717 (blocking shareholder from voting "might smack of that very 'tilting' that the Williams Act seeks to avoid, whereby the court, rather than market forces and the combatting parties, determines the outcome of the struggle for corporate control").[8]

---

[8]  *See also Dan River*, 701 F.2d at 292; *Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977); *accord Pac. Realty Trust v. APC Inv., Inc.*, 685 F.2d 1083, 1086 (9th Cir. 1982) (temporarily enjoining a tender offer until corrective disclosures are made is the ordinary remedy for a Williams Act violation).

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

None of the 1980's-era district court cases cited elsewhere in the section of Allergan's brief provide otherwise.  For example, in *S-G Securities, Incorporated v. Fuqua Investment Company*, the court refused the "drastic" remedy of enjoining the defendant from acquiring additional shares or voting its shares; instead, it issued a time-limited injunction based upon disclosure violations—Rule 14e-3 was not at issue.  466 F. Supp. 1114, 1130 (D. Mass. 1978).[9]

## II.   The Actual and Permanent Harm that Granting an Injunction Would Cause Outweighs the Imagined Harm It Would Prevent.

To obtain an injunction, Allergan must prove that it would face more serious harm without an injunction than Defendants would face if one were granted.  *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 526 F.2d 86, 87 (9th Cir. 1975) (plaintiffs must show that "in balancing the equities, the defendants will not be harmed more than plaintiff is helped by the injunction"); *see also Winter*, 555 U.S. at 24.  Given the total absence of actual harm faced by Allergan, *supra*, the balance would tip against an injunction even if it would only cause Valeant and Pershing Square slight harm.

Allergan's Motion asks this Court for an Order "preliminarily enjoining" Defendants from "exercising any of the rights or benefits attendant to" its ownership of Allergan stock.  Mot. 38.  Although Allergan's brief largely speaks of stopping PS Fund 1 from voting its own shares at the special meeting, the nebulous relief sought in its proposed injunction is far broader.  It would invalidate the votes of *other Allergan shareholders* simply because those votes were expressed in a proxy given to

---

[9]   Because Plaintiffs' brief contains no argument regarding how Ms. Parschauer will be irreparably injured in the absence of an injunction, the issue is waived.  *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110 n.1 (9th Cir. 2000) (en banc).  In any event, Ms. Parschauer's purported injury is ███████████████████████ —she nonetheless sold too cheaply because, unlike PS Fund 1, she did not know that Valeant might, four months later, launch a tender offer. That injury can be completely redressed with damages.  Ms. Parschauer thus has no irreparable injury.  *See Rondeau*, 422 U.S. at 60; *see also Brody*, 280 F.3d at 1002 (addressing private damages remedy under Rule 14e–3).

Defendants.  Proposed Order ¶ 2.  Because nearly all shareholders vote by proxy,[10] the injunction would effectively preclude the special meeting.  Even if the Court limited the injunction to precluding PS Fund 1 from voting its shares, that injunction could be outcome-determinative because it would effectively stack the vote in favor of Allergan's management.[11]  Allergan's shareholders, not anyone else, should determine whether to accept or reject the eight proposals on December 18.  Plainly, the relief Allergan seeks would cause, rather than prevent, irreparable harm.  *La. Muni. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*, 886 F. Supp. 2d 1255, 1267 (W.D. Okla. 2012) ("[I]rreparable harm may be established where corporate management denies shareholders the right to 'vote their shares and to exercise their rightful control over the corporation.");  *AHI Metnall L.P. by AHI Kan., Inc. v. J.C. Nichols Co.*, 891 F. Supp. 1352, 1359 (W.D. Mo. 1995) ("[M]anagement subjects shareholders to irreparable harm by denying them the right to vote their shares or unnecessarily frustrating them in their attempt to obtain representation on the board[.]").

Moreover, the relief Allergan seeks is not just preliminary, but effectively permanent.  An injunction precluding Defendants from voting their shares and/or proxies given to them will irreversibly alter the playing field in the December 18 vote, and there is no way to remedy that injury if Defendants ultimately prevail in this action.  Partnoy Decl. ¶ 9.  Allergan's request is thus not a request for preliminary relief to preserve the status quo pending a final trial on the merits.  Rather, Allergan seeks final relief in the form of disenfranchisement for purposes of the December 18

---

[10]  *See generally Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 340 (Del. Ch. 2008).

[11]  Under Allergan's Certificate of Incorporation, an "affirmative vote of at least a majority of the outstanding shares" is required to remove directors.  Ex. 38 Art. 7.  Thus, by disenfranchising PS Fund 1's 9.7 percent vote while its shares remain "outstanding," Allergan's management would effectively increase the vote required to remove directors from the simple majority required in its certificate to a supermajority of approximately 56 percent of the non-PS Fund 1 shares.  In effect, a stay would convert PS Fund 1's shares into "no" votes.

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Special Meeting.  In effect, Allergan is asking the Court to usurp the role of the jury Allergan requested and to grant it final relief now.

Further, in *Energy Ventures, Inc. v. Appalachian Co.*, the district court rejected as "inappropriate" a request for preliminary relief that would sterilize voting or rescind stock ownership when there had not been a "full hearing on the merits."  587 F. Supp. 734, 743 (D. Del. 1984).  The injunctive relief sought by Allergan cannot be granted on a preliminary basis.  *See Winter*, 555 U.S. at 32 ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that for a permanent injunction plaintiff must show "actual success" (quotation omitted)).

## III.    The Public Interest Does Not Favor Granting an Injunction.

Plaintiffs have also failed to meet their burden to show that an injunction is in the public interest.  *See Alliance for the Wild Rockies*, 632 F.3d at 1131 (movant bears burden on all four *Winter* factors).  The public interest is not benefited by an order enjoining shareholders such as Defendants from exercising voting rights attached to the shares that they purchased in corporations like Allergan, particularly where such an injunction is unprecedented and unwarranted.  In *Masters v. Avanir Pharms., Inc.*, the court assessed the public interest involved where a plaintiff sought to enjoin shareholder voting.  996 F. Supp. 2d 872 (C.D. Cal. 2014).  The court held that enjoining a shareholder vote was not in the public interest:

> Plaintiff can vote against the proposed incentive plan.  He can seek to persuade other shareholders to vote against the plan.  He can even sell his shares.  All of these actions are consistent with the public interest in allowing the efficient internal affairs of the corporation to maximize shareholder wealth.  But seeking to enjoin the vote altogether, in the hopes of obtaining disclosure of information that is incorrect, immaterial, or already disclosed, is definitely not in the public interest.  *Id.* at 887.

With respect to the Williams Act, the public interest is "embodied in the shareholders, persons whose interests are protected by the policies underlying the Williams Act. . . . [I]t is distinctly in the public interest to maintain that neutrality

20

1   which Congress has found essential to the proper operation of the market approach for

2   protecting investors embraced by the Williams Act." *Martin-Marietta Corp. v. Bendix*

3   *Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also Edgar v. Mite Corp.*, 457 U.S. 624,

4   633 (1982) ("Congress became convinced 'that takeover bids should not be

5   discouraged because they serve a useful purpose in providing a check on entrenched

6   but inefficient management.'  It also became apparent that entrenched management

7   was often successful in defeating takeover attempts." (quotation omitted)).

8           Here, the public has no interest in constraining Allergan's shareholders' ability

9   to cast a vote on the eight proposals at the December 18 meeting.  To the contrary, the

10  public interest favors permitting all shareholders to vote.  The Chancery Court in the

11  related Delaware litigation recognized on the record: "the exercise of the [shareholder]

12  franchise is a critical right under Delaware law."  Ex. 36 at 78:20–21.  Indeed, the

13  shareholder franchise is "the ultimate check, and *the loss of that right . . . can rarely be*

14  *remedied after the fact*."  *Id.* at 78:22–24 (emphasis added).

15          Allergan's board has had, and will continue to have, ample opportunity to

16  persuade its shareholders to vote against Defendants' proposals at the December 18

17  Special Meeting, and any merger offer that might come to vote thereafter.  This is

18  consistent with the public interest "in allowing the efficient internal affairs of the

19  corporation to maximize shareholder wealth."  *See Masters*, 996 F. Supp. 2d at 887.

20  But to enjoin PS Fund 1 from voting its shares is not in the public interest.

21  **IV.   Plaintiffs Have No Likelihood of Success on the Merits of Their Claims.**

22          **A.   Allergan Cannot Prevail on the Merits of Its Claim Under SEC**
                 **Rule 14e–3.**

23

24          Allergan's principal claim is founded on its assertion that**,** in connection with PS

25  Fund 1's purchase of its stake in Allergan, Defendants engaged in insider trading in

26  violation of SEC Rule 14e–3, 17 C.F.R. § 240.14e–3.  Compl. ¶¶ 19, 168–80.  "Rule

27  14e–3 regulates illegal insider trading that takes place while a tender offer is under

28  consideration."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1004 (9th Cir.

2002).  Liability under Rule 14e–3 requires proof that: (1) an "offering person" "has taken a substantial step or steps to commence, or has commenced, a tender offer"; (2) an "other person" is "in possession of material information relating to such tender offer"; (3) the "other person" "knows or has reason to know [that the information] is nonpublic"; (4) the "other person" "knows or has reason to know [that the information] has been acquired directly or indirectly from" the "offering person"; and (5) the "other person" purchases or sells the target's securities.  17 C.F.R. § 240.14e–3(a); *accord Brody*, 280 F.3d at 1004 (noting that "[a]ll the elements of a Section 14(e)/Rule 14e–3 insider trading violation are supplied by the language of Rule 14e–3." (quotation omitted)).  In addition, a plaintiff seeking relief under Rule 14e–3 must establish its standing.  *Brody*, 280 F.3d at 1004.  For several reasons, Allergan's Rule 14e–3 claim must fail.

### 1.     Allergan Has No Standing Under Rule 14e–3.

Allergan has no standing to sue because it did not sell any of its own shares at or around the time that Pershing Square acquired its Allergan shares.  The law on this issue has been settled by an on-point case from the Ninth Circuit, *Brody*, 280 F.3d 997. *Brody* held that only "contemporaneous traders" have standing to bring insider trading claims.  *Id.* at 1003.  Allergan bears the burden of establishing standing.  But it did not allege, and presented no evidence in its Motion, that it traded in its own stock at the time PS Fund 1 was buying stock.

Allergan attempts to distinguish *Brody* in a footnote on the last page of its brief on the ground that *Brody* addressed only non-contemporaneous traders suing for damages, not issuers suing for injunctions.  Mot. 40 n.47.  This assertion is of no help to Allergan.  *Brody* expressly held that the SEC enacted Rule 14e–3 only to protect those who suffer the disadvantage of trading with a counter-party that has an illicit informational advantage, and no one else.  *Brody*, 280 F.3d at 1005.  The contemporaneous trading rule is a limit on the scope of the duty to disclose or abstain —a duty owed only to those with whom the defendant potentially traded.  *Neubronner*

22

*v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993); *accord Brody*, 280 F.3d at 1005 (deriving Rule 14e–3 standing from Rule 10b–5 analysis in *Neubronner*).  Thus, only those who actually purchased or sold stock contemporaneously with the challenged trade have standing to bring a claim under Rule 14e–3.

Allergan cites two out-of-circuit district court cases for the proposition that a target company has standing to bring a claim for injunctive relief under Rule 14e–3. *Burlington Indus.*, 666 F. Supp. at 813; *Essex Chem. Corp. v. Gurit-Heberlein AG*, 1988 U.S. Dist. LEXIS 19515, at *15 (D.N.J. June 24, 1988).  Both cases were decided before *Brody*, which necessarily rejects their reasoning.  Moreover, neither of these cases has any substantive analysis of the standing issue.  These district court cases also addressed an entirely different situation where the plaintiff sought to prevent future unlawful insider trades based upon information misappropriated *from the plaintiff*. Nothing of the sort is alleged here.  And to the extent that they *assume* that standing under Rule 14e–3 exists whenever there is standing under section 14(e), that proposition was rejected in *Brody*, 280 F.3d at 1005.[12]

Allergan attempted to elude its standing defects by including Ms. Parschauer, as a co-plaintiff who supposedly "exercised and sold Allergan stock options" during a relevant timeframe.  Compl. ¶ 21.  Her potential remedy, however, is limited to obtaining damages, *see Ranger Oil,* 2000 WL 33115906, at *9, and she cannot seek an injunction because she has an adequate legal remedy.  *See Rondeau*, 422 U.S. at 60.

---

[12]   *Ranger Oil*, 2000 WL 33115906—a case upon which Allergan inexplicably relies—expressly rejected Allergan's theory of standing.  Far from "assuming issuer standing" Mot. 40 n.47, the *Ranger* court held that "any alleged injury is a harm solely to those Ranger shareholders who sold to [defendants], and not a harm to Ranger itself." *Ranger Oil*, 2000 WL 33115906, at *9 (citing *Dirks v. SEC.*, 463 U.S. 646, 672 n.7 (1983) (Blackmun, J., dissenting) ("Insider trading generally does not injure the corporation itself.")).

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## 2. No Substantial Steps Toward a Tender Offer Had Been Taken when PS Fund 1 Acquired Its Shares.

Rule 14e–3 applies only when an offering person has "taken a substantial step or steps to commence, or has commenced, a tender offer[.]"  17 C.F.R. § 240.14e–3.  The steps must be (1) *toward a tender offer*, and not another form of transaction, *see S.E.C. v. Warde*, 151 F.3d 42, 47 (2d Cir. 1998) ("we must also find evidence that a 'substantial step' had been taken toward a tender offer at the time of the inside trading"), and (2) *substantial*, that is, they must show a meaningful effort to commence a tender offer, *see S.E.C. v. Maio*, 51 F.3d 623, 636 (7th Cir. 1995).  This determination is "to be made on the facts of each case." *Id.*

The requirement that the substantial steps described in Rule 14e–3 in fact be in connection with a tender offer is jurisdictional—"the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer."  *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 34 (1977).  In the Release accompanying the adoption of Rule 14e–3, the Commission explained that the "substantial step" requirement was intended to provide an objective measure of the date upon which there was in fact a determination by the bidder to initiate a tender offer, in response to "commentators' concern with the difficulty of identifying when a person has actually determined to make a tender offer."  Tender Offers, Exchange Act Release No. 17,120, 20 SEC Docket 1350, 1980 WL 20869, at *6 n.33 (Sept. 4, 1980).  The Commission noted that, "although this standard is not totally objective, it provides a reasonable basis to identify when the prohibition of Rule 14e–3(a) would apply."  *Id*.  For this reason, without an actual decision—express or implied—by the putative bidder to pursue a tender offer, there is no basis to invoke the proscriptions of the Williams Act.  *United States v. Chestman*, 947 F.2d 551, 558 (2d Cir. 1991) (en banc) (Williams Act is confined to the "discrete and highly sensitive area of tender offers").

Recognizing this, the SEC's implementing release identifies various acts as substantial steps, but only when related or connected with a tender offer including: (1)

24

"voting on a resolution by the offering person's board of directors *relating to the tender offer*"; (2) "the formulation of a plan or proposal t*o make a tender offer* by the offering person or the person(s) acting on behalf of the offering person"; (3) "activities which substantially facilitate *the tender offer* such as: arranging financing *for a tender offer*; preparing or directing or authorizing the preparation of *tender offer materials*"; or (4) "authorizing negotiations, negotiating or entering into agreements with any person to act as a dealer manager, soliciting dealer, forwarding agent or depository *in connection with the tender offer*."  Tender Offers, SEC Release No. 17,120 20 SEC Docket 1350, 1980 WL 20869 at *6 n.33 (emphases added).

Here, no decision was made prior to May 2014 to pursue a potential tender offer. It was the opposite.  The record is undisputed that there was an affirmative decision *not* to pursue a tender offer, and an agreement between Pershing Square and Valeant that no tender offer would be pursued without their mutual consent.  This was not some smoke screen—everyone, including Allergan and its bankers, fully understood that a tender offer was not a viable vehicle to complete an acquisition because Allergan would put in place a poison pill preventing additional stock purchases.  Where, as here, the record is undisputed that no tender offer was intended or contemplated at the time PS Fund 1 acquired Allergan shares, there is no basis at all to invoke Rule 14e–3.

### a.   The Factual Record Demonstrates that No Steps Were Taken Toward a Tender Offer Before Late May.

PS Fund 1 purchased shares or options starting on February 25. Ex. 51 Annex B. All purchases by PS Fund 1 were completed by April 21, 2014 and closed shortly thereafter.  *Id.*  A tender offer was first made on June 18, 2014, Pearson Decl. ¶ 31, almost two months after the last purchase of shares by PS Fund 1.  The evidence unequivocally shows that Defendants did not begin taking steps toward a tender offer until late May. Indeed, every fact witness with knowledge testified that the decision to consider a tender offer resulted from meetings in late May with Allergan shareholders. For example, Valeant's CFO, Howard Schiller, testified:

25

> The first time an exchange offer was contemplated was at the end of May, and it happened I know -- I can remember quite precisely when it happened because we had bumped our bid, and then we had gone to the Sanford Bernstein conference, and the shareholders said, you didn't -- we want more, more money, which we expected to hear.  These are Allergan shareholders.  We were presenting at the conference, and they said, you know, throw away this referendum, it's a waste of time, go get the 25 percent, and put an exchange offer on the table so we have something real to consider. Up until that point, there was never a consideration on an exchange offer.

Ex. 15 at 233:15–234:3.  Every relevant witness testified that there was no consideration of making a tender offer in the February, March, and April time frame.  Ex. 12 at 123:7–10; 123:25–125:23; Ex. 15 at 233:2–7; ██████████████████

Rather, from the outset Defendants planned to pursue a negotiated merger between Valeant and Allergan, including through external pressure from shareholders.  Ackman Decl. ¶¶ 13, 16; Pearson Decl. ¶¶ 17–23.  There was no plan, intent or desire to initiate a tender offer because it served no purpose—Defendants knew any tender offer could not close because of Allergan's expected poison pill.  Ackman Decl. ¶¶ 35; *see also* Daines Decl. ¶¶ 29–31; Partnoy Decl. ¶ 50; Mills Decl. ¶ 25; Ex. 1 at 139:3–141:11.  It was not until the end of May that Defendants changed course.  Ackman Decl. ¶¶ 33–43; Pearson Decl. ¶¶ 24–30.  Every shred of evidence confirms these facts.  First, the February 25 Relationship Agreement expressly precluded Valeant from making a tender offer for Allergan shares without Pershing Square's consent.  Ex. 54 ¶ 1(d).  This was not merely a self-serving statement inserted for litigation purposes, as Allergan argues.  To the contrary, ████████████████████
██████████████████████████████
████████████████████████████
██████████████████████████████
████████████████████████

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1 ██████████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 █████████████████████████████████████████

5 ████████████████████████████████████████

6 ███████████████████████████████

7 ████████████████████████████████████████

8 ████████████████████  Valeant did not secure financing that could support a tender offer

9 until mid-June.  Wolfe Decl. ¶¶ 4-5; Mehta Decl. ¶¶ 4-5; Ex. 85; *see also* Ex. 3 at

10 61:6–63:12, 72:16–73:17, 96:20–97:13; Ex. 69.

11       Defendants produced over 170,000 pages of documents in discovery, including

12 candid discussions between their CEOs.  Yet Allergan's Motion does not identify a

13 single email or other document demonstrating any understanding that the parties

14 intended or considered a tender offer before May 28, 2014.  Instead, Allergan relies on

15 an April 22 public statement by Mr. Ackman that investors can "launch various kinds

16 of offers" and a public statement by Mr. Pearson after the proxy statement and

17 proposed exchange offer were announced that Defendants suspected all along that the

18 proposal "would ultimately have to go directly to shareholders."  Mot. 12–13.  This

19 evidence is striking in what it does not show: Allergan's best evidence does not even

20 mention a tender offer.  Ackman's statement merely acknowledges that Defendants

21 had various options should Allergan refuse to negotiate; it hardly shows a previous

22 intention to launch an exchange offer.  And Pearson's comment simply notes that

23 Allergan would not negotiate a transaction until forced to do so by the shareholders.

24 These ambiguous and fleeting references do not begin to establish that Defendants

25 were planning a tender offer before April 21, particularly in the face of the

26 overwhelming evidence they were not.

27

28

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

b.    **Allergan Misleadingly Equates Steps Toward a Merger With the Commencement of a Tender Offer.**

In its Complaint, Allergan alleged that it would prove that Valeant had "planned to launch a tender offer" as early as February 2014. Compl. ¶¶ 14, 15. But now that discovery has concluded and all of the evidence reveals this allegation to be untrue, Allergan moves the goalposts and argues that it need not prove that any tender offer was planned. Instead, Allergan claims that steps taken in connection with Valeant's merger proposal or a consent or proxy solicitation may *in hindsight* be deemed "objective" evidence of steps that facilitate a later conceived and launched tender offer that was not planned at the time of the trading. *See, e.g.*, Mot. 4, 26–28. Allergan would have the Court treat certain activities undertaken in connection with *other* types of transactions as substantial steps even in the absence of evidence connecting these activities to a tender offer. *Id.* at 26; *see also* Partnoy Decl. ¶ 46; Daines Decl. ¶¶ 32–35. But Allergan is wrong on the law.

The SEC specifically explained—in the very footnote in its guidance that is cited in Allergan's brief—that the substantial steps standard "*is not totally objective*[.]" SEC Release No. 34-17120, 1980 WL 20869 at \*6 n.33 (emphasis added). A subjective component is necessary to tie the objective acts to an intended tender offer; otherwise acts that are factually unrelated to any tender offer could be considered substantial steps, which would exceed the SEC's regulatory authority in promulgating Rule 14e–3. To that end, at least one district court has refused to make a finding that the defendant had taken substantial steps toward a tender offer where the plaintiff failed to present any evidence as to when the defendant formed an intent to make a tender offer. *Telex Corp.*, 1987 WL 43390, at \*5.

Other case law is in accord with the *Telex* decision and the SEC guidance. For instance, in *Maio*, the Seventh Circuit held that the substantial step was a key meeting of the principles of the offeror and the subject company after the subject company had specifically requested that the offeror determine whether it would make a tender offer

28

1    and could secure the requisite financing.  51 F.3d at 636.  In *S.E.C. v. Warde*, the

2    Second Circuit found that a substantial step had occurred when the offeror had already

3    acquired a large toehold position in the target company and the target had launched

4    defensive measures which contemplated a competing management tender offer for the

5    target's shares.  151 F.3d 42, 49 (2d Cir. 1998).  In each case the "steps" found

6    sufficient for liability were both substantial and specifically directed to a tender offer

7    that was contemplated when such steps were taken.  *See also United States v.*

8    *O'Hagan*, 139 F.3d 641, 650 (8th Cir. 1998).

9           The only authority Allergan cites to suggest a contrary rule is *S.E.C. v.*

10   *Ginsburg*, which upheld a jury verdict finding defendant violated both Rule 10b–5 and

11   Rule 14e–3.  362 F.3d 1292 (11th Cir. 2004).  The court found that the jury could have

12   concluded that substantial steps had been made where the principals of the offeror and

13   the subject company had met, a confidentiality agreement signed, diligence begun, and

14   the CEO of the subject company had told the offeror that it needed to act quickly.  *Id.*

15   at 1304.  Although the parties had "not settled on a tender offer as the form of the

16   transaction until the last few days before the deal was announced," the court found that

17   there was sufficient evidence for the jury to conclude that a tender offer was actually

18   under consideration during the challenged trading period.  *Id.  Ginsburg* is inapplicable

19   here.[13]  It does not address a situation where, as here the parties had contractually

20   agreed *not* to pursue a tender offer when the trading took place, and did not do so.[14]

21   _____

22   [13] *Ginsburg* cites *S.E.C. v. Mayhew*, 121 F.3d 44, 53 (2d Cir. 1997) for the proposition
     that substantial steps can occur when "the companies had not settled on a tender offer

23   as the form of the merger."  But the reference is incorrect.  *Mayhew* explained, to the
     contrary, that the information received by the defendant "concerned the tender offer

24   and derived value from its nexus to the tender offer[.]"  *Mayhew*, 121 F.3d at 53.
     Information cannot "concern" a tender offer that is not yet in the works.

25
     [14]   Rule 14e-3 cannot be interpreted to apply to trades when no tender offer was in fact

26   planned.  Section 14(e) is a fraud statute, *In re Digital Island Secs. Litig.*, 357 F.3d
     322, 328 (3d Cir. 2004), and SEC rules may not be applied in a manner that alleviates

27   the need to prove fraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)
     (breadth of Rule 10b-5 must be limited to fraud within the scope of Section 10(b)).

28   (Continued...)

29

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   The putative "steps" asserted by Allergan are only substantial steps when they

2   have an actual connection to a contemporaneously planned tender offer.  Hiring a

3   mergers and acquisitions lawyer *to draft tender offer documents* is potentially a

4   substantial step toward a tender offer.  *O'Hagan*, 139 F.3d at 650.  Hiring a lawyer to

5   draft a merger agreement, as Defendants did here, is not.  Engaging a bank to *provide*

6   *tender offer financing* is potentially a substantial step.  *Id.*; *Maio*, 51 F.3d at 636.

7   Securing financing for a merger is not.  Having a board meeting to *vote on a resolution*

8   *approving a tender offer* is a substantial step.  *O'Hagan*, 139 F.3d at 650.  Having a

9   board meeting in which the board expressly forbids a tender offer, as occurred here,

10  cannot be a step towards a tender offer.  Otherwise, almost *anything* related to a

11  strategic transaction would qualify as a substantial step if a tender offer is later

12  commenced—█████████████████████████████████████████

13  █████████████████████████████████████████████

14  █████████████████████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████████████████████████████

17  ██████████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████████

20  ███████████████████████████████████████████████

21  ██████████████████████████████████████████████

22  ███████████████████████████████████████████████

23  ███████████████████████████████████████████████

24  ███████████████████████████

25

26  _____

    Rule 14e-3 cannot be misconstrued to render unlawful trades made at a time that the

27  trader knew that the information does *not* relate to a tender offer, for otherwise Rule
    14e-3 would impermissibly excise the fraud requirement of Section 14(e).  *Id.* ("scope

28  [of SEC rule] cannot exceed the power granted the Commission by Congress").

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

### 3.   PS Fund 1 Is an "Offering Person" Outside the Trading Proscription in Rule 14e–3.

An "offering person" does not violate Rule 14e-3 by purchasing the target company's securities. *See* 17 C.F.R. § 240.14e–3(a); *Pa. Ave. Funds v. Borey*, No. 06-1737RAJ , 2008 WL 426509, at *7 (W.D. Wash. Feb. 13, 2008) ("Only '[an]other person,' not the 'offering person,' can violate Rule 14e–3 by purchasing the target company's securities."); *see also* Mot. at 17 (conceding this point). Therefore, to succeed on its Rule 14e–3 claim, Allergan must establish that PS Fund 1 (and Pershing Square, which controls it) are not "offering persons." Allergan admits that PS Fund 1 and Pershing Square are "co-bidders" for Allergan along with Valeant under Section 14. *See* Ex. 29 & *infra*, n.17. They are also expressly identified in the offering documents as a "co-offerors." Ex. 44. Nevertheless, Allergan argues that each is a "co-bidder" but not a "co-offeror" despite the fact that the SEC treats them as the same.

Rule 14e–3 defines an "offering person" as any person who has taken substantial steps to commence, or has commenced, a tender offer. Defendants Valeant, PS Fund 1, and Pershing Square are each an offering person listed on the operative tender offer documents. *Id.* All three entities are identified on the cover of the Tender Offer Statement itself as "Offerors." *Id.* No case has found that a court can override the actual terms of the offer in order to find a violation of Rule 14e–3 where, as here, Defendants are actually identified on the Tender Offer Statement as the "offerors."

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████  The identification of all Defendants as "offerors" carries with it significant legal implications for Allergan's shareholders. Pershing Square is potentially liable to the tendering shareholders if Valeant does not pay them. 17 C.F.R. § 240.14e–1(c) ("no

31

person who makes a tender offer shall . . . [f]ail to pay the consideration offered . . . .").[15]

Allergan's repeated earlier concessions that PS Fund 1 is a "bidder" under Rule 14d–1 confirms that Pershing Square and PS Fund 1 each were "offering persons." Rule 14d–1(g)(2) defines a "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made."  SEC Regulation M-A likewise says "Offeror means any person who makes a tender offer or on whose behalf a tender offer is made," 17 C.F.R. § 229.1000(d)—the same definition as "bidder."  Thus, a person who "makes" or "commences" a tender offer is both a bidder and offeror.[16]  Pershing Square's close cooperation with Valeant and financial stake in the surviving entity make it a "co-bidder" and "offering person" rather than a mere financier.  *See* Partnoy Decl. ¶ 34.  The SEC has recognized that a "bidder" in a tender offer is to be determined based on the individual or entity's substantive role.  *See* SEC Excerpt from Current Issues and Rulemaking Projects Outline (November 14, 2000), Section II.D.2. Mergers & Acquisitions—Identifying the Bidder in a Tender Offer, *available at* http://www.sec.gov/divisions/corpfin/guidance/ci111400ex_tor.htm.  Relevant factors are whether the person "play[ed] a significant role in initiating, structuring, and negotiating the tender offer," "act[ed] together with the named bidder," the extent to which "the person control[led] the terms of the offer," and whether the "person

---

[15]   In fact, Allergan's own counsel said the exact opposite about PS Fund 1's trading activity.  Only days before being hired by Allergan, Wachtell Lipton acknowledged the fact that PS Fund 1 had complied with all existing regulations.  Ex. 27.  Wachtell derided PS Fund 1's trading activity as exploiting "loopholes" that needed to be closed.

[Redacted]

[16]   Allergan tries to make hay of the fact that the definitions in section 14(d), 15 U.S.C. § 78n(d)(2), do not apply to Rule 14e–3.  But the definitions that apply to Rule 14D, are in fact, applicable to Rule 14E.  *See* 17 C.F.R. § 240.14d–1(g) ("[F]or purposes of sections 14(d) and 14(e) of the Act and Regulations 14D and 14E, the following definitions apply . . . ).

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  provid[ed] financing for the tender offer, or play[ed] a primary role in obtaining

2  financing." *Id.*

3      Long before Pershing Square and Valeant contemplated pursuing a tender offer,

4  they entered into a joint venture—PS Fund 1—with the goal of acquiring Allergan.

5  Ex. 54.  Far from merely "investing" in the transaction, Pershing Square has played a

6  central participatory role, was a motivating force, and was one of the principal

7  planners. Ex. 1 at 55:19–60:14.  The PS Fund 1 Relationship Agreement gave

8  Pershing Square significant rights in the transaction and included an express provision

9  barring a tender offer by Valeant as a potential acquisition strategy absent Pershing

10  Square's consent.  *See* Ex. 54 § 1(d); *see also* Ex. 15 at 124:6–14 (explaining that

11  Valeant viewed Pershing Square as "as our partner in the transaction," rather than "a

12  financial investor").

13      Moreover, Pershing Square agreed to receive only Valeant stock in the

14  transaction (and committed to hold at least $1.5 billion of stock for a year or more),

15  which frees up over $2 billion in cash to pay Allergan's other shareholders.  Ex. 54 §

16  2(c); Ex. 1 at 255:3–11.  Pershing Square further agreed not to hedge its long position

17  in Valeant stock.  Ex. 54 § 2(c).  And as inducement for Valeant to improve its offer,

18  Pershing Square agreed to accept approximately $21 less per share than other

19  shareholders, or $600 million less in value.  Ex. 80.  Pershing Square has also

20  committed to provide $400 million in cash to finance the acquisition of Allergan, at

21  Valeant's election, in exchange for additional Valeant stock. Ex. 54 § 2(a).

22      Case law confirms that parties are co-bidders where, as here, both are central

23  participants in the tender offer.  In *Hollywood Casino Corporation v. Simmons*, No.

24  3:02-0325-M, 2002 WL 1610598 (N.D. Tex. July 18, 2002), the court dismissed a Rule

25  14e–3 claim brought by a target company who alleged that the defendants were acting

26  as a "group."  There, target corporation sued its former CEO, its former general

27  counsel, and Harold Simmons, "a well-known corporate raider."  *See id.* at *2.  The

28  target company alleged that Simmons and the former officers had engaged in a

33

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

"creeping tender offer," and that they violated Rule 14e–3 by trading on inside information possessed by the former officers. *See id.* at *3. The court rejected the argument, noting that "the Simmons Defendants and the Pratts together would be the 'offering person' for purposes of Rule 14e–3(a) and, thus, would be immune from the operation of 14e–3(d) and 14e–3(a) by 14e–3(d)(1)(i)." *Id.* (emphasis added). Here, PS Fund 1 and Pershing Square have acted, and will continue to act as strategic advisors, equity partners, and financiers, and therefore are co-bidders and co-offerors.[17]

Allergan's admissions that the defendants were acting as a group to acquire Allergan are also inconsistent with its claim that they were not co-offerors. ███████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████ ██████████████████████████

████████████████████████

---

[17] Similarly, in *Mai Basic Four, Inc. v. Prime Computer, Inc.*, 871 F.2d 212 (1st Cir. 1989), the First Circuit affirmed that the named acquirer's investment advisor, investor, and underwriter was a "bidder" because, among other reasons, it was "an active advisor-broker-financer-participant" that would hold a minority interest in the surviving entity, it was "involve[d] from the beginning of the present offer," and it was possibly "the indispensable key to the offer's success." *Id.* at 221; *see also Koppers Co. v. Am. Express Co.*, 689 F. Supp. 1371, 1388-90 (W.D. Penn. 1988) (a financier is a "bidder" if it was "central to the offer," "play[ed] a central participatory role," was "a motivating force," or "one of the principal planners and players.").

[18] *See* Ex. 45 (Press Release, Allergan, Inc., Allergan Comments on Pershing Square's and Valeant's Attempt to Remove a Majority of the Members of the Allergan Board of Directors (June 2, 2014)) ("Allergan urges all of its stockholders to refrain from . . . returning any proxy card sent by *co-bidders* Pershing Square and Valeant . . . ."). *See also* Exs. 46 (6/10/2014 Allergan Investor Presentation); Ex. 47 (6/23/2014 Allergan Solicitation Recommendation Statement Schedule 14D-9); Ex. 48 (07/29/2014 Allergan Revocation Solicitation Statement Schedule 14A); ████████████████ ████████████████████████████████████████

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Recognizing that its admissions that Pershing Square and PS Fund 1 are co-bidders sinks its claims, Allergan makes two arguments that they nevertheless are not co-offerers.  First, Allergan suggests that only the entity that actually accepts the tendered shares can be considered an offering person, an argument contradicted by the plain language of Rule 14e–3.  In fact, Rule 14e–3 defines "offering person" as "any" person that has taken a substantial step or steps to commence, or that has commenced, a tender offer.  17 C.F.R. § 240.14e–3(a).  Plaintiffs do not cite to any statute or case establishing that the SEC intended to only deem a single entity as an offeror for each tender offer.  If such a rule were adopted, then an acquirer would risk insider trading liability by, for example, using a subsidiary as an acquisition vehicle, a common and unquestionably legal practice.  This is not the law.  *Steginsky* v. *Xcelera Inc.*, 741 F.3d 365, 372 (2d Cir. 2014) (dismissing Rule 14e–3 claim against entity that made the tender offer and the persons that controlled the entity); *Finnegan* v. *Campeau Corp.*, 915 F.2d 824, 830 (2d Cir. 1990) ("neither the Williams Act nor SEC regulations make a distinction between joint bids made by parties prior to entering a battle for control . . . and those made by parties who are rival bidders").  "A 'tender' offer within the meaning of the Williams Act may be made by those acting in concert as well as those acting alone."  *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 599 (5th Cir. 1974) (rejecting claim that 14(e) applies only to purchaser).  Indeed, Allergan's lawyers wrote to the SEC on July 21 admitting the exact dispositive fact Allergan now denies:  "*To be sure, the offering person can be more than one person.*"  Ex. 26 (emphasis added).

Second, without citing any authority, Allergan claims that being a "co-bidder," which subjects a party to disclosure obligations under Regulation 14*D* does not make PS Fund 1 an "offering person" exempt from liability under Rule 14e–3, which is part of Regulation 14*E*.  It then engages in an elaborate and highly selective review of the

35

legislative history of the Williams Act and the regulatory history of Rule 14e–3 to concoct a policy basis for its illusory distinction.

The SEC, however, rejects the distinction Allergan attempts to create between "co-bidders" and "co-offerors."  The SEC has explained that "[a] similar analysis of bidder status [under Rule 14d–1] is made in a tender offer subject only to Regulation 14E."  SEC, Div. of Corp. Fin., *Current Issues & Rulemaking Projects* at 13 (Nov. 14, 2000).  And it is, in fact, common in the parlance of securities practitioners to use the terms interchangeably in addressing Rule 14e–3.  The Supreme Court has done it.  *See United States v. O'Hagan*, 521 U.S. 642, 676 (1997).  The Solicitor General has done it.  *See* Brief for the United States at *36, *United States v. O'Hagan*, 521 U.S. 642 (1997), 1997 WL 86306 (No. 96-840).  As has an esteemed judge of the Southern District of New York.  *See S.E.C. v. Musella*, 748 F. Supp. 1028, 1041 (S.D.N.Y. 1989).[19]  The SEC Rules under Section 14 use the terms interchangeably throughout. Indeed, the instructions for Schedule TO—describing who should be identified in the offering document to shareholders as an "offeror"—use a definition of "offeror" identical to the definition of "bidder" in Rule 14d.  17 C.F.R. § 240.14d–100(K). Thus, Rule 14d1 provides that "[t]he term tender offer material means . . . [t]he bidder's formal offer."  17 C.F.R. § 240.14d–1(g)(9).  The SEC, the Supreme Court, and the Solicitor General all reject Allergan's attempts to distinguish between "bidders" and "offerors."  No such distinction exists.[20]  In fact, over the last 25

_____

[19]  Several leading securities treatises have done it too.  *See Corporate Acquisitions, Mergers & Divestitures* § 8:23 (2014 online ed.); A. Jacobs, *The Williams Act—Tender Offers & Stock Accumulations* § 5:40 (2014 online ed.); H. Bloomenthal & S. Wolff, *Securities Law Handbook* § 33:28 (2014 online ed.); 18 D. Langevoort, *Insider Trading Regulation, Enforcement & Prevention* § 7:1 (2014 online ed.).

[20]  In fact, the SEC's rules relating to tender offers refer repeatedly to the "*bidder's* tender offer."  17 C.F.R. § 240.14e–2(a)(1); 17 C.F.R. § 240.14d–5(b)(7) & (e)(2); *see also* 17 C.F.R. § 240.14d–5(b)(7) ("subject company means any issuer of securities which are *sought by a bidder pursuant to a tender offer*"); 17 C.F.R. § 240.14d–10(a) ("No *bidder* shall make a tender offer unless . . . ."); 17 C.F.R. § 240.14e–1(c) (describing required payments by "a *bidder*" for tendered shares); 17 C.F.R. § (Continued…)

36

1   years, numerous co-bidders have made unsolicited offers to buy companies, and they

2   have often bought toe-hold stakes before the unsolicited offer became public. *See* Ex.

3   50.  As the attached chart illustrates, this common practice was employed by several

4   co-bidders with the assistance of plaintiffs' counsel.  *See id.*

5          **B.     Allergan's Disclosure Claims Are Meritless.**

6          Events since the filing of Allergan's complaint have mooted its claims that

7   Defendants failed to disclose material information in their SEC filings.  Allergan's

8   complaint concerns filings that Defendants made in connection with soliciting

9   shareholder support to call for a special meeting.  Compl. ¶¶ 16, 17, 69, 128, 131 & Ex.

10  A.  Since then, Allergan stipulated to hold the meeting on December 18, 2014.

11  Accordingly, the statements that Defendants made in connection with soliciting

12  support for the meeting are moot.  In its brief, Allergan argues that a different

13  document that PS Fund 1 recently filed with the SEC fails to disclose material

14  information, but Allergan never amended its complaint to include any such claim.

15  Specifically, Allergan's brief argues a "September 24, 2014 proxy solicitation," which

16  solicits proxies for votes at the meeting itself rather than calling the special meeting,

17  fails to disclose Allergan's "insider trading" claims.  Mot. 30–33.

18         This argument fails for two reasons.  First, litigants cannot obtain injunctions

19  regarding unpled claims.  *See Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, __ F.

20  Supp. 2d ___, 2014 WL 1259959 (E.D.N.Y. Mar. 25, 2014); *Rabbani v. Enzo*

21  *Biochem, Inc.*, 682 F. Supp. 2d 400, 413 n. 10 (S.D.N.Y 2010); *Walton v. U.S.*

22  *Marshals Serv.*, No. 03-1460 SI, 2003 WL 23875599, at *3 (N.D. Cal. Aug. 12, 2003).

23

24  _____

25  240.140–11(d) (tender offer fee based on value "*offered by the bidder*"); 17 C.F.R. §
    240.14d–5(b)(7) ("A *bidder will have commenced a tender offer* . . .when the bidder

26  has first published, sent or given means to tender to security holders."); 17 C.F.R. §
    240.14d–4 ("on the date of commencement of the tender offer, the *bidder* must

27  publish" mandatory disclosures); 17 C.F.R. § 240.14d–3(a) ("No *bidder shall make a*
    *tender offer*" without complying with Rules).  (All emphases added).

28

1    Second, this unpled allegation is wrong.  Allergan argues that Defendants were

2    required to "disclose the facts giving rise to their potential liability under Rule 14e–3

3    and the risk they had violated the Rule."  Mot. at 31.  In fact, a party soliciting proxies

4    adverse to incumbent management is not required to "admit to the substantive merits of

5    incumbent management's allegations."  *Taro Pharm. Indus., Ltd. v. Sun Pharm. Indus.,*

6    *Ltd.*, 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010).  Instead, the soliciting party is

7    only required to disclose the existence of the dispute.  *City Capital Assocs. LP v.*

8    *Interco, Inc.*, 696 F. Supp. 1551, 1556 (D. Del. 1988) ("Where there exists a good faith

9    dispute as to facts or an alleged legal violation, the Williams Act only requires

10   disclosure of the dispute.").[21]

11   Valeant's and Pershing Square's September 24, 2014 proxy solicitation discloses

12   that Allergan filed this lawsuit.  Ex. 51 at 13.  Allergan filed its entire complaint and its

13   injunction brief with its proxy materials.  ████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████████████████████

17   **V.    ALLERGAN'S INEQUITABLE CONDUCT**

18   Allergan has engaged in inequitable conduct that precludes it from obtaining the

19   equitable relief it requests.  Defendants' unsolicited offer included consideration in the

20   form of both cash and Valeant stock.  Faced with this offer, Allergan embarked on a

21   scheme to decrease its value by falsely attacking Valeant's accounting to diminish its

22   share price. ████████████████████████████████████████████████

23   ████████████████████

24   The doctrine of unclean hands "gives wide range to the equity court's use of

25

26   ───────────────────
     [21]  *City Capital* explained the reason for this rule: A shareholder soliciting proxies

27   "should not be placed in a position of being forced to either admit liability, while he or
     she disputes it, or violate the securities law by failing to disclose the alleged and

28   disputed violation."  696 F. Supp. at 1557.

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  discretion in refusing to aid the unclean litigant[.]"  *See Princess Cruises, Inc. v.*

2  *United States*, 397 F.3d 1358, 1369 (Fed. Cir. 2005); *see also Keystone Driller Co. v.*

3  *Gen. Excavator Co.*, 290 U.S. 240, 245-6 (1933) (in applying doctrine, a court is "not

4  bound by formula or restrained by any limitation that tends to trammel the free and just

5  exercise of discretion.").  Generally, for unclean hands to apply, the plaintiff must have

6  engaged in inequitable conduct that is related to its requested relief.  *Fuddruckers, Inc.*

7  *v. Doc's B.R. Others*, Inc., 826 F.2d 837, 847 (9th Cir. 1987).

8  ██████████████████████████████████████

9  ██████████████████████████████████████

10 ██████████████████████████████████████

11 ██████████████████████████████████████

12 ██████████████████████████████████████

13 ██████████████████████████████████████

14 ██████████████████████████████████████

15 ██████████████████████████████████████

16 ██████████████████████████████████████

17 ██████████████████████████████████████

18 ██████████████████████████████████████

19 ██████████████████████████████████████

20 ███████   This drop in stock price, of course, reduced the value of the pending deal to

21 the Allergan shareholders, to whom Edwards and Pyott owed a fiduciary duty.

22 ██████████████████████████████████████

23 ██████████████████████████████████████

24 ██████████████████████████████████████

25 ██████████████████████████████████████

26 ██████████████████████████████████████

27 ██████████████████████████████████████

28 ████████████████

39

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1

2

3

4

5

6

7 ████████████████████████████████████████ These attacks did not just harm

8 Valeant—they harmed Allergan's shareholders by decreasing the value of the

9 consideration they would potentially receive from a Valeant offer.

10      Allergan's inequitable conduct relates directly to the relief it seeks.  By

11 providing false information to shareholders to suppress the value of Valeant's stock,

12 Allergan is tainting the information available to shareholders before the December 18

13 vote—misleading the *same shareholders it accuses PS Fund 1 of harming.  See*

14 *generally Stokely-Van Camp, Inc. v. Coca-Cola Co*., 646 F. Supp. 2d 510, 533–34

15 (S.D.N.Y. 2009) (collecting cases, denying preliminary injunction because plaintiff

16 "engaged in the same kind of behavior that it challenges"). This Court should exercise

17 its broad discretion and refuse Allergan aid in its attempt to discount shareholders'

18 votes.  *See Princess Cruises*, 397 F.3d 1358 at 1369.[22]

19 **CONCLUSION**

20      For the foregoing reasons, Plaintiffs' Preliminary Injunction Motion should be

21 denied.

22

23

24

25

26

27 [22]  Allergan's inequitable conduct is described in further detail in Defendants'

28 Proposed First Amended Counterclaim. *See* ECF No. 190.

40

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  | Dated: October 20, 2014              Respectfully submitted,

2

3                                        KIRKLAND & ELLIS LLP

4                                        By: ___/s/ Mark Holscher_____

5                                        Mark Holscher (SBN 139582)
                                         Michael Shipley (SBN 233674)
6                                        KIRKLAND & ELLIS LLP

7                                        333 South Hope Street
                                         Los Angeles, California 90071
8                                        Telephone:  (213) 680-8400

9                                        Facsimile:  (213) 680-8500
                                         Email:      mark.holscher@kirkland.com
10                                                   michael.shipley@kirkland.com

11

12                                       Jay P. Lefkowitz (*pro hac vice*)
                                         John P. Del Monaco (*pro hac vice*)
13                                       Danielle Sassoon (*pro hac vice*)
                                         KIRKLAND & ELLIS LLP
14                                       601 Lexington Avenue

15                                       New York, New York 10022-4611
                                         Telephone:  (212) 446-4800
16                                       Facsimile:  (212) 446-4900

17                                       Email:      lefkowitz@kirkland.com
                                                     jdelmonaco@kirkland.com
18                                                   dsassoon@kirkland.com

19                                       *Attorneys for Pershing Square Capital*

20                                       *Management, L.P.; PS Management, GP; LLC,*
                                         *PS Fund 1, LLC; and William A. Ackman*

21

22

23

24

25

26

27

28

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   Dated: October 20, 2014          SULLIVAN & CROMWELL LLP

2
                                     By: ___/s/ Robert A. Sacks_____
3

4                                    Robert A. Sacks (SBN 150146)
                                     sacksr@sullcrom.com
5                                    Edward E. Johnson (SBN 241065)
                                     johnsonee@sullcrom.com
6                                    SULLIVAN & CROMWELL LLP
7                                    1888 Century Park East, Suite 2100
                                     Los Angeles, California 90067-1725
8                                    Telephone:  (310) 712-6600
                                     Facsimile:   (310) 712-8800
9

10
                                     Brian T. Frawley (*pro hac vice* filed)
11                                   frawleyb@sullcrom.com
                                     SULLIVAN & CROMWELL LLP
12                                   125 Broad Street
13                                   New York, New York 10004-2498
                                     Telephone:  (212) 558-4000
14                                   Facsimile:   (212) 558-3588
15
                                     *Attorneys for Defendants Valeant*
16                                   *Pharmaceuticals International, Inc., Valeant*
17                                   *Pharmaceuticals International and AGMS, Inc.*

18

19              **SIGNATURE CERTIFICATION**

20          Pursuant to L.R. 5-4.3.4(a)(2)(i), I hereby attest that all other signatories listed,

21   and on whose behalf the filing is submitted, concur in the filing's content and have

22   authorized this filing.

23   Dated: October 20, 2014          KIRKLAND & ELLIS LLP

24
                                     By:  /s/ Mark Holscher
25                                         Mark Holscher

26
                                     *Attorneys for Pershing Square Capital Management,*
27                                   *L.P.; PS Management, GP, LLC; PS Fund 1, LLC;*
                                     *and William A. Ackman*
28

42
**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**