LATHAM & WATKINS LLP
    Peter A. Wald (Bar No. 85705)
    *peter.wald@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
    Michele D. Johnson (Bar No. 198298)
    *michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626-1925
Telephone: +1.714.540.1235

WACHTELL, LIPTON, ROSEN & KATZ
    William D. Savitt (*pro hac vice*)
    *wdsavitt@wlrk.com*
    Bradley R. Wilson (*pro hac vice*)
    *brwilson@wlrk.com*
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1329

Attorneys for Plaintiffs
ALLERGAN, INC. and
KARAH H. PARSCHAUER

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| ALLERGAN, INC., a Delaware corporation, and KARAH H. PARSCHAUER, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>VALEANT PHARMACEUTICALS INTERNATIONAL, INC., VALEANT PHARMACEUTICALS INTERNATIONAL, AGMS, INC., PERSHING SQUARE CAPITAL MANAGEMENT, L.P., PS MANAGEMENT, GP, LLC, PS FUND 1, LLC and WILLIAM A. ACKMAN, an individual, and DOES 1-10,<br><br>Defendants. | CASE NO. 8:14-cv-01214-DOC (ANx)<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Allergan, Inc. ("Allergan" or the "Company") and Karah H. Parschauer ("Parschauer") through their undersigned counsel, allege as follows:

1.     This is an action for declaratory, injunctive, and other relief for violations of Sections 13(d) and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), codified at 15 U.S.C. §§ 78m(d) and 78n(e); Section 20A of the Exchange Act, codified at 15 U.S.C. § 78t-1; and violations of Exchange Act Rules 13d-1, 13d-2, and 14e-3, codified at 17 CFR §§ 240.13d-1, 240.13d-2, and 240.14e-3 and promulgated by the Securities and Exchange Commission (the "Commission" or the "SEC") under the Exchange Act; against Pershing Square Capital Management, L.P. ("Pershing Square"), PS Management GP, LLC ("PS Management"), William Ackman ("Ackman") and PS Fund 1, LLC ("PS Fund 1" and, collectively, the "Pershing Defendants"); Valeant Pharmaceuticals International, Inc. ("Valeant"), Valeant Pharmaceuticals International ("Valeant USA"), and AGMS, Inc. ("AGMS") (collectively, "Valeant") (Valeant and the Pershing Defendants are collectively referred to as "Defendants"); and Does 1 through 10.

2.     This case is about the improper and illicit insider-trading scheme hatched in secret by a billionaire hedge fund investor on the one hand, and a public-company serial acquiror on the other hand.  The purpose of the scheme was to generate windfall profits on the backs of uninformed Allergan stockholders and to park a substantial block of shares with a stockholder predisposed to support an acquisition proposal.  The method Defendants chose was to operate in secret, flouting key provisions of the federal securities laws designed to protect investors from precisely this type of predatory conduct.

3.     The hedge fund is Pershing Square, controlled by its founder, William Ackman.  Ackman is an "activist investor" who typically tries to make money by acquiring minority stakes in companies, and threatening their Boards of Directors

1  with proxy contests unless they take steps towards short-term increases in the stock

2  price — often through a sale or other transaction.

3      4.    The serial acquiror is a Canadian drug company, Valeant.  Valeant has

4  reported a compounded annual revenue growth rate of over 52% in the past six

5  years, by making more than one hundred acquisitions since 2008 — resulting in a

6  staggering debt load of $16.8 billion.  Valeant acquires companies with successful

7  products and strong cash flows and balance sheets, and then cuts their research and

8  development efforts all while reaping the profits of the acquired companies'

9  revenue streams.  Valeant's business model depends on constantly making new

10 and larger acquisitions to offset the debt burdens of the previous ones — before

11 Valeant's entire enterprise eventually collapses under its own weight.

12     5.    In late 2012, Valeant turned its sights on Allergan — a well-

13 established, well-run Orange County company with an impressive cadre of

14 successful products, $1.5 billion in cash on its balance sheet, a very small amount

15 of debt, an A+ investment grade rating, strong cash flows, and steady growth

16 driven by productive research and development and expansion into new markets

17 with its strong sales force.  Allergan's admirable financial health and product mix

18 made it an ideal target for Valeant — which would gut Allergan's research and

19 development program to inflate short-term profits and use Allergan's cash and cash

20 flow to service Valeant's mounting debt.

21     6.    Because of the crippling debt required to finance its many previous

22 acquisitions, Valeant was unable to borrow enough money to acquire Allergan, and

23 therefore needed an ally with capital to contribute — and found one in Ackman.

24 Ackman, in turn, found in Valeant an incredible opportunity to buy Allergan stock

25 with advance inside knowledge of a tender offer that was certain to cause

26 Allergan's stock price to increase — guaranteeing him a massive return in record

27 time.  The plan was a "win-win":  Valeant would get a head start on its takeover

28 effort by parking a huge block of shares in friendly hands, and Pershing Square

would get a massive overnight profit with no risk.  Of course, it was anything but a "win" for the Allergan stockholders who sold their shares without knowing what Ackman and Pershing Square knew:  that there was about to be a tender offer at a premium to the price the stockholders accepted.

7.     The federal securities laws, however, prohibit any "person" from trading in the stock of a potential target company while in possession of nonpublic information about an upcoming tender offer, once the offering person has taken a substantial step toward launching that offer.  So, Valeant and Ackman came up with a plan to circumvent those rules:  First, Valeant would take every preliminary step in the tender offer playbook to acquire Allergan, all the while studiously avoiding calling their activity a "tender offer."  Second, Pershing Square would form a shell entity to acquire Allergan stock, carefully timing and structuring its purchases to avoid any disclosure requirements.  Third, Defendants would label themselves as "co-bidders" for Allergan, to create the legal fiction that they were a single offering person, and that there was no separate or other "person" trading on the inside information.  Unfortunately for them, the federal securities laws cannot be so easily defeated by a "now you see it, now you don't" sleight of hand.

8.     To acquire Allergan stock, on February 11, 2014, Pershing Square formed shell entity PS Fund 1, an entity controlled entirely by Pershing Square and in which Valeant later made a comparatively miniscule investment.  Hidden behind this shell fund, Valeant blatantly tipped Pershing Square regarding Valeant's tender offer, and Pershing Square — through PS Fund 1 — embarked on a massive acquisition of Allergan stock on that inside information.

9.     On or about February 6, 2014, Valeant began taking substantial steps toward launching a tender offer directly to Allergan's stockholders.  It hired financial and legal advisors, held multiple Board of Directors meetings, negotiated the respective financial commitments of Valeant and the Pershing Defendants, and agreed to commit over $75 million to the entity that would ultimately acquire

Allergan stock.  Valeant and Pershing Square went so far as to claim in their financing agreement that they were ***not*** contemplating a tender offer — a feeble, self-serving attempt to circumvent the insider trading rules — yet then agreed in the same document on the procedures each would follow if a tender offer were to occur.

10.     Armed with the material nonpublic information that Valeant would launch a tender offer for Allergan's shares, PS Fund 1 began buying up significant amounts of Allergan stock on February 25, 2014 — taking careful steps to avoid making any disclosure.  For example, rather than buying Allergan stock directly, PS Fund 1 bought zero-strike price "call options" — options that were economically certain to be exercised and which all parties knew would be exercised in short order.  These zero-strike options gave PS Fund 1 essentially the same ownership rights as if it had purchased the shares directly.

11.     PS Fund 1's LLC agreement was not amended to add Valeant as a member until April 3, 2014, and Valeant's capital contribution — a miniscule 3% of the total funds — was not made until April 10, 2014, just one day before PS Fund 1's ownership of Allergan stock crossed the 5% reporting threshold.

12.     During the ensuing ten-day period from April 11 to April 21, 2014, PS Fund 1 continued on an even more rapid buying spree to exploit the Williams Act's archaic ten-day window, an oft-criticized provision that allows an investor to wait ten full days after crossing the 5% threshold before disclosing its acquisitions and intentions to the market.[1]

13.     On April 21, 2014, the Pershing Defendants finally disclosed PS Fund 1's stake in Allergan by filing a Schedule 13D.[2]

---

[1]  *See* 17 C.F.R. 240.13d-1.

[2]  A true and correct copy of Pershing Square's Schedule 13D filed on April 21, 2014, is attached hereto as **Exhibit A**.

14.     By the time the Pershing Defendants filed the Schedule 13D on April 21, 2014, PS Fund 1 had acquired an astonishing 9.7% of Allergan's outstanding stock, for a total investment at the time of over $3.2 billion, without providing Allergan's stockholders and the marketplace any disclosure about Valeant's control ambitions.

15.     Neither Allergan's stockholders nor the marketplace was aware of Ackman's secret purchasing program, or that Valeant's tender offer was coming. Those who sold during this period, even sophisticated investors, sold on an uninformed basis at an unfair price — while Ackman was unfairly obtaining huge profits from his early inside information about the expected  tender offer.

16.     Finally, once Pershing Square had accumulated its position, Valeant publicly announced for the first time that it wished to "negotiate" a merger agreement with Allergan's Board of Directors, and offered a mix of cash and Valeant stock for each Allergan share.  Upon that April 22, 2014 announcement, the value of Pershing Square's investment in Allergan stock increased by more than a billion dollars.

17.     In its first communications, Valeant carefully avoided disclosing that it planned to launch a "tender offer," claiming instead to be interested in a friendly merger.  Based on Allergan's response to Valeant's prior overture, however, and as corroborated by analyst commentary in February 2014, Valeant knew that Allergan would not be interested in merging with Valeant — particularly if Allergan's stockholders would be compensated in large part with Valeant stock, as Valeant proposed.  Indeed, Valeant later conceded as much.  And contrary to Valeant's claim that it was looking for a friendly deal, Valeant and Pershing Square from the outset engaged in exactly the sorts of pressure tactics commonly associated with hostile tender offers:  a media blitz, multiple threatening letters to Allergan's Board of Directors, and direct communications with Allergan's customers and employees falsely claiming that the deal was a foregone conclusion.

18.     As Valeant fully expected, after carefully considering Valeant's proposal (as improved on two separate occasions), Allergan's Board of Directors concluded that the offer grossly undervalued Allergan and was not in the best interests of its stockholders, and made clear that Allergan would not engage in discussions about a potential merger transaction on the terms Valeant was proposing.  And so, on June 2, 2014 — just six weeks after PS Fund 1 completed its purchases of Allergan stock — Valeant dropped the pretense and publicly announced that it would launch a hostile exchange offer for Allergan's shares.  Upon formally commencing the offer two weeks later on June 18, 2014, Valeant put the lie to the financing agreement's self-serving declaration that the parties had not taken steps toward a tender order, and confirmed that it had planned to launch a tender offer all along.

19.     Simultaneously, Pershing Square commenced a proxy contest to unseat six of the nine Allergan directors — hoping to put in place individuals more in line with Valeant's way of thinking.  On July 11, 2014, Pershing Square filed a definitive proxy statement with the Commission seeking to solicit proxies of the holders of 25% of Allergan's stock to call a special meeting for the purposes of removing the six directors (the "Special Meeting").[3]  And on June 18, 2014, Valeant formally commenced a hostile exchange offer by filing a Schedule TO and Registration Statement on Form S-4.[4]

20.     Pershing Square submitted written requests to call the Special Meeting on August 22, 2014, and the Special Meeting was subsequently set for December 18, 2014.  On September 24, Defendants filed a Definitive Proxy

---

[3]   Pershing Square filed an amended Proxy Statement on September 24, 2014, and again on November 14, 2014.  Pershing Square withdrew the Proxy Statement in a Schedule RW filed on November 18, 2014.  *See infra* ¶ 26.

[4]   In its amended filing on July 23, 2014, Valeant belatedly attempted to label Pershing Square a "co-bidder" for Allergan.  Notwithstanding that labeling effort, the only party that was offering to acquire Allergan shares was Valeant.

Statement, soliciting proxies in support of eight shareholder proposals, including placement of directors who would turn a blind eye to Defendants' illegal acquisition of shares.  In service of Valeant's scheme to buy Allergan at a grossly inadequate price, Defendants accused the Board of Directors it sought to replace of serving its own entrenched interests, and of stubbornly refusing to engage in discussions with Valeant or to allow stockholders to vote on Valeant's purportedly "premium" proposal.

21.     The SEC filings made by Valeant and Pershing Square in pursuit of Valeant's offer were demonstrably false and misleading.  Among other misstatements, Defendants' disclosures materially misstated their relationship in an effort to perpetuate the facade that their conduct was legal under the federal securities laws.  In truth, Defendants' agreements, statements, and actions made clear that they were separate "persons" with separate interests in their fraudulent scheme.  Valeant was, at all relevant times, an "offering person."  Pershing Square, which had purchased Allergan shares with knowledge of Valeant's substantial steps toward a tender offer, was an "other person" using inside information to the detriment of the market.

22.     Plaintiffs filed their original complaint on August 1, 2014, seeking relief for imminent harm resulting from Defendants' unlawful conduct.  Following limited expedited discovery, in October 2014, Plaintiffs filed a motion seeking a preliminary injunction that would (a) enjoin Defendants from exercising beneficial rights of ownership in the shares PS Fund 1 acquired using nonpublic material information regarding Valeant's anticipated tender offer, and (b) enjoin Defendants from voting proxies solicited by Pershing Square for the Special Meeting on the basis of misleading proxy materials and SEC filings, unless or until Defendants corrected those statements.

23.     In an order dated November 4, 2014, this Court granted Plaintiffs motion in part.  On the merits, the Court found that Ms. Parschauer had raised "at

least" and "at minimum" "serious questions" regarding whether Valeant took substantial steps toward a tender offer prior to PS Fund 1's purchases and whether Valeant and Pershing Square were a single offering person—and thereby "raised serious questions going to the merits of their Rule 14e-3 claim." With respect to Plaintiffs' Section 14(a) and Rule 14a-9 claims, the Court concluded that Plaintiffs had raised serious questions going to the merits; that the "potential threat of an uninformed vote" on proposals that will "make significant changes to Allergan's corporate governance" constituted irreparable harm; that requiring corrective disclosures was "preferable to sorting out post-vote remedies"; that "the balance of the equities tips in Plaintiffs' favor"; and that "the proposed injunction to make corrective disclosures is in the public interest."

24.     The Court accordingly ordered Defendants to make corrective disclosures that highlighted the appreciable risks of liability Defendants assumed based on their course of conduct. In particular, the Court-ordered disclosure noted the significant "risks and exposures" "[s]hould Valeant and Pershing Square ultimately be found to have violated Section 14(e) and Rule 14e-3," including "private stockholder class actions, which could result in significant damages awards or disgorgement of profits."

25.     On November 17, 2014, Allergan announced that it had entered into a merger agreement with Actavis plc ("Actavis"), subject to certain closing conditions, including a vote by Allergan's stockholders to approve the transaction.

26.     On November 18, 2014, following Allergan's announcement of the Actavis agreement, Pershing Square filed a Form RW with the Commission withdrawing its Definitive Proxy Statement.[5] Pershing Square also "discontinue[d]

---

[5] Allergan, Inc., Form RW (filed by Pershing Square Capital Management, L.P.) (Nov. 18, 2014), *available at* http://www.sec.gov/Archives/edgar/data/850693/000119312514416965/d823624drw.htm.

1   its proxy solicitation in connection with the special meeting of Allergan, Inc.

2   shareholders."[6]  A day later, on November 19, 2014, Valeant filed amendment

3   number 6 to its Schedule TO, withdrawing its tender offer.[7]  All parties then agreed

4   to cancel the Special Meeting.

5          27.    On November 19 and 20, 2014, consistent with the terms of a

6   February 25, 2014 agreement between Valeant and Pershing Square (the

7   "Relationship Agreement"), which required Pershing Square to pay 15% of its

8   profits to Valeant if an acquiror other than Valeant agreed to acquire Allergan, PS

9   Fund 1 sold 2,242,560 shares of Allergan at a price of $212.80 and $210.36 per

10  share, respectively.[8]

11         28.    On November 21, 2014, Pershing Square made certain amendments to

12  its Schedule 13D, reflecting PS Fund 1's November 19 and 20 stock sales and the

13  effective termination of Defendants' Relationship Agreement.[9]  Defendants

14  attached an amendment to their Relationship Agreement, which provides that

15  Valeant is no longer a member of PS Fund 1 after it receives a certain share of the

16  profits.  Subject to these (and other previous) amendments, Pershing Square's

17  April 21, 2014 Schedule 13D remains operative.[10]  Pershing Square continues to

18  reserve the right to seek major changes to Allergan's business.

---

[6]   *Id.*

[7]   Allergan, Inc., Amendment to Schedule TO (filed by Valeant Pharmaceuticals International, Inc.) (Nov. 19, 2014), *available at* https://www.sec.gov/Archives/edgar/data/850693/000119312514418566/d824480dsctota.htm.

[8]   Allergan, Inc., General Statement of Acquisition of Beneficial Ownership (Schedule 13D) (filed by Valeant Pharmaceuticals International, Inc.) (Nov. 20, 2014), *available at* http://www.sec.gov/Archives/edgar/data/850693/000119312514420199/d825077dsc13da.htm.

[9]   A true and correct copy of Amendment No. 14 to Pershing Square's Schedule 13D filed on November 21, 2014 is attached hereto as **Exhibit B**.

[10]  As of the filing of this complaint, Pershing Square has amended its Schedule 13D 14 times.  These amendments generally supplement its initial filing by disclosing later events, including correspondence with Allergan's Board of

29.     Pershing Square still owns 8.9% of Allergan common stock.  As of the date of this First Amended Complaint, the Pershing Defendants have profited from their illegal scheme to the tune of over $2.5 billion.

30.     Defendants' unlawful conduct has caused substantial harm to Plaintiffs and is not excused now that Valeant has abandoned its hostile takeover effort.  Plaintiffs accordingly seek the following relief:  (a) a declaration that the Pershing Defendants violated Rule 14e-3 by trading while in possession of material nonpublic information about a tender offer, and that Valeant violated Rule 14e-3 by communicating information that was likely to be used in such a manner; (b) a declaration that the Pershing Defendants failed to file full and accurate disclosures required by Section 13(d) of the Exchange Act; (c) an order requiring that the Pershing Defendants rescind the purchase of Allergan securities that were acquired while in possession of material nonpublic information in violation of Rule 14e-3, or that were acquired prior to filing complete and accurate Schedule 13D; (d) an order requiring that Defendants correct by public means their material misstatements and omissions and to file with the Commission accurate disclosures required by Section 13(d) of the Exchange Act; (e) such injunctive relief as may be necessary to remedy Defendants' unlawful conduct; and (f) an order awarding Plaintiff Parschauer damages under Sections 14(e) and 20A of the Exchange Act.

## PARTIES

31.     Plaintiff Allergan is a publicly traded Delaware corporation.  It is a multi-specialty health care company that develops and commercializes pharmaceuticals, biologics, medical devices, and over-the-counter products for the ophthalmic, medical aesthetics, medical dermatology, and other specialty markets

---

Directors and management, disclosure of Valeant's proposals for a business combination, and actions taken in waging the proxy contest in support of Valeant's tender offer.  Yet, the initial disclosures made about Pershing Square's intentions with respect to Allergan have not been removed or altered. Its initial Schedule 13D, along with these amendments, comprise the operative disclosures that must satisfy Pershing Square's obligations under Section 13(d).

globally.  Allergan is listed on the New York Stock Exchange under the symbol "AGN."  Allergan employs roughly 11,500 employees, many of whom are located at its principal place of business in Irvine, California.

32.     Plaintiff Karah H. Parschauer is and at all relevant times was an employee and stockholder of Allergan.  Ms. Parschauer exercised and sold Allergan stock options on February 26, 2014, for a price of $127.60 and on March 11, 2014, for a price of $129.08.

33.     Defendant Valeant is a publicly traded company governed by the laws of the Province of British Columbia, Canada, with its principal place of business in Laval, Quebec, Canada.  Valeant manufactures and markets pharmaceuticals, over-the-counter products, and medical devices in the areas of eye health, dermatology, and neurology therapeutic classes.  Valeant actively and directly participated in the proposed offer made to Allergan employees and stockholders.

34.     Defendant Valeant USA is a Delaware corporation with its principal place of business in New Jersey.  Valeant USA actively and directly participated in the proposed offer made to Allergan employees and stockholders, and became a member of PS Fund 1 on April 3, 2014.

35.     Defendant AGMS is a Delaware corporation and wholly owned subsidiary of Valeant Pharmaceuticals International, Inc.  Valeant pursued its tender offer through AGMS.

36.     Defendant Pershing Square is an investment adviser founded in 2003 and registered with the SEC under the Investment Advisers Act of 1940, as amended.  It manages a series of hedge funds.  Pershing Square is a Delaware limited partnership with its principal place of business in New York.

37.     Defendant PS Management serves as the sole general partner of Pershing Square.  PS Management is a Delaware limited liability company with its principal place of business in New York.

38.     Defendant William A. Ackman is the founder and CEO of Pershing Square.  Ackman resides in New York.  Ackman, by virtue of his position with Pershing Square, at all relevant times controlled PS Fund 1.

39.     Defendant PS Fund 1 is a limited liability company formed by and among: Pershing Square; Pershing Square, L.P., a Delaware limited partnership; Pershing Square II, L.P., a Delaware limited partnership; Pershing Square International, Ltd., a Cayman Islands exempted company; Pershing Square Holdings, Ltd., a Guernsey limited liability company; and, nearly two months later, Valeant USA.  PS Fund 1 was formed for the purpose of serving as the acquisition vehicle in the acquisition of Allergan stock.  PS Fund 1 was formed in Delaware on February 11, 2014, and has its principal place of business in New York.  PS Fund 1 at all relevant times was controlled by Pershing Square and, by virtue of his position with Pershing Square, Ackman.

40.     Allergan does not know the names and identities of Does 1 through 10, inclusive, and therefore sues those defendants by such fictitious names.  Allergan is informed and believes, and on that basis alleges, that Does 1 through 10, inclusive, are responsible for the acts alleged in this Complaint.  When the true names of such fictitious defendants are ascertained, Allergan will seek leave of this Court to amend this Complaint to name those individuals or entities.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 78aa, 78m(d)(3), and 28 U.S.C. § 1331.

42.     This Court has personal jurisdiction over Defendants because each of them has sufficient minimum contacts in the State of California to satisfy California's long-arm statute and constitutional due process requirements as, on information and belief, Defendants have participated in a coordinated takeover attempt of Allergan, which is located in California.

43.     Venue is proper in the United States District Court for the Central District of California pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).

44.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201.

## BACKGROUND FACTS

### Allergan

45.     Allergan is a multi-specialty health care company established more than 60 years ago with a commitment to uncover medical advances and develop and deliver innovative and meaningful treatments.[11]  Allergan's core strengths include the development of pharmaceutical and medical devices in the areas of ophthalmology, dermatology, neurosciences, and related disciplines.  Based in California and incorporated in Delaware, Allergan has a global presence, with approximately 11,500 employees in 38 countries.  Perhaps Allergan's greatest strength is its effective and industry-leading research and development operation.  In 2013, research and development expenditures were approximately 16.8% of product net sales, or approximately $1 billion.[12]  Allergan's research efforts have led to the development of numerous glaucoma and dry-eye treatments, topical retinoid Tazorac®, and significant expansions in the uses of its neuromodulator Botox®.

### Valeant

46.     By contrast, Valeant, while styling itself as a traditional pharmaceutical manufacturer, has turned its back on the conventional drivers of long-term profitability — successful research and development — in favor of aggressive expansion, cost-cutting, and short-term value maximization.

---

[11]  *Allergan at a Glance*, ALLERGAN, http://www.allergan.com/investors/index.htm (last visited January 23, 2015).

[12]  Allergan 2013 Annual Report at 16, *available at* http://agn.client.shareholder.com/financials.cfm.

47.     Over the past four years, Valeant has embarked on a series of aggressive mergers and takeovers, beginning with the September 2010 takeover of Biovail Corp.  Since then, Valeant has acquired, *inter alia*, cold-and-flu remedy manufacturer Afexa Life Sciences, Inc. (December 2011), medical cosmetics company Medicis Pharmaceutical Corp. (December 2012), skin-care and aesthetics products manufacturer Obagi Medical Products, Inc. (April 2013), eye care company Bausch & Lomb Holdings, Inc. (August 2013), and dermatological device maker Solta Holdings Inc. (January 2014),[13] as well as a number of smaller concerns.  In all, Valeant has entered into over 100 transactions since 2008.[14]

48.     This pursuit of takeovers is the essence of Valeant's business model. As the Wall Street Journal noted, "[Valeant CEO] Michael Pearson runs a drug company, but that doesn't mean he wants to spend money on science."[15]  Indeed, under Pearson, research and development spending at Valeant went from 12% of revenue in 2007 to a mere 3% in 2013.

49.     This strategy, and the prospect of potential collapse of the Valeant business model once it runs out of targets to acquire, has been noted by commentators and, perhaps, Valeant management as well.  As one June 2014 article stated, sales are flat and executives are looking for the exits.  "The most telling sign that the gig [sic] is up for Mr. Pearson is the high level of turnover in executives. ***You are more likely to see a unicorn than a Valeant executive with a***

---

[13]  Valeant Acquisition FAQs, http://www.valeant.com/about/acquisition-faqs (last visited January 23, 2015).

[14]  Valeant April 22, 2014 News Release, *available at* http://ir.valeant.com/investor-relations/news-releases/news-release-details/2014/Valeant-Proposes-to-Combine-With-Allergan-for-4830-in-Cash-and-083-Shares-of-Valeant-Stock-for-Each-Allergan-Share/default.aspx.

[15]  Dana Mattioli et al., *Allergan Pursuer Valeant: A Drug Maker with Little Patience for Science*, WALL ST. J. (Apr. 22, 2014, 7:42 PM), *available at* http://online.wsj.com/news/articles/SB1000142405270230473430457951729342 9546768.

1  *five-year pin.*"[16]  Another analyst noted in May 2014, "there have been six

2  executives who left, senior executives, in the past 15 months and there has been a

3  lot of insider selling, including the Executive Vice President of Corporate and

4  Business Development, who sold stock yesterday . . . there seems to be not a lot of

5  confidence from inside the Valeant executive suite here."[17]  That analyst further

6  noted, "you have to analyze a company that's not growing organically and has to

7  deliver value by doing bigger and bigger acquisitions, and usually the companies

8  do an acquisition too far."[18]

9       50.    Indeed, Valeant's own financial advisors, Morgan Stanley, have

10  referred to Valeant and its unsustainable business model as a "house of cards."[19]

11       ***Pershing Square***

12       51.    Pershing Square, led and controlled by Ackman, provided financing

13  that Valeant required in its pursuit of Allergan.  But as set forth below, Pershing

14  Square did so knowing that Valeant was mounting a tender offer for Allergan,

15  thereby locking in considerable profit for Pershing Square should a deal be

16  consummated (by Valeant or anyone else).

17       52.    Pershing Square manages approximately $13 billion in capital.

18  Ackman has a reputation of being an "activist" hedge fund manager, who "drive[s]

19  up the stock and get[s] out – fast."[20]

20

21  _____

22  [16]  Patrick Burke, *Valeant Business Model Too Good to be True*, ROCHESTER DEMOCRAT & CHRONICLE (June 6, 2014) (emphasis added).

23  [17]  CNBC Fast Money Halftime Report: Jim Chanos on Shorting Valeant (May 15, 2014).

24  [18]  *Id.*

25  [19]  Sonali Basak & David Welch, *Morgan Stanley's Valeant E-mails Call Client a 'House of Cards,'* BLOOMBERG (June 16, 2014, 7:01 PM), *available at*

26  http://www.bloomberg.com/news/2014-06-16/morgan-stanley-s-valeant-e-mails-call-client-a-house-of-cards-.html.

27  [20]  Chris Serres, *William Ackman: Targeting Target*, STAR TRIBUNE (Jan. 13, 2008, 12:15 AM), *available at* http://www.startribune.com/business/13715691.html.

28

53.     Pershing Square has previously pursued widely known companies such as Target, McDonald's and Wendy's — in some cases, extracting significant concessions from the target, and in others, failing to do so.  Its interest in Allergan came on the heels of several recent high-profile stumbles, including Ackman's ill-fated bets against health supplement distributor Herbalife and retailer J.C. Penney Co.  In each case, Ackman's efforts to force change on the target were rejected, and Pershing Square withdrew its investments.[21]

54.     In early 2014, Pershing Square made its largest bet ever — Ackman collaborated with Valeant in its proposed Allergan takeover by providing financial support, while remaining free to accept a better offer if one emerged.  The inside maneuvering between Pershing Square and Valeant allowed Pershing Square to recognize initial profits of more than $1 billion upon Valeant's April 22 announcement.  But as set forth below, Pershing Square did so illegally by taking advantage of Valeant's inside information and acquiring a very significant stake in Allergan ahead of the broader market in direct contravention of the securities laws — all with Valeant's full complicity.

### *Valeant Takes Substantial Steps Toward a Tender Offer*

55.     Valeant had been eyeing a potential transaction with Allergan since the fall of 2012.  On September 10, 2012, Pearson reached out to Allergan's CEO, David Pyott and expressed interest in a business combination with Allergan.

56.     Allergan's Board of Directors was not interested in a transaction with Valeant in 2012 and declined to engage in discussions.  Pearson was thus well aware in early 2014 that Allergan was not likely to be supportive of a friendly merger, and so Valeant began plotting an alternate course.

---

[21]  Liz Hoffman, *Ackman Pares Down $1B Herbalife Bet, Books Losses*, LAW360 (Oct. 3, 2013, 10:54 AM), *available at* http://www.law360.com/articles/477827/ackman-pares-down-1b-herbalife-bet-books-losses.

57.    Less than a year after its very expensive Bausch & Lomb acquisition in November 2013, debt-laden Valeant grew even more interested in acquiring cash-rich Allergan to help even out Valeant's books.

58.    Around the same time, Pershing Square hired William F. Doyle, a friend of Pearson's and a classmate of Ackman's from Harvard Business School, as a "special advisor" — providing the inside connection Pearson needed to reach out to Pershing Square.

59.    As early as February 4, 2014, and continuing for the next several weeks, Valeant took substantial steps toward a tender offer by engaging in a scheme with the Pershing Defendants to start acquiring Allergan stock.

60.    First, through Doyle, Pearson and Ackman met on February 4, 2014, to discuss potential partnerships, including with respect to Allergan.  Beginning February 6, 2014, Valeant engaged three separate law firms — Sullivan & Cromwell LLP, Skadden, Arps, Slate, Meagher & Flom LLP, and Osler, Hoskins & Harcourt LLP — as counsel in connection with a potential Allergan transaction.

61.    Also on February 6, Ackman and Pearson had a telephone call to discuss a potential transaction structure in which Valeant would identify a specific target and disclose it confidentially to Pershing Square, which would then decide whether it was interested in working with Valeant.  At the same time, Pearson sought to meet with Allergan's CEO Pyott to follow up on their September 2012 discussions.

62.    On February 7, 2014, the Finance and Transactions Committee of Valeant's Board of Directors held a telephonic meeting at which they discussed a possible combination of Valeant and Allergan.  During the next two weeks, Valeant's Board of Directors — and different subcommittees thereof — met *five* more times to discuss takeover plans.

63.     On February 9, 2014, Valeant and Pershing Square entered into a confidentiality agreement, after which Pearson informed Ackman of Valeant's interest in a potential transaction with Allergan.[22]

64.     With its inside knowledge of Valeant's impending takeover, Pershing Square agreed to acquire a significant Allergan stake using its own funds, to support Valeant's efforts and to secure massive profits for itself.  In furtherance of Valeant's plan, on February 11, 2014, Pershing Square and other Pershing Square entities formed a new Delaware limited liability company, PS Fund 1, that would ultimately carry out the stock acquisition.

65.     On February 13, 2014, representatives of Valeant and Pershing Square and their respective counsel met to discuss a potential transaction involving Allergan.

66.     On February 15, 2014, Andrew Davis, Vice President of Business Development at Valeant, emailed Pearson attaching a document acknowledging that the "Allergan Opportunity" would consist of a "[h]ostile cash and stock merger."

67.     Between February 20 and 25, 2014, representatives of Valeant and Pershing Square and their respective counsel exchanged drafts of and negotiated a contractual and financial agreement related to the purchase of equity in Allergan. The parties finalized and executed the Relationship Agreement on February 25, 2014.

68.     Under the Relationship Agreement, Valeant agreed to contribute $75.9 million — the maximum allowed without triggering antitrust disclosure requirements — to the purported "co-bidder entity" in PS Fund 1 to assist with the Pershing Defendants' acquisition of a significant stake of Allergan's stock at non-

---

[22]   The confidentiality agreement was later amended on February 20, 2014.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
ORANGE COUNTY

FIRST AMENDED COMPLAINT;
JURY TRIAL DEMAND

premium prices before Valeant disclosed its takeover plans to the market.  Pershing Square supplied funds of over $3 billion, and retained sole control over PS Fund 1.

69.     Throughout the weeks during which Valeant was taking these substantial steps, it remained clear to Valeant that Allergan would not likely be interested in negotiating a friendly merger with Valeant.  On February 10, 2014, in connection with Allergan senior management's meetings with analysts, Sanford B. Bernstein & Co. published a report of its discussions with Mr. Pyott, reporting that an acquisition of Allergan by Valeant "was not a good fit and shareholders would hesitate to take Valeant paper."  That same day, Bank of America Merrill Lynch analyst Gregg Gilbert issued a note stating that Allergan would not be interested in a transaction with Valeant.

70.     In light of this negative press, and consistent with his expectation that a friendly combination would not be possible, Pearson cancelled his scheduled February 14, 2014 meeting with David Pyott.

71.     Given this chronology, Pearson knew that a negotiated transaction would not be possible and that a hostile tender offer would ultimately be necessary.  Pearson's later public statements confirm as much:  on June 17, 2014 – the day before Valeant launched its tender offer – Pearson stated that he was "correct" in his initial suspicion that Valeant "would ultimately have to go directly to Allergan shareholders."[23]

72.     Thus, before they entered into the Relationship Agreement on February 25, and before PS Fund 1 had purchased any shares of Allergan, Valeant had already taken substantial steps toward commencing its tender offer, including: (i) engaging legal counsel; (ii) reaching out to Ackman and convincing him to

---

[23]  Allergan, Inc., Form 425 (filed by Valeant Pharmaceuticals International, Inc.) (June 17, 2014), *available at* http://www.sec.gov/Archives/edgar/data/850693/000119312514239987/d74531 6d425.htm.

1  participate as a financier and supporter; (iii) holding Board of Directors and

2  committee meetings regarding the potential offer on February 7, 9, 16, 17, 19 and

3  21, 2014; (iv) negotiating the respective financial commitments of Valeant and the

4  Pershing Defendants; and (v) agreeing to commit over $75 million to the

5  Relationship Agreement to help finance the stock acquisition.

6  ***Valeant and Pershing Square Violated Rule 14e-3 By Tipping and Trading on***

7  ***Material Nonpublic Information About a Tender Offer***

8       73.    In the Relationship Agreement, Defendants specifically claimed to be

9  "co-bidders" in connection with a potential Allergan transaction — likely in order

10  to support an argument that they were all the same "person" for purposes of the

11  insider trading rules.  Armed with this self-serving label, PS Fund 1 (directed by

12  Pershing Square and Ackman) secretly purchased a substantial amount of Allergan

13  stock without filing disclosure documents with the Commission or paying any

14  form of control premium.

15       74.    Pershing Square was the primary actor in purchasing Allergan stock;

16  it provided approximately 97.5% of the funding for PS Fund 1, and the

17  Relationship Agreement states that Pershing Square Capital Management "will

18  direct the management" of PS Fund 1.

19       75.    In a series of complex and undisclosed transactions between February

20  25 and April 21, 2014, PS Fund 1 quickly acquired 9.7% of Allergan's stock (the

21  "Purchase Program"), primarily through over-the-counter ("OTC") call options and

22  OTC equity futures.  This percentage of Allergan's stock was just shy of the "short

23  swing" profits prohibition in Section 16 of the Exchange Act, which requires

24  holders of greater than 10% of a company's stock to disgorge any profits made in a

25  six-month buy-sell period.

26       76.    The Pershing Defendants began the Purchase Program at a time when

27  they unquestionably had material nonpublic information relating to Valeant's

28  forthcoming tender offer, in violation of Rule 14e-3's trading prohibition.

77.     Rule 14e-3 provides that, where any person has taken "a substantial step or steps" (the "offering person") to commence a tender offer of a target company, any "other person" who is in possession of material nonpublic information relating to that tender offer is prohibited from purchasing or selling any securities of the target company, unless the information is publicly disclosed within a reasonable time *prior* to the purchase or sale.  The rule imposes a duty to disclose or abstain from trading irrespective of whether the trader owes a duty to respect the confidentiality of the information.

78.     Valeant took substantial steps toward a tender offer for Allergan's stock beginning on or before February 6, 2014.  Moreover, having already been rebuffed, Valeant knew that it would not likely be able to acquire Allergan through a "friendly" deal, and that a hostile tender offer was therefore inevitable.

79.     Valeant told Pershing Square about Valeant's confidential plans to launch a tender offer precisely because Valeant wanted Pershing Square to trade on that information.  Valeant wanted as many shares as possible to be held by stockholders that Valeant perceived as likely to support an Allergan takeover, but since it could not pay for the shares directly, it turned to Pershing Square.  The illicit tip from Valeant was Pershing Square's incentive to join the scheme.  Pershing Square agreed and acquired 9.7% of Allergan's outstanding stock while in possession of that material, nonpublic information.

80.     None of the parties disclosed Valeant's takeover intentions until long after the purchases were made, and long after Allergan stockholders — including Plaintiff Parschauer— and the overall market had been damaged to the benefit of Pershing Square and Valeant.

81.     Plaintiff Parschauer suffered damages as a result of these trades because she did not know the information she was entitled to know under the disclose-or-abstain-from-trading principle of Rule 14e-3, and consequently sold for an unfair price and did not receive the benefit of the premium that followed once

the Pershing Defendants' material nonpublic information was released to the
market.  Pershing Square thus exploited exactly the sort of informational advantage
that Rule 14e-3 was designed to prevent, and reaped an initial benefit of more than
$1 billion when Valeant's proposal was announced.  As the Commission put it
when adopting Rule 14e-3, "[t]he Commission has previously expressed and
continues to have serious concerns about trading by persons in possession of
material, nonpublic information relating to a tender offer."[24]  This practice results
in unfair disparities in market information and market disruption.  Security holders
who purchase from or sell to such persons are effectively denied the benefits of
disclosure and the substantive protections of the Williams Act.  If furnished with
the information, these security holders would be able to make an informed
investment decision, which could involve deferring the purchase or sale of the
securities until the material information had been disseminated or until the tender
offer had been commenced or terminated.  Moreover, the Williams Act was
designed to avert a 'stampede effect' in the context of tender offers, and the trading
on material, nonpublic information and the dissemination of leaks and rumors in
connection with such trading tends to promote this detrimental effect."[25]

82.    In an effort to circumvent Rule 14e-3, Valeant and Pershing Square
attempted in their written agreements with each other to construct a "co-bidder"
fiction — falsely suggesting that they should be considered a single "person" or
"offering person" under the Rule.  However, Valeant and Pershing Square's
construction of a shell entity through which to act, and their self-serving
description of their own conduct, are irrelevant.  The terms of the Relationship
Agreement, the parties' subsequent actions, and the economics of this attempted

---

[24]  45 Fed. Reg. 60,410, 60,412 (Sept. 12, 1980).

[25]  *See* Tender Offers, Exchange Act Release No. 17120, 1980 WL 20869, at 4
(Sept. 4, 1980) (footnotes omitted).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

FIRST AMENDED COMPLAINT;
JURY TRIAL DEMAND

1    takeover make clear that they were not acting as a single or joint "offering person"

2    at the time of Pershing Square's trades.

3         83.     At the time the proposed acquisition was announced, Valeant was the

4    sole offering person.  The proposal to acquire Allergan was not made by Ackman

5    or Pershing Square, nor was it made on behalf of Ackman or Pershing Square.

6    Crucially, only Valeant offered consideration in the form of shares and cash to

7    Allergan's stockholders.  By contrast, Ackman and the other Pershing Square

8    entities together offered precisely zero to Allergan stockholders — they were

9    seeking to sell Allergan stock, as Valeant sought to buy it.  Ackman would not

10    have become a Board of Directors member of Valeant, nor otherwise become a

11    control person of Valeant, and would not receive any business or asset of Allergan

12    as a result of the tender offer.

13         84.     Ackman also confirmed publicly that it was Valeant, and not Pershing

14    Square, that retained complete control over the transaction.  In a July 21, 2014

15    interview on CNBC, when asked whether he and Valeant would "raise their offer"

16    in light of Allergan's strong second quarter performance, Ackman responded,

17    "*Valeant* controls what *they're* prepared to pay."  Regardless of semantics,

18    Ackman and the Pershing Square entities were not an "offering person" within the

19    meaning of Rule 14e-3.

20         85.     Valeant concedes that it was not even added as a member of PS Fund

21    1 until well into the Purchase Program — on April 3, 2014 — and did not

22    contribute any capital to PS Fund 1 until April 10, 2014.  By this time, PS Fund 1

23    had acquired more than 11 million shares or options.

24         86.     Even after Valeant purportedly became a member of PS Fund 1, the

25    nature of Defendants' relationship remained clear:  Valeant was an offering person,

26    and PS Fund 1 — at the direction of Pershing Square — was another person

27    acquiring shares in violation of Rule 14e-3.

28

87.     Under the Relationship Agreement, Pershing Square retained the authority to act for its own account — even in contravention of Valeant's interests. The Relationship Agreement provides that it will terminate if a "Third Party Transaction Proposal" — a public proposal by a bidder other than Valeant — is made, and Valeant does not match or exceed that proposal within 45 days.

88.     The Relationship Agreement also gave Valeant unilateral discretion to terminate the contract upon notice to Pershing Square that "it is not interested in consummating" a transaction with Allergan.  Regardless of the "co-bidder" label, under the terms of the Relationship Agreement, Pershing Square was *not* the same "person" as Valeant with respect to this proposal.  Rather, it was a separate, independent investor, unaffiliated with Valeant, which retained the freedom to accept a better deal when one came along — while Valeant retained (and exercised) its unilateral discretion to terminate the takeover altogether.

89.     Valeant and Pershing also took great pains to conceal their true intent early on, by purposely including language in their agreement that "no steps have been taken toward a tender or exchange offer."

90.     This statement was not only demonstrably false, but also clearly crafted in an attempt to circumvent the prohibitions of Rule 14e-3 and requirements of the Williams Act more generally.

***The Purchase Program Was Carefully Designed to Avoid Required Disclosure***

91.     In addition to violating Rule 14e-3, the Purchase Program was aimed at preserving secrecy and seeking to evade disclosure requirements at every turn.

92.     The manner in which these trades occurred was carefully designed to preserve the secrecy of the block acquisitions, and therefore Pershing Square's informational advantage over the market.

93.     On February 25 and 26, 2014, PS Fund 1 acquired approximately 600,000 shares of the outstanding common stock of Allergan, stopping just short of

1  $75.9 million worth to avoid having to disclose its purchases under the Hart-Scott-

2  Rodino ("HSR") Act.

3      94.    Between March 3, 2014 and April 8, 2014, PS Fund 1 acquired

4  additional Allergan shares, bringing its holdings up to 4.9%, through deep-in-the-

5  money, American-style, OTC zero-strike call options.

6      95.    The counterparty for all of the option and equity forward trades was

7  the same entity:  Nomura.  The call options that PS Fund 1 purchased from

8  Nomura had strike prices of less than $1.35 — roughly *100 times* less than the

9  actual price of the stock that day.  Because of the extremely low strike price, the

10  options were guaranteed to be exercised and thus were the equivalent of outright

11  ownership.  Such a low strike price meant that PS Fund 1 paid Nomura almost the

12  full value of the share for each option, and had only to pay the balance (less than

13  $1.35 per share) to exercise the option and convert it into a share of Allergan stock.

14  As commentators have pointed out, these so-called options were effectively

15  common stock because they were certain to be exercised.  According to one:

16  "Ackman's options are 99 percent in-the-money; there's no optionality at all. . . .

17  Ackman hired dealers to buy **stock** for him, but the contracts were phrased as

18  options for regulatory purposes."[26]

19      96.    By remaining under the 5% threshold of Section 13(d) and having PS

20  Fund 1 purchase these so-called options, Defendants deliberately avoided federal

21  securities and antitrust disclosure requirements, keeping their scheme secret while

22  victimizing unknowing Allergan stockholders.  Defendants were able to acquire

23  well over the HSR threshold by the third day of purchasing and still delay FTC

24  notification until after public announcement of the takeover plans on April 21.

25

---

26  [26] *See* Matt Levine, *Predatory Traders Front-Ran Bill Ackman's Botox Buy*,

27  BLOOMBERGVIEW (Apr. 23, 2014), *available at* http://www.bloombergview.com/articles/2014-04-23/predatory-traders-front-ran-bill-ackman-s-botox-buy).

28

97.     Pershing Square then halted trading for two days (April 9 and 10) to let Allergan's stock price settle down to a purported "unaffected" stock price.

98.     Taking advantage of the ten-day window under Section 13(d), PS Fund 1 continued with the second half of its aggressive accumulation of Allergan stock between April 11 and April 21, 2014.  During this window, PS Fund 1 increased its holdings to nearly 10% of Allergan's stock (by acquiring an almost 14 million additional shares) through additional deep-in-the-money OTC call options and OTC equity forwards.

99.     On April 21, 2014 PS Fund 1 entered into an over-the-counter equity forward contract with Nomura.  The equity forward contract allowed PS Fund 1 to buy the specified number of shares of Allergan stock on a later unspecified date — in essence, guaranteeing that the options were the equivalent of common stock. Not only was this equivalence an economic certainty, it was expressly contemplated as part of Defendants' "Proposed Acquisition Plan," through which PS Fund 1 would acquire options and then convert them into actual ownership shares once it obtained HSR clearance.

100.   Indeed, on the day Pershing Square received HSR clearance to exercise the options, and thereby acquired 24.8 million shares of Allergan stock from Nomura, Allergan's daily trading volume was only about 3.7 million total shares — meaning that Nomura had covered the options by purchasing the 24.8 million shares long before the date of exercise.

101.   By April 21, 2014, when Pershing Square finally disclosed in a Schedule 13D that PS Fund 1 had acquired 9.7% of the outstanding Allergan stock, Defendants still had not disclosed Valeant's takeover intentions.  None of the stockholders who sold to PS Fund 1 or its counterparty Nomura knew what Defendants knew: that Valeant was about to announce a takeover bid at a premium to Allergan's trading price.

102.   From the time these significant acquisitions began, Allergan's stock price increased from $125.54 per share on February 25, 2014, to a closing price of $163.65 per share on April 22, 2014, the day of Valeant's announced proposal.

***Defendants' Statements and Actions Further Reveal the Plain Fact That They Were Separate Persons***

103.   The fact that Valeant and Pershing Square were not, and cannot be considered, the same "offering person" is consistent with Valeant's and Ackman's public statements.  For example, in its amended S-4, Valeant expressly disclaimed any affiliation with Pershing Square, in contending that its proposed acquisition of Allergan would not be a transaction with an "Interested Stockholder" under the terms of Allergan's certificate of incorporation.  Under Article 15 of that certificate, an affirmative vote of at least two-thirds of "disinterested shares" is required for the approval of a transaction between the Company and "any other corporation or any of its affiliates that individually or in the aggregate are directly or indirectly the beneficial owners of 5% or more of the outstanding voting shares of the Company."  In the amended S-4, Valeant took the position that, because Valeant itself owns only 100 shares, and because in Valeant's view it cannot be said to be the "owner" of the shares of Allergan common stock held by PS Fund 1, a merger between Valeant and Allergan would not be a "Business Combination" with an "Interested Stockholder."  Although incorrect for purposes of Article 15, Valeant itself acknowledged that Valeant is and always was the offering person, while PS Fund 1 was a separate, unaffiliated entity.

104.   After Valeant and Pershing Square entered into the Relationship Agreement, and even after they publicly announced that agreement on April 22, 2014, Ackman repeatedly represented that he was just another Allergan stockholder looking to maximize value, whether through a transaction with Valeant or some other company.

FIRST AMENDED COMPLAINT;
JURY TRIAL DEMAND

105.   In a May 5, 2014 letter from Ackman to Michael Gallagher, Allergan's Lead Independent Director, Ackman wrote:  (1) "As Allergan's largest shareholder with 9.7% of the common stock, we look forward to working with you and the rest of the board to maximize value for all Allergan shareholders"; and (2) "As Allergan's largest shareholder, we are supportive of Allergan making the best possible deal with Valeant or identifying a superior transaction with another company" (emphasis supplied).

106.   In a May 12, 2014 letter from Ackman to Matthew Maletta, Allergan's Associate General Counsel and Secretary, making demand under Delaware General Corporation Law Section 220 for the inspection of Allergan's books and records, Ackman wrote, "[t]he purpose of this demand is to enable the Requesting Stockholder to communicate with fellow stockholders of the Company on matters relating to their mutual interest as stockholders… including, without limitation, the solicitation of views regarding Valeant Pharmaceuticals International Inc.'s proposal to acquire the Company."  In the letter, Ackman correctly referenced the proposal and the transaction as Valeant's — not Pershing Square's — a characterization consistent with Allergan's public rejections of the offer and inconsistent with any attempt to cast Pershing Square and Valeant as a single "person."

107.   On May 13, 2014, Valeant and Pershing Square filed a Preliminary Proxy Statement with the Commission to conduct a non-binding "shareholder referendum" purporting to direct the Allergan Board of Directors to "promptly engage in good faith discussions with Valeant regarding Valeant's offer to merge with the Company," but without precluding the Allergan Board of Directors from engaging in discussions with other parties that might offer higher value.  This Proxy Statement defined Pershing Square as the Requesting Shareholder, and requested negotiations with *Valeant* regarding *Valeant's* offer.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY

FIRST AMENDED COMPLAINT;
JURY TRIAL DEMAND

108.   In a May 19, 2014 letter from Ackman to Mr. Gallagher, Ackman wrote, (1) "I find it inappropriate that Allergan's lead independent director was unwilling to speak to a shareholder without management present"; (2) "Mr. Pyott has also apparently criticized Pershing Square, explaining that our views should not be considered, as we are somehow conflicted because of our relationship with Valeant. To set the record straight, Pershing Square is Allergan's largest shareholder with nearly 10% of the common stock of the company . . . . We are interested only in maximizing the value of our investment in Allergan"; (3) "Based on conversations we have had with other Allergan shareholders . . . , we believe that the majority of Allergan shareholders are interested in a potential business combination with Valeant . . . . [I]t is rare that a shareholder is willing to candidly share its views with a Chairman/CEO who will likely lose his job as a result of a proposed transaction . . . . "

109.   On July 16, 2014, Ackman wrote in a letter to Allergan's Board of Directors that, if allegations of Valeant "malfeasance" are true, "then as Allergan's largest shareholder with a $5 billion investment we would of course strongly oppose a Valeant transaction."  These are neither the words nor the actions of an actual bidder.

110.   Ackman and his hedge fund are not shielded from liability simply because they called themselves "co-bidders"; they were *other persons* who were prohibited from trading under Rule 14e-3(a).

111.   At its core, Valeant's and Pershing Square's conduct constitutes an impermissible warehousing scheme.  Valeant leaked its nonpublic tender offer intentions to Pershing Square, prompting Pershing Square to purchase 9.7% of Allergan stock.  Not only did the leaked information procure significant profits for Pershing Square, but it also ensured a presumptively "friendly" stake for Valeant once Valeant launched its tender offer.

*Valeant Launches an Aggressive Takeover Campaign*

112.   On April 21, 2014, the last possible day permissible under the ten-day period prescribed by Section 13(d),[27] Valeant and Pershing Square shocked the market when they each filed a Schedule 13D purporting to disclose the acquisition of Allergan stock and Valeant's attempt to take over Allergan.

113.   On April 22, 2014, immediately after announcing its intentions to the market for the first time, Valeant delivered to Allergan a formal, unsolicited proposal and draft merger agreement at $48.30 in cash and .83 of Valeant stock per Allergan share.

114.   While Valeant initially tried to characterize its takeover as a "merger" to try to skirt the federal securities regulations triggered by a tender offer, its plan from the very beginning was to launch a tender offer.  Indeed, Valeant's aggressive and hostile tactics from the outset constituted a *de facto* tender offer in everything but the actual name.  When Allergan did not immediately agree to negotiate with Defendants, Valeant sought, with Ackman's help, to persuade stockholders that a deal was "inevitable."[28]

115.   Meanwhile, Ackman openly bragged about how he was able to make this unprecedented gain without, in his view, technically violating the insider trading rules.  At a lunch hosted by Valeant, Ackman and Pearson "acknowledged that there may be some questions around how Pershing Square/Bill Ackman

---

[27] Under Section 13(d), the Schedule 13D must be filed with the Commission within ten days of the date that the filer crosses the 5% threshold (a time period that was put in place in 1968, long before technological advances made rapid accumulations much easier).

[28] Allergan, Inc., Form 425 (filed by Valeant Pharmaceuticals International, Inc.) (June 3, 2014), *available at* http://www.sec.gov/Archives/edgar/data/850693/000119312514222737/d737699d425.htm (Ackman: "[O]ur point of view is at this point we think Allergan's board and management are delaying the inevitable.").

accumulated AGN shares ahead of the takeout offer being announced publicly, but they stressed everything they have done is completely legal."[29]

116.   Under the facade of pursuing a negotiated merger, Valeant launched an aggressive campaign, using the classic playbook for hostile tender offers:  an offensive public relations and media blitz, pre-packaged investor presentations trumpeting the "synergies" of a combined company and the shortcomings of Allergan as a stand-alone company, concerted stockholder outreach, and direct communications with Allergan employees and customers.

117.   Valeant undertook an aggressive public relations campaign with financial analysts and the media.  In all of its communications, Valeant made clear that it intended to rely on its continued "slash and burn" strategy by making deep cost cuts at Allergan's headquarters, particularly in the area of research and development.

118.   On April 28, 2014, Valeant hosted an analyst event to discuss its proposal to Allergan.  At the event, Valeant emphasized that the likelihood of another bidder emerging was low, that "[t]ime is of the essence,"[30] and that Allergan should not "take more than about 30 days" to evaluate.[31]

119.   On a conference call with equity analysts on Thursday, May 8, 2014, Valeant CEO Pearson said that he and Valeant CFO Howard Schiller had been traveling across the U.S. to meet with Allergan's top stockholders, as well as Valeant's top stockholders.[32]  Pearson stated:  "We have been in New York, Baltimore, Boston, Los Angeles, San Francisco, Vancouver and South Florida.  So

---

[29]   Credit Suisse, ALLERGAN INC.: TAKEAWAYS FROM VRX LUNCH: MANAGEMENT PROVIDES COMPELLING POINTS FOR AGN TAKEOUT (Apr. 27, 2014), at 16.

[30]   Canaccord, VRX REMAINS FOCUSED ON THE GOAL (Apr. 28, 2014), at 9.

[31]   Credit Suisse, *supra* note 29.

[32]   Joseph Walker, *Valeant Steps Up Hostile Takeover Campaign Against Allergan*, WALL ST. J. (May 8, 2014, 3:20 PM), *available at* http://online.wsj.com/news/articles/SB1000142405270230488540457954937382488490000.

1   far, all of the feedback has been overwhelmingly positive."[33]  To the contrary,

2   many Allergan stockholders including Dan Davidowitz, Chief Investment Officer

3   of Polen Capital Management LLC, stated in interviews that they did not support

4   Valeant's bid.  Allergan's co-founder and former Chairman, Gavin S. Herbert,

5   urged the company's directors to reject a buyout offer saying that Valeant's

6   slashing the research and development budget would "really kill this company . . . I

7   am very much against that."[34]

8          120.   On May 8, 2014, Schiller warned of more aggressive measures,

9   explaining that Valeant and Pershing Square would request a stockholder list from

10  Allergan in order to "commence a shareholder referendum that will determine that

11  the Allergan shareholders are supportive of Allergan's Board of Directors

12  engaging in negotiations with us in parallel with other efforts they may be

13  undertaking."[35]  Schiller also made clear that Valeant and Pershing Square were

14  willing to bypass the Board of Directors entirely, stating that "if necessary, we will

15  also pursue holding a special meeting to remove some or all of the Allergan board

16  members."

17         121.   Meanwhile, Ackman bragged that he was already up about 38% on his

18  Allergan stake, less than one month after the unusual deal became public.[36]  The

19  gains at the time added up to more than $1 billion in paper profits.[37]

20

21

---

22  [33]  *Id.*

23  [34]  Stuart Pfeifer, *Allergan Co-Founder Speaks Out Against Valeant Takeover*,
        L.A. TIMES (May 6, 2014, 6:57 PM), *available at*
24      http://www.latimes.com/business/la-fi-allergan-meeting-20140507-story.html.

25  [35]  Walker, *supra* note 32.

26  [36]  Rob Copeland, *Ackman Gains 38% on Valeant Deal to Buy Allergan*, WALL ST.
        J. (May 9, 2014, 5:42 PM), *available at*
27      http://online.wsj.com/news/articles/SB1000142405270230443110457955231179
        2829166.

28  [37]  *Id.*

122.   Throughout April and May, Valeant also undertook to communicate directly with Allergan's customers and employees.  Among other tactics, Valeant management and other personnel:

    a.    Began representing to Allergan's customers that the acquisition was a "done deal" and "we own them";

    b.    Offered rebates on both Allergan and Valeant purchases;

    c.    Contacted Allergan sales representatives and welcomed them to Valeant;

    d.    Visited Allergan customers, announcing that they were Allergan's new sales representatives;

    e.    Began telling Allergan customers that Allergan's SkinMedica line was going to be divested; and

    f.    Sent a letter to Valeant's customers discussing its merger proposal and plans for the joint company going forward.

**Valeant Formally Launches a Proxy Contest and Hostile Exchange Offer**

123.   Two weeks after Allergan's Board of Directors "unanimously determined that Valeant's unsolicited proposal substantially undervalues Allergan," on May 28, 2014, Valeant increased its offer by $10 cash per share.

124.   Before the Allergan Board of Directors had the chance to consider the revised offer, Valeant raised its offer again on May 30, 2014, by increasing the cash portion of its bid to $72.00 per share (the "Revised Proposal").

125.   As part of the Revised Proposal, Pershing Square agreed to forego all cash and accept 100% of its consideration in Valeant stock using an exchange ratio determined based on the previous day's closing stock prices of Allergan and Valeant.  Pershing Square would receive $20.75 per share less consideration than other Allergan stockholders, providing substantially more value and cash for other

1  Allergan stockholders.[38]  Pershing Square was again stepping in to help finance a

2  deal that Valeant could not afford.

3      126.   In a presentation to investors on June 2, 2014, Valeant abandoned the

4  pretense of "negotiations" with the Board of Directors and reaffirmed that it was

5  "preparing to launch an exchange offer."

6      127.   Allergan's Board of Directors unanimously rejected the Revised

7  Proposal on June 10, 2014, reiterating its belief that the increased proposal still

8  "substantially undervalues Allergan, creates significant risks and uncertainties for

9  Allergan's stockholders and does not reflect the Company's financial strength,

10 future revenue and earnings growth or industry-leading R&D."

11     128.   On June 18, 2014, Valeant filed a Registration Statement on Form S-4

12 (the "S-4") and Schedule TO with the Commission, finally commencing the tender

13 offer that it had been planning for several months.

14     129.   On July 11, 2014, Valeant and Pershing Square filed a definitive

15 proxy statement with the Commission, soliciting proxies to call the Special

16 Meeting.  Allergan filed a Definitive Proxy Statement and a Schedule 14D-9 in

17 response to Valeant's offer.  These filings defended Allergan's position that

18 Valeant's offer was grossly inadequate.

19 ***Material Misstatements and Omissions Regarding Defendants' Relationship and***

20 ***Intentions***

21     130.   Section 13(d) requires any entity that directly or indirectly acquires

22 beneficial ownership of more than 5% of a registered class of an issuer's equity

23 securities to file a Schedule 13D disclosure statement with the SEC.  The Schedule

24 13D must contain the information specified in Section 13(d) and the Commission

---

25

26 [38]  Pershing Square was able to make this election because it had already obtained a paper profit of approximately $1 billion through its rapid accumulation program while in possession of material, nonpublic information.  Pershing Square is effectively using those ill-gotten gains to help finance Valeant's takeover effort.

27

28

1  rules promulgated thereunder, including, among other things:  the number of shares

2  beneficially owned; the source and amount of the funds to be used in the

3  acquisition; information as to any contracts, agreements, or understandings with

4  any entity relating to the securities of the issuer; and the beneficial owner's plans

5  for the issuer's business and governance.  Section 13(d) and Schedule 13D

6  function together as key elements of the Williams Act and provide public

7  stockholders with early warning of a potential takeover.

8      131.   Notably, Section 13(d) expressly requires the filer to disclose the

9  "purpose" of its acquisition of the issuer's securities, and "any plans or proposals"

10  the filer "may have which relate to or would result in . . . [a]n extraordinary

11  corporate transaction."[39]

12      132.   Valeant's and Pershing Square's Schedule 13D filings on April 21,

13  2014 — purporting to disclose the acquisition of Allergan stock and Valeant's

14  attempt to take over Allergan — do not satisfy Section 13(d)'s requirements.  The

15  Schedule 13D filed by Pershing Square on April 21, 2014, stated that Pershing

16  Square "intend[s] to engage in discussions" with Allergan's Board of Directors,[40]

17  and the Schedule 13D filed by Valeant on April 21, 2014, stated that Valeant

18  "currently intends to propose a merger" in which Allergan's stockholders would

19  receive "a combination of cash and Valeant common shares," and that it expected

20  the cash component to total approximately $15 billion.[41]

21

---

22  [39] 17 C.F.R. § 240.13d-101, Item 4.

23  [40] Allergan, Inc., General Statement of Acquisition of Beneficial Ownership
       (Schedule 13D) (filed by Pershing Square Capital Management, L.P.) (Apr. 21,
24     2014), *available at*
       http://www.sec.gov/Archives/edgar/data/850693/000119312514150906/d71160
25     3dsc13d.htm.

26  [41] Allergan, Inc., General Statement of Acquisition of Beneficial Ownership
       (Schedule 13D) (filed by Valeant Pharmaceuticals International, Inc.) (Apr. 21,
27     2014), *available at*
       http://www.sec.gov/Archives/edgar/data/850693/000119312514150941/d71550
       9dsc13d.htm.

28

133.   These characterizations of Defendants' intentions at that time are belied by later admissions.  When investors asked Ackman and Pearson on April 22, 2014, whether an exchange offer was coming, Ackman admitted, "I think that anyone in the room who talks to a good M&A attorney will understand, you'll read the documents on the company, there are opportunities to call special meetings. ***There are opportunities for investors to launch various kinds of offers***. You should assume that we're familiar with all these various techniques."[42]

134.   Reflecting back on the announced offer in April, on June 17, 2014, Pearson admitted that a tender offer was part of Valeant's ultimate plan, stating: "On April 22nd, we announced our offer for Allergan.  ***We suspected at the time it would ultimately have to go directly to Allergan shareholders.  We were correct***."[43]  Having already taken substantial steps towards a tender offer at that time, Valeant filed a Schedule 13D that was deficient in that it did not accurately convey its plans and proposals for Allergan pursuant to the requirements of Item 4.

135.   In an apparent effort to remedy its deficient initial filing, Pershing Square first amended its Schedule 13D/A on July 17, 2014.  Exhibits 99.14 and 99.15 to the Schedule 13D/A consisted of previously undisclosed share call option and share forward master confirmations.

136.   Pershing Square also subsequently amended Item 4 of its Schedule 13D on several occasions to reflect its attempts to cajole Allergan's Board of

---

[42]  Allergan Inc., Form 425 (filed by Valeant Pharmaceuticals International, Inc.) (Apr. 23, 2014), *available at* https://www.sec.gov/Archives/edgar/data/885590/000119312514155048/d713979d425.htm (emphasis added).

[43]  Allergan, Inc., Form 425 (filed by Valeant Pharmaceuticals International, Inc.) (June 18, 2014), *available* at https://www.sec.gov/Archives/edgar/data/850693/000119312514239987/d745316d425.htm (emphasis added).

1  Directors to pursue a business combination with Valeant.[44]  And, the Schedule 13D

2  was repeatedly amended to reflect the status of Valeant's takeover attempt and the

3  supporting proxy contest to remove Allergan's Board of Directors and pave the

4  way for Valeant's tender offer.  None of these amendments disclosed the true

5  nature of Pershing Square's relationship with Valeant, or its awareness of the

6  potential liability for insider trading when it structured its Relationship Agreement

7  with Valeant.

8       137.  Pershing Square's most recent amendment to its Schedule 13D on

9  November 21, 2014, likewise does not correct these disclosure deficiencies.[45]  That

10  amendment came in the wake of Allergan's announcement, on November 17, that

11  it had entered into a merger agreement with Actavis, Pershing Square's withdrawal

12  the next day of its Special Meeting Proxy Statement,[46] and Valeant's filing on

13  November 19 of amendment number 6 to its Schedule TO withdrawing its tender

14  offer.[47]  It discloses that Pershing Square sold almost 1,651,509 shares to split its

15  profits with Valeant, per the terms of their Relationship Agreement.  Valeant made

16  almost $400 million in profits — $350 million of which was a pure gain resulting

17  from Defendants' unlawful insider trading scheme.

18       138.  Although Valeant's tender offer for Allergan stock has been

19  withdrawn, Pershing Square remains the beneficial owner of over 26 million

20

---

21  [44]  Pershing Square amended its April 21, 2014 Schedule 13D multiple times.
22       Pershing Square most recently amended its Schedule 13D on November 21,
         2014.  *See infra* ¶¶ 28.

23  [45]  *See* **Exhibit B**.

24  [46]  Allergan, Inc., Withdrawal of Definitive Proxy Statement, (filed by Pershing
25       Square Capital Management, L.P.) (Nov. 18, 2014), *available at*
         http://www.sec.gov/Archives/edgar/data/850693/000119312514416965/d82362
         4drw.htm.

26  [47]  Allergan, Inc., Amendment to Schedule TO (filed by Valeant Pharmaceuticals
27       International, Inc.) (Nov. 19, 2014, 2014), *available at*
         https://www.sec.gov/Archives/edgar/data/850693/000119312514418566/d8244
28       80dsctota.htm.

1   Allergan shares.  As with any Schedule 13D filer, Pershing Square has a duty to

2   ensure that the Schedule adequately discloses its intentions to stockholders.

3      139.   Yet, Pershing Square's most recently amended Schedule 13D remains

4   operative and *still* omits key information including:  (1) Pershing Square's current

5   plans with respect to Allergan; (2) its previous plan to label itself a "co-bidder"

6   with Valeant in the event of a Valeant tender offer (an attempt to avoid liability for

7   insider trading); and (3) its potential 14e-3 liability and awareness of that liability

8   at the time it purchased Allergan stock.  Allergan stockholders would find any

9   information regarding Pershing Square and Valeant's scheme to defraud the

10  market material to any decision to buy, sell, hold, or otherwise exercise rights

11  attendant to those shares.

12     140.   Moreover, the Pershing Defendants have publicly stated in live SEC

13  filings that they may seek major changes to Allergan's business, including "actions

14  which may impede the acquisition of the issuer by any person."[48]  Pershing Square

15  has never revoked the statement in its initial April 21, 2014 Schedule 13D that it

16  "may also take one or more of the actions described in subsections (a) through (j)

17  of Item 4 of Schedule 13D."[49]  To this day, according to its 13D statements,

18  Pershing Square reserves the right to push for a major change in Allergan's Board

19  of Directors or corporate structure.

---

[48] *See* 17 C.F.R. 13d-101, as referenced in Pershing Square's April 21, 2014 Schedule 13D (**Exhibit A**).

[49] *See* **Exhibit A**.  Subsections (a) through (j) of Item 4 of Schedule 13D include: (b) "an extraordinary corporate transaction, such as a merger"; (d) "any change in the present board of directors or management of the issuer including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board"; (f) "any other material change in the issuer's business or corporate structure"; or (g) "changes in the issuer's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the issuer by any person."  17 C.F.R. 13d-101.

# FIRST CLAIM FOR RELIEF

## Section 14(e) of the Exchange Act and the Rules Thereunder

## Against All Defendants

141.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

142.   Defendants have engaged in fraudulent, deceptive and manipulative acts in connection with taking substantial steps towards a tender offer, including trading on material nonpublic information.

143.   Rule 14e-3(a) provides that once an offering person has "taken a substantial step or steps to commence a tender offer," then "it shall constitute a fraudulent, deceptive or manipulative act or practice" for any person who is in possession of material nonpublic information relating to the tender offer (other than the offering person) to acquire shares in the target.

144.   Rule 14e-3(d) provides that under such circumstances, it shall be unlawful for an offering person "to communicate material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section."

145.   The purpose of the rule is to prevent parties with nonpublic information that a tender offer is going to be commenced at a premium price from transacting with investors who do not have such information — unless they disclose that information first.

146.   After Valeant took substantial steps to commence a tender offer for Allergan shares, the Pershing Defendants acquired shares of Allergan stock while in possession of material nonpublic information relating to that tender offer. In light of the Relationship Agreement, it was reasonably foreseeable that Valeant's communication would result in a violation of Rule 14e-3.

147.    The Pershing Defendants knew or had reason to know that the information was nonpublic, and that the information was provided by Valeant, the bidder.

148.    Section 14(e) provides:  "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ."

149.    Defendants violated Section 14(e) and Rule 14e-3 thereunder by failing to disclose material information regarding Valeant's tender offer before purchasing Allergan stock. Valeant further violated Rule 14(e) and Rule 14e-3 thereunder by communicating material, nonpublic information relating to its tender offer to the Pershing Defendants under circumstances in which it reasonably foreseeable that such communication was likely to result in a violation of Section 14(e).

150.    Defendants had the motive and opportunity to commit fraud. Valeant was motivated to facilitate Pershing Square's purchase of a large stake in Allergan, and thereby ensure critical financing and friendly backing in support of its hostile takeover attempt.  Pershing Square was motivated to purchase its stake in Allergan by trading with Allergan stockholders on the basis of material, nonpublic information, and thereby reap the enormous financial gains accruing to it from this information imbalance.  Defendants made false and misleading statements to the market in an attempt to hide the details of their conduct.

151.    Defendants' fraudulent, deceptive, and manipulative acts violated their respective obligations under Section 14(e) of the Williams Act and the rules adopted thereunder, including, at minimum:  14e-3(a) (prohibiting the Pershing Defendants from trading on nonpublic material information in connection with a

1    tender offer); and 14e-3(d) (prohibiting Valeant from communicating nonpublic

2    material information in connection with a tender offer).

3         152.   Defendants' violations of Section 14(e) of the Williams Act, and the

4    rules adopted thereunder, have caused, and continue to cause, Allergan

5    stockholders irreparable harm that cannot be adequately compensated in monetary

6    damages, and for which preliminary and permanent injunctive relief is appropriate.

7         153.   Defendants' violations of 14(e) of the Williams Act, and the rules

8    adopted thereunder, have caused and continue to cause, Plaintiff Parschauer

9    damages because she did not have the information required to be disclosed under

10   Rule 14e-3 and therefore sold Allergan stock for an unfair price.

11                      **SECOND CLAIM FOR RELIEF**

12   **Section 13(d) of the Exchange Act and Schedule 13D Thereunder**

13                **Against the Pershing Defendants**

14        154.   Plaintiffs incorporate by reference and reallege each and every

15   allegation contained above, as though fully set forth herein.

16        155.   Section 13(d) and the Commission rules promulgated thereunder

17   require that Schedule 13D disclosure statements adequately disclose the "purpose"

18   of its acquisition of the issuer's securities, and "any plans or proposals" the filer

19   "may have which relate to or would result in . . . [a]n extraordinary corporate

20   transaction." 17 C.F.R. § 240.13d-101, Item 4.

21        156.   The Pershing Defendants' November 21, 2014 Schedule 13D is

22   materially false and misleading because it omits key information including:

23   (1) Pershing Square's current plans with respect to Allergan; (2) its plan to label

24   itself a "co-bidder" with Valeant in the event of a Valeant tender offer; and (3) its

25   potential 14e-3 liability and awareness of that liability at the time it purchased

26   Allergan stock.

27

28

157.   As a result of the Pershing Defendants' failure to file an accurate Schedule 13D, the Pershing Defendants violated and remain in violation of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 thereunder.

158.   The omissions in the Pershing Defendants' November 21, 2014 Schedule 13D concern information material to Allergan stockholders and to the investing public.

159.   Allergan's stockholders and the investing public will be irreparably harmed in the absence of the declaratory and equitable relief as prayed for herein.

## THIRD CLAIM FOR RELIEF

### Section 20A of the Exchange Act

### By Plaintiff Parschauer Against the Pershing Defendants

160.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

161.   As detailed herein, the Pershing Defendants were in possession of material, nonpublic information concerning Allergan, and traded on the basis of that information to obtain initial profits of over $1 billion and current profits of over $2.5 billion.

162.   The Pershing Defendants' trades were made contemporaneously with Plaintiff Parschauer's trades.

163.   Plaintiff Parschauer suffered damages as a result of these trades because she did not have the information required to be disclosed under Rule 14e-3 and therefore sold for an unfair price and did not receive the benefit of the premium that followed once the Pershing Defendants' material nonpublic information was released to the market.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.    For an order declaring that the Pershing Defendants violated Rule 14e-3(a) by acquiring shares of Allergan while in possession of material nonpublic information relating to Valeant's tender offer.

B.    For an order declaring that Valeant violated Rule 14e-3(d) by communicating material, nonpublic information relating to Valeant's tender offer to Pershing Square.

C.    For an order requiring the Pershing Defendants to rescind their purchases of any Allergan securities they acquired unlawfully, either (i) prior to filing complete and accurate Schedule 13D disclosures, or (ii) while in possession of material nonpublic information in violation of Rule 14e-3.

D.    For an order declaring that Defendants failed to file complete and accurate disclosures in violation of Section 13(d) of the Exchange Act.

E.    For an order requiring that Defendants correct by public means their material misstatements and omissions and to file with the Commission accurate disclosures required by Section 13(d) of the Exchange Act.

F.    For such preliminary and/or permanent injunctive relief as may be necessary.

G.    For an order awarding Ms. Parschauer damages under Sections 14(e) and 20A of the Exchange Act.

H.    For an order awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' and experts' fees.

1    I.    For an order awarding Plaintiffs such other and further relief as the

2  Court may deem just and proper.

3  Dated:  January 26, 2015                          LATHAM & WATKINS LLP

4                                                    By:  /s/Peter A. Wald
                                                        Peter A. Wald
5

6                                                    LATHAM & WATKINS LLP
                                                     Peter A. Wald (Bar No. 85705)
7                                                    *peter.wald@lw.com*
                                                     505 Montgomery Street, Suite 2000
8                                                    San Francisco, CA 94111-6538

9                                                    LATHAM & WATKINS LLP
                                                     Michele D. Johnson (Bar No. 198298)
10                                                   *michele.johnson@lw.com*
                                                     650 Town Center Drive, 20th Fl.
11                                                   Costa Mesa, California 92626

12                                                   LATHAM & WATKINS LLP
                                                     Blair Connelly (Bar No. 174460)
13                                                   *blair.connelly@lw.com*
                                                     885 Third Avenue
14                                                   New York, NY 10022-4834
                                                     Telephone: +1.212.906.1658
15

16                                                   LATHAM & WATKINS LLP
                                                     Colleen C. Smith (Bar No. 231216)
17                                                   *colleen.smith@lw.com*
                                                     12670 High Bluff Drive
18                                                   San Diego, California 92130
                                                     Telephone: +1.858.523.5400
19
                                                     LATHAM & WATKINS LLP
20                                                   Matthew D. Harrison
                                                     (Bar No. 210981)
21                                                   *matt.harrison@lw.com*
                                                     505 Montgomery Street, Suite 2000
22                                                   San Francisco, CA 94111-6538

23                                                   WACHTELL LIPTON ROSEN &
24                                                   KATZ LLP
                                                     William D. Savitt (*pro hac vice*)
25                                                   Bradley R. Wilson (*pro hac vice*)
                                                     51 W. 52nd Street
26                                                   New York, NY 10019

27                                                   Attorneys for Plaintiffs
                                                     ALLERGAN, INC. and
28                                                   KARAH H. PARSCHAUER.

## __DEMAND FOR JURY TRIAL__

Plaintiff hereby demands a trial by jury on all claims so triable, as provided by Rule 38(a) of the Federal Rules of Civil Procedure and by the Local Rules of this Court.

Dated: January 26, 2015

LATHAM & WATKINS LLP

By: /s/Peter A. Wald
　　　Peter A. Wald

LATHAM & WATKINS LLP
Peter A. Wald (Bar No. 85705)
*peter.wald@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538

LATHAM & WATKINS LLP
Michele D. Johnson (Bar No. 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Fl.
Costa Mesa, California 92626

WACHTELL LIPTON ROSEN & KATZ LLP
William D. Savitt (*pro hac vice*)
Bradley R. Wilson (*pro hac vice*)
51 W. 52nd Street
New York, NY 10019

Attorneys for Plaintiffs
ALLERGAN, INC. and KARAH H. PARSCHAUER.

FIRST AMENDED COMPLAINT;
JURY TRIAL DEMAND

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
ORANGE COUNTY